**THOMAS V. SJOBLOM**
*Attorney At Law*
tvsjoblom@tvs-law.com
www.tvs-law.com

**Franklin Square Center**          **Americas Tower**
**1300 I Street, N.W.**             **1177 Avenue of the Americas**
**Suite 400E**                      **Suite 500**
**Washington D.C. 20006**           **New York, NY  10036**
**(202) 429-7125**                  **(646) 452-7060**

**July 3, 2019**

<u>Via  ECF and First Class Mail</u>

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

   Re: *SEC v. Armstrong, 99 Civ 9667  (PKC)*
     *CFTC v. Armstrong,  99 Civ 9669 (PKC)*

Dear Judge Castel:

   I write on behalf of my client, Martin Armstrong.  We object to several of the provisions in the Proposed Order ("PO").  I have included in this cover letter an acknowledgement I am sending the copy of the Stamoulis Declaration I obtained from the clerk of court for the Southern District of New York in  May 2018. Finally, I have included the letter sent by Mr. Schiavoni to Mr.Victor England in November 2018.

   <u>Receiver's Proposed Order</u>

   On behalf of Mr. Armstrong, I write to raise the following objections and  clarifications to certain provisions of the receiver's Proposed Order ("PO") (Dkt # 529).  We have also attached a modified proposed order with the language acceptable to Mr. Armstrong. [*See* Exhibit A-1 (redline version) and A-2 (clean copy of PO as modified).]

   As an initial matter, this PO should be captioned Order of <u>Preliminary Injunction</u>, the relief requested by the Receiver in his application.  There has been no final determination on the ownership of the 49 coins, because Sam Speigel's underlying work has not been reviewed and he has not yet been subjected to cross examination.  I have requested the underlying documentation for Mr. Speigel's declaration from counsel for Heritage.  Moreover, there has been no determination of the  merits for many of the other items described in the PO (*e.g.,* gold bars, or

1

bullion coins). Accordingly, the relief granted should only be the relief requested: a preliminary injunction. The same change has been made to paragraph  30 of the PO ("preliminary relief").

Our other objections are as follows:

First, when referring to the $8 or $9 million in rare coins, the receiver claims that Mr. Armstrong has "admitted to hiding them." PO, at 1. Mr. Armstrong has never made such an admission. In fact, Mr. Armstrong testified that he thought the coins not given to Mr. Kirwan were in the possession of the government since the Fall of 1999. (*See* Schweon Declaration, Dkt # 518, Exhibit 1, Deposition of Martin Armstrong, May 30, 2019, before the Receiver, p. 173: "First of all, anything that was there afterwards, I assumed you had that. You had't sold anything, nobody gave me any inventory of what you took from the office, what was -- or the FBI from the office, what I produced to you, what was taken from the inventory from the beach house, or the FBI. So I had no knowledge whatsoever of what coins you even had.") *See also* Armstrong's Opposition Memorandum to Receiver's Application, Dkt # 510, p. 1: "Armstrong had assumed all these years that the FBI (or possibly the receiver) had seized the other coins in the fall of 1999."  Therefore, this  statement should be removed from the PO.

Second,  paragraph1 of the PO purports to give this Court jurisdiction pursuant to Title 11, the Bankruptcy Code,  as if it were sitting as a bankruptcy court. *See* 28 U.S.C §§157 and 1334.  We disagree that this Court is sitting as a bankruptcy court, or that it is a court of original or even non-exclusive jurisdiction together with a bankruptcy court to decide core claims being administered by the bankruptcy court.  The statute grants district courts "original and exclusive jurisdiction" of all cases "arising under" the bankruptcy laws, as well as original but not exclusive jurisdiction of "all civil proceedings arising under" or "arising in" or "related to" cases under the bankruptcy laws. A case "arises under" Title 11 when, "essentially, the cause of action is created by title 11 or that the right to relief necessarily depends on resolution of a substantial question of bankruptcy law." *Wallach v. Am. Int'l Grp., Inc.,* No. 11 CV 3025 DRH AKT, 2011 WL 4026802, at *3 (E.D.N.Y. Sept. 12, 2011). A proceeding "relates to" Title 11 if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'" *Wallach v. Am. Int'l Grp., Inc.,* No. 11 CV 3025 DRH AKT, 2011 WL 4026802, at *3 (E.D.N.Y. Sept. 12, 2011) (quoting *In re Tower Auto., Inc.*, 356 B.R. 598, 600 (Bkrtcy.S.D.N.Y.2006). Thus, the test in the Second Circuit (like most Circuits) for determining the existence of "related to" jurisdiction under 28 U.S.C. § 1334 is whether the outcome of a proceeding "might have any 'conceivable effect' on the bankrupt estate," or if the proceeding has "a significant connection" with the bankrupt estate. *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 1529357, at *6 (Bankr. S.D.N.Y. June 5, 2006) (quoting *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir.1992)).  The instant case does not arise under or relate to Title 11. Moreover,  the Second Circuit has yet to issue its mandate. Therefore, the Receiver cannot make an end run around the lack of a Second Circuit mandate by seeking to lodge jurisdiction in this Court under Title 11, the bankruptcy code.

Third, paragraph 4 of the PO states that all parties have been afforded a reasonable opportunity to object to or be heard on the receiver's application and relief requested.  The Court will recall that Your Honor stopped me during the June 13, 2019 hearing in order to allow counsel for Antoniaks and Heritage to address the Court and to bring the proceedings to a close,

given the late hour.  [Hrg. Trans. P. 71, line 23-24.] Therefore, since the purpose of the provision was to satisfy Judge Bartle's concerns that Heritage and Antoniak be given an opportunity  to be heard from a due process  standpoint, the PO  should clarify in paragraph 4 that the Antoniaks and Heritage have been afforded sufficient notice and opportunity, but the hearing on the application for preliminary injunction as to Mr. Armstrong's is continued.

Fourth,  paragraph  15 of the PO states that Mr. Armstrong waived his right to litigate "issues" set forth in the CFTC order.  But he certainly has the right to contest what the CFTC Order purports to cover.  Thus, coins that are not covered by invoices "with particularity," as referenced in Exhibit 1, Section B, paragraph  3 of the CFTC Order, page 15,  are fair ground for litigation. Therefore, paragraph 15 should be re-worded to clarify that the "issue" being litigated on the receiver's application is ownership of the 58 coins, nothing else.  Mr. Armstrong also objects to the insertion of the Stipulation of Settlement in paragraph 15 because there is a dispute as to whether the stipulation referenced waived his rights to all his personal property, an issue that will now be taken up to the United  States Supreme Court. It certainly has no place in this order regarding coins.

Fifth, the first paragraph on page 9 of the PO states that " It Is Further Ordered That  the forty-nine coins"  are "the subject of this court's prior turn over and contempt rulings" and lists all the prior orders from September 13, 1999 through August 25, 2000. This part of the PO is over broad. It suggests that Mr. Armstrong - and possibly even some family members - have violated all these prior orders.  This concern and its implication arise from the Nigel Kirwan email dated November 7, 2012, which was produced on June 12, 2019 (the day before the hearing) and which is attached as exhibit 4 to the Declaration of Daniel Schweon (Dkt # 527). There has been no hearing to make any such findings.  It is sufficient for the PO simply to refer to Judge Owen's August 25, 2000 Order and his Findings  of Fact and Conclusions of Law as well as the CFTC Consent Order.  The paragraph has been so modified.

Sixth , I would note that the time in the PO for the hearing on July 31, 2019 is stated to be **10:00** am, whereas the  hearing transcript and the minute order of the Court entered on the docket on June 28, 2019 states **11:00** a.am. The change has been made.

Seventh, the language of the preliminary injunction in the last paragraph  on page 9 should concern disposition of the coins only.   It should not extend to the other assets.  Evidence was offered at the April 2007 contempt hearing, over which Your Honor presided, that Armstrong did not have the gold bars or the gold bullion coins were given to two of his employees (Joann Flann and Susan Greenberg).  Moreover, the PO  certainly should not include and impose a wholly new turn over order, which has not been part of these proceedings to date and not part of the receiver's application for preliminary injunction.  In fact, the issue of the initial freeze order and turn over order will be part of the petition for certiorari because it is part of the  issues covered by the Supreme Court's decision in *Luis v. United States*, 196 S.Ct. 1083 (2016). I have attached Armstrong's brief to the Second Circuit on this issue. [*See* Exhibit B] The Court also will  recall that Armstrong's objections to the closure of the receivership in August  2017 raised the  *Luis* issue. *See* Objection of Martin Armstrong to Final Report and Motion to Close Receivership, Dkt# 490, pp. 6-20.

Finally, the last full paragraph on page 10 regarding this Court's continuing jurisdiction should not contain the language that "its provisions are self-executing." Given that the receiver has sought to impose a new turn over obligation without any hearing on the topic, which could extend to family members who have not been heard, and given that the receiver has sought to expand the topic of the hearing beyond the 49 coins to all the other assets, the validity and scope of any such turn over order should be held in abeyance for a subsequent hearing after the Supreme Court decides the petition for certiorari. Moreover, PEI was dissolved in April 2009 by the Turks & Caicos Supreme Court, with all remaining assets to go to HSBC. [*See* Exhibit D, ¶ 3] "At common law and under the federal rule, in the absence of statute, dissolution of a corporation abates a pending cause of action against it." *The Greyhound*, 68 F.2d 832, 834 (2d Cir. 1934). The Receiver's September 2008 Plan of Distribution did not disturb HSBC's rights to assets located outside the United States. [*See* Exhibit E, Section 2.2(f).]

Stamoulis Declaration

As directed by the Court, I am sending under separate cover by US Mail a 3-ring binder that contains a copy of the Stamoulis declaration I received from the office of the clerk of court for the Southern District of New York in May 2018. I will also supply under same cover letter the requested declaration.

Receiver's Letter to Victor England

At the hearing on June 13, 2019, the issue arose as to whether anyone had a duty to inform the receiver that litigation had commenced in Philadelphia over the 58 coins. I informed the Court that Mr. Schiavoni had written a letter to Mr. Victor England in November 2018 inquiring about the exact same coins as those at issue in the Philadelphia case. [Hrg Trans. (June 13, 2019), p. 49, lines 15-22). Mr. Schiavoni objected, and claimed he wrote a letter to Mr. England about other coins Armstrong was selling on his website; namely, "Athenian coins. We didn't write him – we had *no idea* the Antoniak matter at that point. This is not in evidence, but it is also *just wrong*." " [Hrg.Trans. at 50, line 1-5 (emphasis added)], attached as Exhibit B to Letter from Mr. Schiavoni to Court, dated July 2, 2019.

As requested by the Court, I have attached Mr. Schiavoni's letter to Mr. England. The letter clearly refers to the 58 coins at issue in the Philadelphia case. "Someone claims to have found these coins under mysterious circumstances and consigned them to Heritage to auction them. I attach the list of coins that Heritage is holding as consignor." [*See* Exhibit C.] Mr. Schiavoni references the "Henry III Gold Penny," the "Byzantine Empire's Mezezius," and other Byzantine coins. He concludes by saying "I think Heritage may have marketed the coins on the attached list or some of them in a catalog by referring to them as a "Penn Collection." Mr. Schiavoni attached the two page list of coins Mr. Armstrong had himself recently received in the Philadelphia litigation just three weeks before.[*See* Exhibit C.]

Mr. Schiavoni's representation to the Court and his objection to this offer of proof of knowledge on his part were misguided and improper. Antoniaks, plaintiffs in the Philadelphia case, were ordered to produce documents on October 19, 2018. Heritage produced this two page

list to Armstrong's counsel on November 6, 2018. Mr. Schiaonvi's letter is dated November 16, 2018. Thus, within a few weeks, Mr. Schiavoni learned the same facts as Mr. Armstrong.

Yet. Mr. Schiavoni did nothing about it. He never sought to intervene, though he later asked the district court in Philadelphia to dismiss the case for failure to name the receiver as an indispensable party, an argument he repeated to Your Honor. ("It is our view that the declaratory action should never have been filed in Pennsylvania, that they were lacking a necessary party to that action for determination of ownership …." Hrg. Trans., p. 14, lines 3-8). In fact, despite knowing of the list of coins about the same time as Mr. Armstrong, Mr. Schiavoni did nothing until he was served with a subpoena approved by Judge Bartle to produce all documents regarding the transfer of the coins to Mr. Armstrong, which Mr. Schiavoni has declined to do.

Therefore, Mr. Schiavoni had ample opportunity make his views known to the court in Philadelphia and chose not to. The Antoniaks and Heritage also could have brought this matter to the receiver's attention, but chose not to.

* * *

Thank you for your consideration of these matters.

Sincerely,

_____

Thomas V. Sjoblom

cc:    Counsel for Heritage Numismatic Auctions, Inc. and the Antoniaks