UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 99 Civ. 9667 (PKC) |
| – against – | : | |
| | : | |
| PRINCETON ECONOMICS INTERNATIONAL LTD., PRINCETON GLOBAL MANAGEMENT LTD., and MARTIN A. ARMSTRONG, | : | |
| | : | |
| Defendants. | : | |
| COMMODITIES FUTURES TRADING COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| – against – | : | 99 Civ. 9669 (PKC) |
| | : | |
| PRINCETON ECONOMICS INTERNATIONAL LTD., PRINCETON GLOBAL MANAGEMENT LTD., and MARTIN A. ARMSTRONG, | : | |
| | : | |
| Defendants. | : | |

## [PROPOSED] ORDER

This matter came before the Court on the Application of Alan M. Cohen, as Temporary Receiver for an Order to Show Cause (Dkt. 500) (the "Application"), as to why an order should not be issued (1) directing Heritage Numismatic Auctions, Inc. ("Heritage") to turn over to the Receiver fifty-eight coins consigned to Heritage and marketed as the "Penn Collection," (2) restraining the $8 to $9 million in rare coins that Armstrong has admitted to hiding and barring their transfer or assignment or the transfer or assignment of their proceeds, if Armstrong has already sold them, and (3) authorizing the withdrawal of Alan Cohen as Temporary Receiver and the appointment of a substitute receiver in this case.

1

On May 14, 2019, the Court issued an Order to Show Cause (Dkt. 507) directing that anyone opposing the relief requested in the Application show cause, if there were any, to the Court on June 13, 2019, as to why the Court should not grant the relief requested.

Adequate notice of the Application and the hearing on the Application were given by service of the papers supporting the Application and the Order to Show Cause, providing notice of the hearing on the Application, on counsel for the SEC, CFTC, Martin Armstrong, Heritage, George and Andrew Antoniak, and Princeton Noteholder Yakult as provided in the Certificate of Service filed by the Receiver (Dkt. 505).  Such notice was adequate and reasonable under the circumstances and no other or further notice was required or needed to be sent.

A hearing on the Application was held on June 13, 2019 (the "Hearing") to consider the Application, and all interested parties were given an opportunity to be heard, present evidence, and object to the Application.  Based upon the record of the Hearing and of these cases, the Court having reviewed the Application, the responses filed by Mr. Armstrong (Dkt. 510), Andrew and George Antoniak (Dkt. 509), and Heritage (Dkt. 521), including the Declaration of Sam Spiegel (Dkt. 528), and having heard from counsel for the SEC, CFTC, Mr. Armstrong, Heritage, and the Antoniaks at the Hearing and after due deliberation thereon, and good and sufficient cause appearing therefore:

The Court hereby FINDS that:

1.    ~~This Court has jurisdiction to hear and determine the Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this District is proper under 28 U.S.C. §§ 1408 and 1409.~~ *This proceeding is ancillary to the two actions captioned above and to the enforcement of the prior Orders of This Court.*

2.    The notice of the Application, the deadline to object to the Application, and the Hearing on the Application described above constitutes due, sufficient, and timely notice to all

persons entitled thereto. No other or further notice of the Application, the Hearing on the

Application, or the request for entry of this Order is or shall be required.

     3.     No objections were filed or asserted prior to the response date, except for the

Memorandum of Law of Defendant Martin Armstrong in Response to Order to Show Cause

(Dkt. 510).

     4.     A reasonable opportunity to object or be heard with respect to the Application and

*(either orally or in writing or both)*

the relief requested therein has been afforded to all parties in interest.

     5.     By this Court's prior Orders, including Judge Kaplan's September 13, 1999 Order

(Dkt. 2), Judge Owen's November 11, 1999 Order (Dkt. 50), Judge Owen's January 7, 2000

Order (Dkt. 518-2), Judge Owen's February 4, 2000, Order (Dkt. 112), Judge Owen's August 25,

2000, Findings of Fact and Conclusions of Law (Dkt. 161), Judge Owen's August 25, 2000

Order (Dkt. 162), this Court held Mr. Armstrong in civil contempt after he refused to comply

with this Court's turn over orders by returning $12.9 million in rare coins, 699 gold bullion

coins, a statue of Julius Caesar and 102 gold bars that the Court found were purchased by and

assets of the corporations in receivership.

     6.     In holding Mr. Armstrong in civil contempt, this Court issued Findings of Fact

and Conclusions of Law. *See* Findings of Fact and Conclusions of Law on the Receiver's

Motion for and Order Holding Defendant Martin Armstrong in Contempt for Failing to Turn

Over Certain Corporate Assets, No. 99-cv-9667 (S.D.N.Y. Aug. 25, 2000) (Dkt. No. 161)

("**Findings of Fact and Conclusions of Law**").

     7.     This Court determined that a $14 million collection of rare coins, 102 gold bars,

699 gold bullion coins, and a bust of Julius Caesar were corporate assets of the Princeton

companies in receivership.  *See* Findings of Fact and Conclusions of Law, at ¶¶19–22, 25, 83–91.

8.     This Court further found that Mr. Armstrong conceded as part of his testimony at the January 14, 2000 hearing that the $14 million collection of rare coins were a corporate asset of the companies in receivership.  *Id*. at ¶ 88.

9.     In 2006, the Court of Appeals affirmed these Orders, and the findings made in connection with them, holding that:  "Mr. Armstrong failed to produce a black Compaq computer, the missing computer hard drive, 102 gold bars, 699 gold bullion coins, a bust of Julius Caesar, and the remaining rare coins valued at $12.9 million.  All told, Mr. Armstrong failed to return approximately $15 million in **corporate assets**."  *Armstrong v. Guccione*, 470 F.3d 89, 94 (2d Cir. 2006) (emphasis added).

10.     After an evidentiary hearing following remand on April 27, 2007, this Court terminated Mr. Armstrong's confinement for contempt, finding that it no longer had coercive effect, but reaffirmed that Judge Kaplan's September 13, 1999 Order, Judge Owen's November 11, 1999 Order, Judge Owen's January 7, 2000 Order, Judge Owen's February 4, 2000, Order, Judge Owen's August 25, 2000 Order, Judge Owen's August 25, 2000, the Findings of Fact and Conclusions of Law and all the findings of fact and conclusions of law made in support of the turnover and contempt rulings by the Court remained in effect.  *See* Transcript of Apr. 27, 2007 Hearing, at 95:23–111:23 and 104:23–25 (Dkt. 502-26 and Dkt. 502-27) (Mr. Sjoblom:  "If I understood you, did you say that the finding of contempt is still in effect?"  The Court:  "Oh, absolutely.")

11.     In June and July of 2008, Mr. Armstrong entered into consent orders with the CFTC and SEC that this Court then so ordered.  *See* Final Consent Judgment as to Defendant

Martin Armstrong, No. 99-cv-9667 (Jul. 22, 2008) (hereinafter "**SEC Consent Order**") (Dkt. 435); Judgment and Consent Order of Permanent Injunction and Other Equitable Relief Against Defendant Martin A. Armstrong, No. 99-cv-9669 (Jun. 24, 2008) (Dkt. 110) (hereinafter "**CFTC Consent Order**").

12.     Section III.3 of the CFTC Consent Order, dated June 12, 2008, holds that the Order was entered into "without disturbing the findings of fact and conclusions of law in the civil contempt order entered by the Court."  *See* CFTC Consent Order, at 10, § III.3.

13.     The findings of fact and conclusions of law referred to in Section III.3 of the CFTC Consent Order include the Findings of Fact and Conclusions of Law made by this Court in its Order dated August 25, 2000.  The Findings of Fact and Conclusions of Law made in support of the Court's civil contempt order include the finding that the $12.9 million in rare coins, statue of Julius Caesar, 699 gold bullion coins and 104 bars of gold bullion are the property of the receivership estate.  *See* Findings of Fact and Conclusions of Law (Dkt. 161) ¶¶ 25, 83–91.

14.     As part of the CFTC Consent Order, Mr. Armstrong also separately agreed to transfer to the Receiver as civil restitution "any and all right, title and interest that he possesses" in the property and assets listed in Exhibit 1 to the CFTC Consent Order and to "forever waive any claim against such property and assets."  *See* CFTC Consent Order, at 8, § II.4.

15.     Mr. Armstrong waived the right to litigate issues elsewhere, or at all, that were addressed by this Court as part of his entry into the CFTC Consent Order, SEC Consent Order, and the Order Approving the Stipulation of Settlement Among the Receiver, Proskauer Rose LLP, and Martin Armstrong, No. 99-cv-9667 (Sept. 24, 2008) (Dkt. 444).

16.     Mr. Armstrong admitted at his deposition in *Antoniak, et al., v. Armstrong*, Case No. 2:18-cv-01263-HB (E.D. Pa.), on March 22, 2019 that he had held the fifty-eight rare coins

that are the subject of the Receiver's motion in a cabinet in the basement of his mother's home. *See* Armstrong Deposition Tr., Mar. 22, 2019 (Dkt. 502-28) at 55:2–56:4.

17.     The fifty-eight coins are now in the possession of Heritage, which holds them in a vault in its office in Dallas, Texas.  These coins were consigned to Heritage to be auctioned on behalf of two antique dealers, Andrew and George Antoniak, and are identified on Exhibit B of the Declaration of Sam Spiegel (Dkt. 528).

18.     Sam Spiegel is a rare coin specialist with the World and Ancient Coin division of Heritage.  In his declaration (Dkt. 528), Mr. Spiegel affirms that based on his work to date he has traced at least forty-nine of the fifty-eight rare coins held by Heritage to invoices attached to the Stamoulis Declaration that reflect that they were purchased and paid for by the Princeton companies in Receivership (Dkt. 528).  These coins are identified on Exhibit B of the Declaration of Sam Spiegel.

19.     Mr. Armstrong concedes that forty-nine of the fifty-eight rare coins held by Heritage, and identified on Exhibit B of the Declaration of Sam Spiegel (Dkt. 528), are property of the Receivership and are required to be transferred to the Receiver under the CFTC Consent Order.  *See* Jun. 13, 2019 Hearing Tr., p. 41:10-12 ("I think one thing, for clarity purposes, Mr. Armstrong does not dispute -- in fact, concedes that the 49 coins were corporate property and they're subject to the CFTC judgment.")

20.     As the forty-nine coins that are identified on Exhibit B of the Declaration of Sam Spiegel (Dkt. 528) are among the rare coins that are the subject of this Court's September 13, 1999 Order, January 7, 2000 Order, August 25, 2000 Order, and the CFTC Consent Order, they are and have been the property of the Receivership estate.

21.     Heritage has consented to transfer all fifty-eight coins identified on Exhibit B of the Declaration of Sam Spiegel (Dkt. 528) from its office in Dallas, Texas to its office on 445 Park Avenue, New York, New York and to safe keep them there, pending further Order of this Court.  Neither Mr. Armstrong nor the Antoniaks object to this relief.

22.     Heritage and the Antoniaks each have filed a memorandum of law asserting that the fifty-eight coins are subject to this Court's prior turn over and contempt rulings and that Mr. Armstrong is barred by the prior Orders of this Court from claiming an ownership interest in any of the fifty-eight coins.  *See* Brief in Support of Heritage's Motion for Summary Judgment, 99-cv-9667 (Jun. 8, 2019) (Dkt. 521-1); Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, 18-cv-01263 (E.D. Pa. May 16, 2019) (Dkt. 90-3).

23.     The Antoniaks (George Antoniak, Andrew Antoniak, and I. Switt, LLC) appeared at the Hearing through their attorney.  The Antoniaks conceded during the Hearing of June 13, 2019 and in their Motion for Summary Judgment filed in the Eastern District of Pennsylvania that the fifty-eight coins that Heritage holds are the same ones that were the subject of this Court's prior orders and therefore are subject to the receivership, subject to their right to assert a claim to ownership of, or at least equitable right with respect to, the coins.  *See* Jun. 13, 2019 Hearing Tr., p. 77:22-78:21, 81:2-82:23.

24.     In entering the orders that created the Receivership and adjudicated the rights to the rare coins, statue of Julius Caesar, 699 gold bullion coins and 102 bars of gold bullion purchased by the companies in receivership, this Court exercised jurisdiction over them as property of the estate.

25.    The Court has the inherent equitable authority to enforce its prior orders and direct that the property over which it has exercised jurisdiction be turned over.  *See United States v. First National City Bank*, 379 U.S. 378, 384, 85 S. Ct. 528, 531 (1965).

26.    The entry of the Closing Order did not change this as the Court expressly retained jurisdiction over the property of the estate to enforce the Plan of Final Distribution even if the case was closed.  *See* Closing Order, No. 99-cv-9667 (Oct. 6, 2017) (Dkt. 494) at 4.

27.    As part of his Application, Mr. Cohen has also requested that he be authorized to withdraw and a substitute receiver be appointed to complete such final tasks as remain thereafter as may be necessary to close the case.  Mr. Cohen has faithfully served as the Court-appointed Temporary Receiver since September 13, 1999.

28.    Mr. Schiavoni is a partner of O'Melveny & Myers LLP who has worked on this case as counsel for the Receiver from its outset, is familiar with the facts and procedural history of the case and has agreed to abide by the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission

29.    The Court has had an opportunity over the last twelve years to observe Mr. Schiavoni in his role as counsel to Mr. Cohen as Temporary Receiver in this case and finds him to be qualified to serve as substitute receiver.

30.    The Receiver has demonstrated good, sufficient, and timely justification for the relief requested in the Application.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT** Heritage shall forthwith transfer the fifty-eight coins identified on Exhibit B of the Declaration of Sam Spiegel (Dkt. 528) that it is holding in its Dallas, Texas office to its office on

445 Park Avenue, New York, New York 10022, where it shall hold and safekeep said coins pending further Order of this Court; and

**IT IS FURTHER ORDERED THAT** the forty-nine rare coins that are highlighted in yellow on Exhibit B of the Declaration of Sam Spiegel (Dkt. 528) and attached to this Order as Exhibit 1 are hereby held to be among the rare coins that were the subject of this Court's prior turn over and contempt rulings including Judge Kaplan's September 13, 1999 Order, Judge Owen's November 11, 1999 Order, Judge Owen's January 7, 2000 Order, Judge Owen's February 4, 2000, Order, Judge Owen's August 25, 2000 Order, Judge Owen's August 25, 2000, Findings of Fact and Conclusions of Law and the CFTC Consent Order and, as such, are and have been the property of the receivership estate; and

**IT IS FURTHER ORDERED THAT** the Court shall hold a hearing commencing at 10:00 A.M. on July 31, 2019, in Room 11D of the United States District Court, Southern District of New York, Daniel Patrick Moynihan, United States Courthouse, 500 Pearl St., New York, NY 10007, to address the disposition of the nine rare coins held by Heritage that remain subject to dispute; and

**IT IS FURTHER ORDERED THAT** the findings of fact and conclusions of law as they pertain to the rare coins, statue of Julius Caesar, 699 gold bullion coins and 102 bars of gold bullion that were the subject of this Court's prior turn over and contempt orders remain viable so that **MARTIN ARMSTRONG**, his agents, servants, employees, attorneys, and persons in active concert or participation with him and all others and are therefore **ENJOINED AND ORDERED TO REFRAIN** from transferring, selling, assigning, or otherwise disposing of these assets or the proceeds of any transfer, sale, assignment, or disposition of said assets and

are required to turn over these assets or their proceeds to the Receiver pending further Order of this Court; and

**IT IS FURTHER ORDERED THAT** nothing herein shall affect the right of the Antoniaks to assert a claim to ownership of or at least equitable right with respect to the coins; and

**IT IS FURTHER ORDERED THAT** upon entry of this Order, Alan Cohen's role and responsibilities as Temporary Receiver is terminated and Tancred Schiavoni is appointed as substitute Temporary Receiver with all the rights, obligations, and protections afforded the Temporary Receiver pursuant to the prior orders of this Court, including this Court's Order dated September 13, 1999, as clarified by Order dated January 6, 2000, the Order Approving Plan of Final Distribution, and the Closing Order; and.

**IT IS FURTHER ORDERED THAT** this Court shall retain jurisdiction over these cases to enforce this Order and for all other purposes and that such jurisdiction shall be retained even if the case is closed, and the case may be reopened for such purpose. This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

**IT IS SO ORDERED,** this 15th day of July 2019.

P. KEVIN CASTEL, JUDGE
UNITED STATES DISTRICT COURT

Prepared and submitted by:


 /s/ Tancred V. Schiavoni
Tancred V. Schiavoni, Esq.
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036

*Attorneys for Receiver, Alan Cohen,*
*For Defendants Princeton Economics*
*International Ltd., Princeton Global*
*Management Ltd., and their subsidiaries*
*and affiliates appointed by Order of the*
*District Court for the Southern District*
*of New York, dated September 13, 1999*

AGREED AS TO FORM



Stephen G. Harvey (PA 58233)
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19013
Tel: (215) 438-6600
Email: steve@steveharveylaw.com

*Attorneys for George Antoniak, Andrew*
*Antoniak, and I. Switt*

Shawn M. Rodgers, Esq.
GOLDSTEIN LAW PARTNERS, LLC
11 Church Road, Suite 1A
Hatfield, PA 19440
P.O. Box 552
Paoli, PA 19301
Tel: 610.949.0444
Email: srodgers@goldsteinlp.com

*Counsel Heritage Numismatic Auctions, Inc.*

EXHIBIT B

J6dnpric

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION ,

                    Plaintiff,

          v.                              99 Civ. 9667 (PKC)

PRINCETON ECONOMICS
INTERNATIONAL LTD. *et al.*,

                    Defendants.           Order to Show Cause
------------------------------x
                                          New York, N.Y.
                                          June 13, 2019
                                          3:35 p.m.
Before:
                    HON. P. KEVIN CASTEL,

                                          District Judge

                         APPEARANCES

SECURITIES AND EXCHANGE COMMISSION
BY: DOMINICK V. FREDA
    PATRICIA SCHRAGE

COMMODITIES FUTURES TRADING COMMISSION
BY:  STEVEN RINGER

O'MELVENY & MYERS LLP
     Attorneys for Receiver
BY:  TANCRED VINCENT SCHIAVONI, III

PROSKAUER ROSE LLP
     Attorneys for Defendant Armstrong
BY:  THOMAS V. SJOBLOM

SHAWN M. RODGERS
JONATHAN GOLDSTEIN
     Attorneys for Heritage Numismatic Auctions

STEVEN G. HARVEY
     Attorney for Interested Parties Antoniak and Switt

ALSO PRESENT:  ALAN COHEN, Temporary Receiver

J6dnpric

1              (Case called)

2              THE DEPUTY CLERK:  At the first table, please state

3      your appearances.

4              MR. SCHIAVONI:  Your Honor, Tancred Schiavoni, counsel

5      for the temporary receiver.

6              THE COURT:  Good to see you.

7              MR. COHEN:  Alan Cohen, the temporary receiver, your

8      Honor.

9              THE COURT:  Good to see you, Mr. Cohen.

10             You give new meaning to the word "temporary."

11             MR. COHEN:  I do, your Honor.

12             MR. RINGER:  Good afternoon, Judge.  Steven Ringer,

13     for the CFTC.

14             THE COURT:  Good afternoon.

15             MR. FREDA:  Dominick Freda, for the SEC.

16             THE COURT:  Good afternoon, sir.

17             MS. SCHRAGE:  Patricia Schrage, for the SEC.

18             THE COURT:  Good afternoon, ma'am.

19             At the back table.

20             PARALEGAL:  Good afternoon, your Honor.  I am a

21     paralegal for the counsel for the temporary receiver.

22             THE COURT:  Thank you.

23             MR. GOLDSTEIN:  Good afternoon, your Honor.  Jonathan

24     Goldstein, on behalf of Heritage Numismatic Auctions.

25             THE COURT:  Good afternoon Mr. Gold seen.

J6dnpric

1           MR. RODGERS:  Good afternoon, your Honor.  Shawn

2    Rodgers, also on behalf of Heritage Numismatic Auctions.

3           THE COURT:  Thank you.

4           MR. HARVEY:  Good afternoon, your Honor.  My name is

5    Steve Harvey.  I am an attorney for the interested parties

6    George and Andrew Antoniak and I. Switt, who are the plaintiffs

7    in the Philadelphia action that you have read about.

8           THE COURT:  Thank you, Mr. Harvey.

9           MR. SJOBLOM:  Good afternoon, your Honor.  Tom Sjoblom

10   for defendant Armstrong.  I apologize to the Court for my

11   delay.

12          I specifically left Washington last night to get to

13   Philly to avoid all those inevitable delays and still couldn't

14   beat the time.  My apologies to the Court and my fellow

15   counsel.

16          THE COURT:  I appreciate that and I know that you

17   telephoned to let us know, and I appreciate that.  We are all

18   subject to the human condition.

19          There are three items on the agenda as I see it.

20          First is the receiver's application with regard to the

21   turnover of the coin collection currently consigned to

22   Heritage;

23          Secondly, whether the Court should issue a preliminary

24   injunction restraining any other outstanding rare coins that

25   Armstrong may have, said to be perhaps eight to nine million in

J6dnpric

1    coins; and,

2          Three, whether the Court should authorize Mr. Cohen's

3    withdrawal as temporary receiver and appoint Mr.Schiavoni as

4    substitute receiver.

5          So let me hear from Mr. Schiavoni, and I'll let you

6    present it the way you wish.  I have endeavored to do my

7    homework, but it doesn't mean I couldn't learn more.

8          Go ahead.

9          MR. SCHIAVONI:  Your Honor, if it please the Court, I

10   would like to start with the coin motions --

11         THE COURT:  Yes.

12         MR. SCHIAVONI:  -- and deal last with the application

13   to change the receivership.

14         THE COURT:  We'll do that last.

15         That is fine.

16         MR. SCHIAVONI:  Your Honor, I don't want to belabor

17   the papers.  I would just like to give you sort of an overview

18   of what we think are the key issues.

19         There was an e-mail that came in that was produced

20   last night from Mr. Armstrong that he received from Mr. Kirwan

21   that we would like to just spend a moment on, and also note

22   because although we filed it last night, we didn't really have

23   an opportunity to brief it, and I think it is of some

24   importance.

25         Your Honor, we, as you probably recall -- or may not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    given the passage of years -- but we entered into a

2    comprehensive settlement here that was intended to bring about

3    the complete resolution of issues with the estate overall and

4    with Mr. Armstrong.

5            It was a layered belt-and-suspenders settlement in

6    part because we knew who we were dealing with with

7    Mr. Armstrong.  The CFTC put in place a consent order with

8    Mr. Armstrong, a separate judgment was entered with respect to

9    the corporate defendants, the receiver entered into a

10   settlement with Mr. Armstrong which was approved by the Court,

11   and separately there was a bar order which sort of buttressed

12   and belt and suspendered the whole package all together.

13           At the time we put in place all those settlements, it

14   had come after our appearance before you ending the confinement

15   for civil contempt, a hearing that was held in April of 2000.

16   At the conclusion of that hearing, your Honor concluded that

17   the civil confinement should end because it was no longer

18   coercive.  There was an application made by Mr. Armstrong's

19   counsel to --

20           THE COURT:  This was after the April 27, 2007,

21   hearing.

22           MR. SCHIAVONI:  Yes, your Honor.

23           At the very end of that hearing, Mr. Armstrong's

24   counsel asked you to in essence vacate the findings of fact and

25   vacate the contempt finding, and your Honor on the

J6dnpric

transcript --

            THE COURT:  I recall.  Not that I per se I recall it,
but my recollection has been refreshed.  Mr. Armstrong's
attorney asked, If I understood you, did you say that the
findings of contempt are still in effect?

            And the Court responded, Oh, absolutely.

            MR. SCHIAVONI:  Yes.

            I bring us back to that because the contempt ended
with the findings of fact and conclusions of law in place.
They were very detailed.  They had been reviewed by the Second
Circuit and affirmed on --

            THE COURT:  These are the ones going back to 2000
following -- I guess this is the August 25, 2000 findings of
fact?

            MR. SCHIAVONI:  Yes, your Honor.

            THE COURT:  Yes.

            MR. SCHIAVONI:  The detailed order entered, it's I
think as many as 80 paragraphs, memorializing many findings by
Judge Owen on an extensive factual record, including the
testimony of Mr. Armstrong.

            Those findings of fact were left in place when we did
this multifaceted settlement with -- overlapping settlement.
Those settlements all were designed to leave in place
specifically the contempt findings.  The way that settlement
ended was the settlements basically left it that the

J6dnpric

1    receivership had possession or didn't have possession, but it

2    had those findings, which were that the property that was the

3    subject of the contempt was receivership property, that that

4    was being given to the receivership in connection with the

5    settlements as even an overlay in the CFTC consent order that

6    there was an express waiver with respect to that property.

7              THE COURT:  Let's see.

8              This is the CFTC order filed June 24, 2008, paragraph

9    4.  This looks to me like the relevant provision on page 8:

10   "Defendant Armstrong shall fully satisfy his restitution

11   obligation in this matter by transferring to the

12   court-appointed receiver any and all right, title, and interest

13   that he possesses, if any, in the property and assets listed in

14   Exhibit 1 to this order, and he shall hereafter forever waive

15   any claim against such property and assets listed in Exhibit 1

16   to this order.  The property and assets listed in Exhibit 1

17   shall be applied and distributed pursuant to an order of the

18   Court in satisfaction of defendant Armstrong's restitution

19   obligation."

20             MR. SCHIAVONI:  That is what I am referring to, your

21   Honor, precisely.

22             There is also some related provisions.  There's one in

23   there right before it where it expressly states that the

24   findings of fact from the contempt remain in place.  There is

25   another provision right after the restitution, I think it's

1   paragraph 4 that follows.  It's a cooperation provision.  It

2   states that Mr. Armstrong shall basically cooperate -- he shall

3   cooperate with us in the sale of those items, sign any papers,

4   any deeds, what's necessary to ensure that the property that is

5   the property of the estate may be sold, and he'll otherwise

6   cooperate in the sale of it.

7          There's other provisions in there that preclude him

8   from challenging the allegations of the complaint, and not

9   taking discovery, etc.

10         All of that was intended to deliver finality and to

11  memorialize that the findings that had previously been made

12  that these -- the coins, the bullion, and the statue of Julius

13  Caesar were all property of the estate and that we could then

14  execute and sell those items to the extent we were able to

15  locate them.

16         At that time we had located about a million one of the

17  coins that was turned over in advance of the contempt.  But the

18  Court had found as part of its findings of fact on the contempt

19  that there were a total of $14 million of coins that were in

20  Mr. Armstrong's possession, that he turned over approximately a

21  million one.  The findings of fact expressly hold that -- I

22  think it's paragraph 23 -- that there's $12.9 million of coins

23  that were unaccounted for at that point, were missing but were

24  property of the estate.

25         The specific findings in the findings of fact that the

1    coins were part of a corporate reference collection, as

2    Mr. Armstrong had put it, that this was just an entire

3    corporate collection of coins, and they were purchased with

4    corporate monies, corporate assets, under the judgment that was

5    entered with respect to the corporate defendants and also the

6    CFTC consent order, the freeze order, a freeze order was left

7    in place with respect to those assets that were corporate

8    property.  So it's our contention that applied to these assets.

9           THE COURT:  Tell me what you mean by freeze order in

10   this context.

11          MR. SCHIAVONI:  Well, there was originally a turnover

12   order and freeze order for all property of the estate.  As part

13   of entering into --

14          THE COURT:  Are you talking about Judge Owen's bench

15   order of January 7, 2000, or are you talking about something

16   different than that?  There was an original bench order in

17   which he ordered Mr. Armstrong to turn over --

18          MR. SCHIAVONI:  Yes, your Honor.  That order applied

19   specifically --

20          THE COURT:  The coins and antiquities, yes.

21          MR. SCHIAVONI:  That was an order that was really

22   enforcing really a prior order requiring -- at the outset of

23   the appointment of the receiver, an order was entered freezing

24   all corporate property of the estate, and then Judge Owen in

25   his December order -- we specifically identified property that

1    we said was subject to that freeze order and asked for it to be

2    turned over, and Judge Owen entered that order in December.

3            So the reference in the CFTC consent order to leaving

4    in place a freeze with respect to corporate property was to in

5    a sense really both those orders, and we believe at that point,

6    given that there was already a finding that this was corporate

7    property, that that order applied.

8            The CFTC order released the freeze with respect to,

9    quote, personal property, but the restitution provision was

10   sort of a belt-and-suspenders buttress to that because the

11   restitution provision provided that Mr. Armstrong was

12   personally waiving any claim, right, title, and interest in

13   transferring it to any of these assets to the receivership.

14   The intent was to end all dispute about these items and have

15   them be part of the receivership.

16           So that's where we believe we ended this receivership

17   in the settlement.  We are now faced with a situation that has

18   arisen since we closed the case.  On the very day, your Honor,

19   that we presented to you our reply brief in support of closing

20   the case in 2017 -- this was in I think September of 2017 -- on

21   that exact day these 58 coins, a consignment agreement was

22   signed to consign these coins to Heritage for sale.

23           THE COURT:  You learned that subsequently?

24           MR. SCHIAVONI:  We've learned that subsequently.

25           THE COURT:  When did you learn that?

J6dnpric

1        MR. SCHIAVONI:  Your Honor, we learned --

2        THE COURT:  Approximately.

3        MR. SCHIAVONI:  I think like late November, early

4   December.  If you give me --

5        THE COURT:  Of what year?

6        MR. SCHIAVONI:  Of last year, of 2018.

7        THE COURT:  OK.

8        MR. SCHIAVONI:  Your Honor, if you give me two weeks

9   of leeway, a little bit there -- at some point in the

10   proceeding the exact date might be important, but I think in

11   general terms that's when it was.

12        Your Honor, I literally was working Saturday night at

13   11 o'clock on an appellate brief for an appeal that I thought

14   made no sense, and I was trying to fathom why we were getting

15   this challenge, why we couldn't resolve this.  And I Googled at

16   11:30 at night one of -- Mr. Sjoblom had an associate working

17   on this.  I couldn't even understand why anyone would work on

18   this.

19        I Googled her name, and it took me to a link, it took

20   me to another link, and it took me to this case in

21   Pennsylvania.  It took us a little time to learn, you know,

22   figure out what this case was about, and then it took a little

23   bit more time for us to determine that we really -- I mean, I

24   have to say, your Honor, I almost had to pinch myself when I

25   saw that this was what it was, and I wanted to be certain that

J6dnpric

we were dealing with the same coins.  So I took a little while
for us to put it together, but we did at some point, not long
after.

And we moved, you know, in what we thought a duly
conservative time.  After consulting with the commissions and
the other parties in interest in the case, we moved.

Where we now think we are with this is that Heritage,
the auction house to whom these had been consigned, they have a
branch that specializes in rare coins.  They have had their
people look at the coins.  They believe they're the same coins.
We would quibble about whether there is a match on 100 percent
of the coins, but there is undoubtedly a match on the vast
majority of the coins, and I will come back to the specifics on
that.  But there is a very significant match on the coins.

Both Heritage and the Antoniaks, the claimants who
have them, have both moved for summary judgment in this action
in Pennsylvania claiming that the coins are in fact the same
coins that were the subject of the contempt here, and they both
have actually moved for collateral estoppel before Judge Bartle
before he had stayed his case pending developments before your
Honor.

THE COURT:  Just help me out here.

The parties to the Eastern District of Pennsylvania
action are who?

MR. SCHIAVONI:  They are the two Antoniak brothers

J6dnpric

and/or -- I don't know if it's father and son or brothers, but
they own a jewelry shop or an antique shop with a storefront in
downtown Philadelphia.

They contend they obtained the coins from a homeless
day worker who claims to have obtained them from a house, he
can't remember exactly where the house is, who owned it, who
hired him to go there, but he brought the coins into their
shop.  Allegedly they bought them for $6,000, and they then
were the ones, whatever their relationship was with other
parties, they were the ones who then consigned them.

After they consigned them, Mr. Armstrong made a claim
against Heritage.  Then the Antoniaks filed against Armstrong.
Armstrong filed suit back.  So they were both seeking competing
declarations as to which owned them.

We have our own concerns about the two parties in that
action, how the coins ended up where they are, and at some
point perhaps if your Honor wants to know about that we can
address that, but that is the nature of that action.  Armstrong
also brought a claim against Heritage, the auction house, I
think for conversion or -- or to make sure -- to get the coins
returned from them.

The auction house doesn't have an ownership claim to
the coins.  The Antoniaks contend that they're good-faith
buyers.  Armstrong contends he's the owner.  That's the nature
of that action.

1      So, your Honor, just for a moment we did appear

2  before -- Judge Bartle asked us.  We served courtesy copies of

3  the papers on Judge Bartle.  It is our view that the

4  declaratory action should never have been filed in

5  Pennsylvania, that they were lacking a necessary party to that

6  action for determination of ownership, that both Mr. Armstrong

7  and the Antoniaks knew about the receivership, and they both

8  should have brought us into the action, or they should have

9  filed it here for a determination of rights.

10      So essentially the position we took in our papers was

11  they can go forward with that action if they so chose, but they

12  couldn't really reach a determination of who owned it except as

13  between them.

14      So Judge Bartle read the papers.  He held an

15  off-the-record telephonic conference asking in essence for

16  thoughts about how to proceed.  We appeared before him.  We

17  submitted the full transcript of that proceeding, your Honor,

18  and the result of it was he stayed the proceedings pending

19  developments here.

20      I defer to the transcript obviously for what Judge

21  Bartle has to say, but I think the main import of what he was

22  getting at was he wanted to make sure that the Antoniaks had an

23  opportunity to be heard and that perhaps if they had that

24  opportunity here he might not need to do much further on the

25  case.  He asked us to give a status report after we appeared

 1   before your Honor, and that's what we would otherwise plan to

 2   do here.

 3            That's where we are.  That's what that action was

 4   about.

 5            Mr. Armstrong, when we deposed him he basically -- we

 6   walked through many of the -- there were depositions where he

 7   was deposed before the Antoniaks, and that was before he really

 8   knew I think that we had learned about the case or before we

 9   did learn about the case.

10            Then we took a deposition, the one your Honor

11   authorized us to take.  When we deposed him, and with the

12   Antoniaks, he really didn't fight the notion that these coins

13   are corporate property.  We've cited in our brief many

14   citations where we walked through -- the various lawyers are

15   walking through multiple invoices, and he concedes that they

16   were purchased by the corporations with corporate money.

17            I don't really think there is fundamentally an issue

18   there.  There is a declaration that was filed last night by

19   Heritage, by a second coin expert.  And he contends that there

20   is a match for 49 of the 58 coins to the documents we have

21   right now.  That the sort of one-coin difference between him

22   and his fellow at Heritage, there was one he backed off of.

23   His colleague had said in his declaration that there was a

24   match of 52 of the 58.  Well, he's a coin expert, not a math

25   expert, because he sort of counted them wrong, but his chart is

J6dnpric

1    correct.  He really matched 50 of 58, not 49.  So there's a

2    one-coin difference between them.

3              THE COURT:  Between?

4              MR. SCHIAVONI:  Between the two Heritage experts so to

5    speak.

6              THE COURT:  Right.  In house or?

7              MR. SCHIAVONI:  Their in-house people that run their

8    coin division.

9              THE COURT:  The difference between that which -- let's

10   use the number 49 for the moment.

11             MR. SCHIAVONI:  Yes.

12             THE COURT:  49 of the 58 coins in the hands of

13   Heritage have been linked to, for example, Exhibit 1 of the

14   CFTC order, or what are they linked to?  What are they matched

15   with?  That's a question.

16             MR. SCHIAVONI:  Yes, your Honor.

17             At the original contempt hearing, and before it at the

18   December hearing that your Honor referred to the order from,

19   one of the lawyers from my firm, Stam Stamoulis submitted an

20   affidavit, a declaration, the Stamoulis declaration, and this

21   declaration had in it a large collection of invoices and

22   summaries of wire transfers.

23             Because what we had done, your Honor, was the receiver

24   had engaged Price Waterhouse to do a sources and uses of funds

25   analysis.  There was $600 million missing at the beginning of

J6dnpric

1   this case, and we were trying to determine what happened to it,

2   where it went.

3        Every one of the wires were run down.  As that

4   narrowed down and we determined where the money went, there was

5   a starting to get a narrower group, somewhere in the 20, 30

6   million dollar range of wires that we couldn't tie to note

7   holders or to these sort of note transactions, and it turned

8   out we started to realize that some of them were going, they

9   were going to accounts of these companies that sell coins.

10       So, in support of the contempt, there was a submission

11  by Price Waterhouse of their analysis of the wire transfers and

12  transfers of money to coin dealers, antiquity dealers, and

13  bullion dealers.

14       Then we went and we tried to match every one of those

15  wires to specific invoices.  So subpoenas were issued to all

16  the -- almost all the coin dealers in the United States, and

17  there was a matchup made.  That's what the Stamoulis

18  declaration did.  It has $14 million of wires in it and

19  invoices that match to many, many of those.

20       THE COURT:  So I understand the match of 49 coins by

21  both of the Heritage in-house people, maybe the other one has

22  50, but at least both have 49, is between that which they have

23  in their possession and the coins identified in the Stamoulis

24  declaration.

25       MR. SCHIAVONI:  Yes, your Honor.  That is exactly

J6dnpric

1   right.

2           THE COURT:  That is what they matched?

3           MR. SCHIAVONI:  That's what they matched.  They

4   matched it to the invoices.

5           THE COURT:  The CFTC order incorporates the Stamoulis

6   declaration?

7           MR. SCHIAVONI:  Yes.  I actually think it's broader.

8   What it says in it, in saying specifically the property that is

9   subject to restitution, it refers to this exhibit, Exhibit 1.

10          THE COURT:  Right.

11          MR. SCHIAVONI:  And Exhibit 1 listed the property that

12  we at that time believed was property of the receivership.  I

13  think it's in Section B, it lists -- in Section 1, it lists

14  actual bank accounts, accounts we were holding.  In Section B,

15  it listed antiquities, gold bullion, coins.  Then, you know,

16  there was an issue about how to describe them so to speak.

17          THE COURT:  Describe them in what now?

18          MR. SCHIAVONI:  In the exhibit.

19          THE COURT:  In the exhibit to the CFTC?

20          MR. SCHIAVONI:  Yes.

21          So there's the exhibit to the CFTC order -- first of

22  all, the order itself says that all right, title, and interest

23  is being transferred with respect to all those assets that are

24  on Exhibit 1.  OK.

25          Then on Exhibit 1 it lists bank accounts and then

1    there's a section called, I think, tangible property.  I think

2    that's B.  Under B there is a listing of the property that was

3    the subject of the contempt.

4            And it's numbered and titled, and there's a section

5    that says coins.  We list what we presently had in dollar terms

6    there.  There was always an issue about how to describe it.

7    Then there is a reference below it, saying go look at the

8    Stamoulis affidavit.  Like, if you want the actual names of

9    coins, you can look in the invoices there and/or the transfers,

10   and you get what coins were the subject of the contempt.  So

11   that's exactly then what the Heritage coin folks tried to do.

12   They looked at that declaration.

13           THE COURT:  So what are you seeking to have the Court

14   do as to which coins?

15           MR. SCHIAVONI:  So, your Honor, first of all, just we

16   would ask -- the relief we are seeking is really for all 58 of

17   the coins.  And we would say that the fact that they're

18   identified -- there's one coin that's very significant I want

19   to add, that I want to discuss for a moment that is in addition

20   to the 49 that we don't have an invoice for.  There's one coin

21   that we don't have an invoice for, but we do have the wire

22   transfer for in the Stamoulis affidavit.  That's the so-called

23   English golden penny.

24           Among coin collectors this is one of the rarest of all

25   the coins in the world.  It has a very colorful history to it.

J6dnpric

The wire transfer for that is there, we believe.  We've
exhibited it, and we have testimony that supports that this was
part of the corporate collection.

        We also think it's supported by the fact that in the
inventories that were part of the Kirwan affidavits, it's not
only listed, there's actually pictures of it in there, and that
was part of the findings of fact that these coins, all these
coins that went to Mr. Kirwan, of which this one is
specifically identified, that this coin would be -- is
corporate property, part of the corporate estate.  So we
believe the coins, all 58, should come to us either because
they fall specifically under that restitution provision and or
because --

        THE COURT:  Of the CFTC order?

        MR. SCHIAVONI:  Yes.

        And/or because they're corporate property, for which
the freeze order was never dissolved and remained in place and
that they were corporate property through the original findings
of the contempt proceedings.  So we could ask --

        THE COURT:  Well, I was trying to do it my own way,
but I don't know whether that's the best way.  I wanted to
first find out what you wanted me to do with the 49 coins that
Heritage does not dispute are referenced in the Stamoulis
declaration.

        Heritage doesn't dispute it.  I need to hear from

1  Mr. Armstrong and from the Antoniak parties, but what are you

2  asking that I do with those coins?

3          MR. SCHIAVONI:  We are asking that those coins be

4  turned over.

5          THE COURT:  Turned over to whom?

6          MR. SCHIAVONI:  To the receivership.

7          THE COURT:  How?  I mean what?  Have them drop them

8  off at your office --

9          MR. SCHIAVONI:  Yes.

10          THE COURT:  -- or are you going to pick them up?  I

11  want to know.

12          MR. SCHIAVONI:  The coins are physically as we speak

13  in a vault in Dallas that Heritage maintains custody of.

14  Heritage has an office here in New York City on Park Avenue.

15          They regularly transfer valuable assets like this

16  between the offices.  Heritage has told us that they would

17  voluntarily transfer the assets from their office to that

18  office, and they would maintain them there until we sell them

19  or to when we have alternative instruction to dispose of them.

20  We have a vault at Citibank.  We could keep them there in the

21  first instance.

22          THE COURT:  I am putting it on your shoulders in the

23  first instance when I ask what are you asking me to do.  It

24  sounds like you don't ask me to transfer it from the physical

25  custody of Heritage.  You are not asking me to do that.

 1          MR. SCHIAVONI:  We are not asking you to do that at

 2   this moment.

 3          THE COURT:  That's what I am trying to get at.

 4          MR. SCHIAVONI:  Yes.  Sorry, your Honor.

 5          THE COURT:  What are you asking me to do.

 6          MR. SCHIAVONI:  We ask that they be physically

 7   transferred to New York, to their New York safe within the

 8   jurisdiction of this Court so that we can make subsequent

 9   application to have them removed there if we need to, to sell

10   them.

11          THE COURT:  All right.

12          And I guess what I am trying to get at as to the --

13   help me again with the rarest of all.  It's the two penny?

14          MR. SCHIAVONI:  The English golden penny.

15          THE COURT:  The English golden penny, forgive me for

16   not being familiar with it.  The English golden penny.  You

17   maintain that it is identified in the Stamoulis declaration.

18   It is the subject of the turnover order, the contempt order,

19   and the CFTC order.  Is that what you maintain?

20          MR. SCHIAVONI:  Yes, your Honor.

21          But I want to be clear so you understand what I am

22   saying.  We don't have an invoice that specifically identifies

23   it.  But what we do have in the Stamoulis affidavit behind tab

24   1 is a list of the wire transfers to the specific auction

25   houses for specific auctions.  We have the wire transfer for

J6dnpric

1    the -- this coin was sold in July of 1997.  We have a wire

2    transfer from 30 days later.

3              THE COURT:  I'm trying to piece this together as a

4    matter of evidence.  What does the exhibit to the Stamoulis

5    declaration show as an evidentiary matter?  It shows that there

6    was a wire transfer of money to somebody, right?

7              MR. SCHIAVONI:  Yes.  Well, specifically to the

8    auction house that sold the coin.

9              THE COURT:  All right.  Then how do you prove that

10   it's the auction house that sold the coin, and who they sold

11   the coin to?

12             MR. SCHIAVONI:  OK, your Honor.  First of all, the

13   wire is within -- it's within 30 days of the auction.

14             THE COURT:  How do I know that?

15             MR. SCHIAVONI:  The terms of payment were within 30

16   days.

17             THE COURT:  Excuse me.  Back off.

18             MR. SCHIAVONI:  Yes.

19             THE COURT:  I hate to be very literal about this, but

20   that's what we do for a living in this building I suppose.

21             MR. SCHIAVONI:  Yes.

22             THE COURT:  So is there anything in the Stamoulis

23   declaration other than the wire transfer to the auction house

24   of money?

25             In other words, the information about the English

golden penny being auctioned by this auction house, does that
come from the Stamoulis declaration, or are you relying on
something else to prove that?

MR. SCHIAVONI:  We have the wire transfer, and we're
relying on something else to prove it.

THE COURT:  What's the something else?

MR. SCHIAVONI:  The something else is in the two
Kirwan affidavits there were inventories attached of the
corporate collection that were allegedly being transferred to
Mr. Kirwan.  And the findings of fact say that those coins were
part of the corporate collection.  In those inventories the
English golden penny is prominently displayed.  It's listed --

THE COURT:  It is in a Kirwan inventory, correct?

MR. SCHIAVONI:  Yes, your Honor.

THE COURT:  That was before Judge Owen, before his
August 25, 2000 findings of fact and conclusions of law were
issued?  Is that what you are telling me?

MR. SCHIAVONI:  That's right, your Honor.

Judge Owen in his findings of fact said he considered
those declarations.  He didn't end up giving them weight for
other reasons, but he gave them weight that this was the
corporate collection.  So the coin is in there.  There is a
photograph of it.  The coin experts have matched the photograph
to the present coin.  So it's not just that it's listed.

THE COURT:  And the golden penny is -- forgive my

J6dnpric

1    simplistic description -- but the 59th coin?  Is that accurate?

2    It's not in the 58?

3              MR. SCHIAVONI:  No, it's within the 58.  It would be

4    the 50th coin match so to speak.

5              THE COURT:  I see.

6              MR. SCHIAVONI:  We have 49 matches.  It would be the

7    50th match.

8              THE COURT:  Is it the 50th that the two Heritage

9    experts disputed?

10             MR. SCHIAVONI:  No, there was another coin that they

11   disputed of --

12             THE COURT:  All right.  Is it within the 49 they

13   didn't dispute?

14             MR. SCHIAVONI:  No, because they were doing matches of

15   the -- they agreed that it was in the Kirwan thing.  But what

16   they were matching was what your Honor asked.  They were

17   matching invoices.

18             THE COURT:  OK.

19             MR. SCHIAVONI:  We have been candid that we don't have

20   an invoice for it.  We have a wire.

21             THE COURT:  All right.

22             But it's in the Kirwan declaration as a coin purchased

23   by PEIL and identified there, right?

24             MR. SCHIAVONI:  Yes, your Honor.

25             THE COURT:  There's no dispute that it is in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J6dnpric

1  possession of Heritage?

2        MR. SCHIAVONI:  No dispute, your Honor.

3        THE COURT:  All right.

4        How do you get anywhere with the other coins that are

5  not included in the 49 or 50?  Now we will put the gold penny

6  aside.

7        MR. SCHIAVONI:  Your Honor, we believe that there has

8  been -- the testimony from Mr. Armstrong has been he hasn't

9  been able to identify any specific coin as one that he

10 personally purchased.  We have his tax returns from the time.

11 We don't think he had the ability to purchase coins personally.

12 There is not any --

13        THE COURT:  That may mean they are not his.

14        MR. SCHIAVONI:  Yes.

15        THE COURT:  Personally.

16        MR. SCHIAVONI:  Yes.

17        THE COURT:  I am more concerned at the moment in how

18 do you show or demonstrate or prove that they are within the

19 scope of judicial turnover orders?  That is what I am

20 interested in.

21        How do you get up to the full 58?  As to those that

22 have not been matched up with Stamoulis, the gold penny is

23 matched up with Kirwan.  What are the others matched up with?

24 How does an Article III judge turn around and say, well,

25 they're within Judge Owen's order, they're within my order of

J6dnpric

2007?  How do I know that about these other coins in the
possession of Heritage?

        MR. SCHIAVONI:  This is what we do know, your Honor.
We know from Mr. Armstrong's testimony they were all in the
same boxes, in the same box that he hid in his basement, and
from his testimony were all part of the corporate collection.
But we don't have invoices on the --

        THE COURT:  OK.  He said that at his deposition
pursuant to my recent order, or where did he say that they were
all part of the corporate collection?

        MR. SCHIAVONI:  He said that he put the coins from the
collection in -- oh.  He referred -- we cite in a footnote of
our brief where he talks about how he secreted the coins that
are now held by Heritage in the basement.

        Your Honor, to be clear, it is not a hundred percent
crystal clear.  I want to be very candid with you on that.  But
in the footnotes he talks about how he puts the coins from the
corporate collection in the basement, and now he believes
that's -- so it is the whole basis of the context that they're
his in the first place, that they're in Heritage's hands.

        I would add just one other thing about those coins,
your Honor.  When we look at what they couldn't match, there
is -- almost half of the ones that we have not been able to
match come from the same auction house, Spinks.

        Spinks was a foreign auction house.  It was in

J6dnpric

1    England.  It's the same one that sold the English golden penny.

2    We know that when the English golden penny was bought other

3    coins were purchased with it.  It might be that we can

4    ultimately obtain the invoice from Spinks in England, but in

5    the time we have not been able to get it.  To be clear that

6    invoice is not in the Stamoulis declaration.

7              THE COURT:  All right.

8              I realize that I may be switching topics for a moment,

9    but what about your request for an injunction as to other

10   coins, referred to as 8 or 9 million dollars worth of coins.

11             MR. SCHIAVONI:  Yes.  Let me just speak about that for

12   a second.  Let me just take one step back so you understand

13   what happened here.

14             What Mr. Armstrong was telling your Honor in April of

15   2007 was that he had none of the coins before 1999 because they

16   were all transferred to Mr. Kirwan.

17             If you run the clock forward, the coins end up in the

18   hands of Heritage.  He's left with trying to explain and defend

19   himself from the others, the new parties in this case, why is

20   it, how could any of these coins be his.

21             He said he gave them to Mr. Kirwan.  He effectively

22   offered a new story.  He disclosed that he had in fact given,

23   he said, some coins to Mr. Kirwan, but had transferred coins to

24   himself as salary.

25             When asked what he transferred, on page 102 of his

J6dnpric

deposition on March 22, 2019, he testified that:

"Q.  Now, what was the value of the coins that were transferred to you in 1999?  What was the total value of those that was provided to you as compensation?"

        This is because he was saying he got them somehow. They were being given to him by his own company as compensation.

        There is an objection by Mr. Sjoblom:  "Are you talking about separate and apart from the Kirwan or en masse?"

        Mr. Harvey, on behalf the Antoniaks: "I'm just referring to the ones that were transferred to him.

"Q.  What the value of that, that was given to you in lieu of salary?

"A.  I believe it would have been somewhere in the area of around 7 to 8 million, something like that."

        As part of the contempt proceedings the findings of fact were that this Kirwan affidavit was not reliable and that those coins that he had said he gave to Kirwan were in fact in his possession.

        THE COURT:  Right.

        MR. SCHIAVONI:  We now we have pretty powerful evidence that the coins were not transferred to Mr. Kirwan at all.  We have his own admission -- he will now quibble about whether it's 7 million or something less, but it's quite clear he didn't give Mr. Kirwan all the coins.

1          In fact I think it's apparent -- there is another

2     admission in his deposition where he blurts out that the Kirwan

3     declaration can't be right because -- this is page 198 of that

4     same deposition -- because in effect the math can't be right.

5     He couldn't have given him $10 million.  It must be less.

6     Because this only makes sense if he in fact did what he said he

7     did, which is transfer the coins to himself and keep them.  So

8     we could ask --

9          THE COURT:  This is absolutely besides the point, but

10    he said that he kept the coins where?  In his mother's house or

11    in a basement?  Tell me again where the coins purportedly were

12    kept.

13         MR. SCHIAVONI:  The story changes a little bit through

14    the three depositions.  But he testified that he put these

15    coins in the mother's basement.

16         THE COURT:  OK.

17         MR. SCHIAVONI:  That they were there in '98.

18         The story really varies between when we became

19    involved and when we weren't about how long he knew that they

20    were there.

21         In the Antoniak action in the first two depositions,

22    he seemed to be saying or he was saying that the coins were put

23    in the basement, and then he basically thought that they were

24    there until he got out of prison.

25         When we deposed him, the story sort of changed and he

J6dnpric

1   said he put them in this cabinet in his mother's basement and

2   they were there.  He then went to Europe for six months, and

3   when he came back the contempt proceeding was going on.  He

4   went in the cabinet, he got all the coins, and he gave them to

5   us and he effectively was saying, well, gosh, I thought I gave

6   them to you.

7            THE COURT:  You, the receiver.

8            MR. SCHIAVONI:  Yes.

9            So I didn't deceive Judge Owen or Judge Castel because

10  I thought I gave them all to you.  OK.  That's sort of what the

11  testimony was, that I put them in the basement, they were in

12  this cabinet, I turned over the contents of that cabinet to the

13  receiver.

14           Now, your Honor, it takes a real leap of faith to

15  understand, like, the truth of that because what he is

16  essentially saying is that we don't have these coins.  That

17  somebody over a six-month period snuck into the basement while

18  his mother was living there and took not all the coins in the

19  cabinet, but just took specific ones and left the others there,

20  and that then when he went down in connection with the

21  turnover, he turned over what was there and didn't realize that

22  a whole bunch of coins were missing.

23           THE COURT:  But he did in fact turn over some coins to

24  the receiver?

25           MR. SCHIAVONI:  He did, your Honor.  He turned over

J6dnpric

1   approximately a million one in coins.

2              THE COURT:  Right.

3              MR. SCHIAVONI:  A large number of what we thought were

4   lesser value coins.

5              THE COURT:  Right.

6              MR. SCHIAVONI:  He did testify that he specifically

7   held back this golden penny coin.  And, again, his story has

8   changed, but he said it was put in that cabinet, and that's

9   where it was.

10             In connection with just explaining to you why we

11  think -- in essence the way the contempt ended was that the

12  12.9 in missing coins and the statue of Caesar was in his

13  possession and the bullion also was in his possession.  That is

14  how it was left.

15             We are asking to basically just reinstitute the

16  injunction with respect to those items because we now think

17  there's very significant -- he's admitted that he didn't get --

18             THE COURT:  Let's pause for a second.

19             MR. SCHIAVONI:  Sorry.

20             THE COURT:  I wouldn't think of it as reinstituting

21  anything at all.  I would be loath to do that because that

22  would imply that there was a minute of time where the original

23  injunction I think by Judge Kaplan and then Judge Owen and my

24  own orders, I would be loath to imply that those orders, I

25  don't understand to be implying that those orders have in any

J6dnpric

1   way, shape or form ceased to have their efficacies.

2              MR. SCHIAVONI:  Forgive me.  Poor choice of words.  My

3   client has already chastised me, that, yes, that is not what I

4   was trying to imply.

5              Those orders, as I suggested before, the freeze order

6   remained in place throughout, and that is exactly what the CFTC

7   contempt order said.  We would just like to leave here with

8   certainty that those other coins and the statue and the bullion

9   is subject to this injunction.

10             Your Honor, there is an e-mail from Mr. Kirwan that we

11  got last night that I would like to hand up just to make sure

12  you have.

13             THE COURT:  All right.

14             MR. SCHIAVONI:  May I approach?

15             Your Honor, on I think Friday Mr. Sjoblom filed a

16  letter I think indicating that he thought that certain evidence

17  might not -- the Court should not rely on it.  I'll let him

18  speak for himself about the import of his letter.

19             But after getting that letter we served a subpoena on

20  Mr. Armstrong and Mr. Sjoblom for copies of correspondence with

21  Mr. Kirwan.  There were indications at Mr. Armstrong's

22  deposition that Mr. Kirwan had either threatened or blackmailed

23  Mr. Armstrong after he got out of jail.  Given the overall

24  developments, we had reason to believe that this was, you know,

25  directly in connection with him basically threatening to reveal

J6dnpric

that his affidavit was not candid.

THE COURT:  That Kirwan's affidavit was not candid?

MR. SCHIAVONI:  Yes.

THE COURT:  That Kirwan revealed that Kirwan had perjured himself is what your contention is, or what you believe it is?

MR. SCHIAVONI:  Yes, your Honor.

THE COURT:  OK.

MR. SCHIAVONI:  And, your Honor, this e-mail that was produced last night dated November 7, 2012, we did file it with an affidavit last night.

It is an e-mail from Mr. Kirwan to Mr. Armstrong, to Mr. Armstrong's son and Mr. Sjoblom that again is dated November 7, 2012, not long after Mr. Armstrong got out of prison.

One of the things it does is it contains, he has block quoted in it those provisions of his own affidavit -- this is on I think the fourth page of it -- of his affidavit in 2007 that he presented -- that was presented to your Honor that effectively, those four paragraphs effectively state that the coins, the bust, etc., are not in Armstrong's possession.

This was the key part of the declaration from Mr. Armstrong's perspective for the contempt hearing.  So he block quotes those, and then he has in the paragraph above it the statement that, regarding the excerpt below -- and that's

J6dnpric

from his affidavit -- taken from my supplementary statement

that your counsel, meaning Mr. Armstrong's counsel, attempted

to submit to the U.S. federal court in April 2007 and that your

counsel told me was read by Castel J., Judge Castel, colon,

obviously, whether or not you now have possession or can now

exercise control are not issues I can attest to.

This is important because he was -- Mr. Kirwan, he's

citing here the paragraphs where he was saying, Hey, look, I

submit an affidavit saying you didn't have possession.  I can't

attest to that now obviously.

He then goes on in this paragraph immediately after

it, and he says, Martin, I imagine your lawyers, family,

friends, colleagues, and business associates may feel

uncomfortable knowing any of this.  Yet, if the implications of

any of it escape you, I'm sure there are those competent to

attempt to explain it to you -- to you its significance,

particularly if information were ever to be provided to counsel

for the U.S. receiver of Princeton Economics or the media.

Now, the declaration then or the -- it goes on to talk

about things that Mr. Kirwan wants from Mr. Armstrong towards

the end, but there's other things in this e-mail, your Honor,

that -- you know, there's discussion in here of Mr. Kirwan

sending Mr. Armstrong and his son a cell phone in 1999, having

it sent by courier from Australia to the United States so that

they could use the cell phone to communicate with him.

J6dnpric

1      THE COURT:  How did this e-mail come into your

2  possession?

3      MR. SCHIAVONI:  As a result of the subpoena that we

4  served on Mr. Armstrong for documents on Tuesday.  That's how

5  we got it.

6      THE COURT:  When you say on Tuesday, this past?

7      MR. SCHIAVONI:  This week, your Honor, yes.

8      THE COURT:  You served the subpoena this week?

9      MR. SCHIAVONI:  Yes.

10      Again, the timing of this was Mr. Sjoblom,

11  Mr. Armstrong's lawyer, filed with your Honor a letter on

12  Monday stating that, in light of the testimony at

13  Mr. Armstrong's deposition -- and this was testimony where he

14  acknowledged that the bill of sale assigned to Mr. Kirwan's

15  affidavit was not accurate and that the confirmatory letter

16  about the transaction was not accurate and that the exhibits to

17  Mr. Kirwan's affidavit were not accurate -- Mr. Sjoblom says in

18  the letter that he doesn't feel that evidence that was offered

19  to you could be relied on.

20      THE COURT:  Kirwan declarations from way back when?

21      MR. SCHIAVONI:  Yes.

22      THE COURT:  So that's bad news for you and good news

23  for Mr. Armstrong, right?

24      MR. SCHIAVONI:  No, your Honor.  I don't think so.

25      THE COURT:  In other words, Mr. Armstrong is saying

J6dnpric

1    that wonderful document that you want to rely on to establish

2    the ownership of the golden penny cannot be relied on?

3              MR. SCHIAVONI:  No, your Honor.  I don't think so.  I

4    think what it goes to is that who has it, who has possession

5    can't be relied upon.  But the exhibit itself was offered as a

6    list of these are the corporate assets of the company.  And

7    Mr. Armstrong was offering it to try to excuse his possession

8    of it by saying that they were in possession of Mr. Kirwan.

9    But the Court found that those assets in its findings of fact

10   were property of the estate, and that although the transfer --

11             THE COURT:  Let's cut to the chase.

12             MR. SCHIAVONI:  The Court didn't give credit to the

13   transfer, but it gave credit to the testimony that those were

14   corporate assets.

15             THE COURT:  Let's cut to the chase.

16             Do you agree with Mr. Sjoblom's statement in his, I

17   guess this is the June 7 letter.

18             MR. SCHIAVONI:  We agree that the affidavit, the

19   declaration doesn't accurately represent what was transferred

20   to Mr. Kirwan or in fact that anything was transferred to

21   Mr. Kirwan.  We take his admissions that the coins listed on

22   the inventory were in fact property of the estate.

23             THE COURT:  So, there are portions of the Kirwan

24   declaration you want to rely on, and there are portions of the

25   Kirwan declaration you agree should be disregarded?

J6dnpric

1          I mean, we already have the findings of Judge Owen

2     about the Kirwan declaration.  That's why I am a little bit

3     puzzled as to the position of the receiver about this.

4          MR. SCHIAVONI:  Yes.

5          We are relying, your Honor, on those portions of the

6     findings of fact that find that the corporate reference

7     collection was property of the estate and that, the separate

8     testimony that the coins listed on these inventories were, at a

9     minimum were part of that collection.  That is something we

10    always argued.  What we always contested was the substance of

11    the affidavit that there was a transfer to Mr. Kirwan of these

12    coins.

13         THE COURT:  Well, what Mr. Sjoblom seems to say is,

14    given these recent revelations and as an officer of the Court,

15    I want to advise Court that it cannot rely on the spreadsheets

16    or inventories attached to Mr. Kirwan's two declarations or

17    presumably the statements made in those declarations regarding

18    those inventories, cannot rely that they are accurate.

19         Do you agree with that, or you don't agree with it?

20         MR. SCHIAVONI:  There is an affirmation in the

21    declaration that the coins on the inventory were transferred to

22    Mr. Kirwan.  We do not think that is a true statement.  We do

23    think the coins themselves are --

24         THE COURT:  But what Mr. Armstrong's counsel is

25    telling the Court not to rely on is the spreadsheets or

J6dnpric

1    inventories attached to the two declarations or presumably the

2    statements made in the declarations regarding those

3    inventories.

4              Do you agree that I should not rely on them?

5              MR. SCHIAVONI:  No, your Honor.  It's like you can

6    rely on the inventories as property of the estate --

7              THE COURT:  That's the only thing he's disclaiming in

8    this letter.

9              MR. SCHIAVONI:  No, I don't think so.

10             There is an important sentence in the affidavit where

11   it says these coins were transferred to me, the ones that were

12   on the attached inventory.

13             THE COURT:  No.  I am not talking about that.  I am

14   talking about the letter of June 7.  Mr. Sjoblom is specific as

15   to what he's telling me I shouldn't rely on, and it is not the

16   part of the declaration that you are telling me I shouldn't

17   rely on.  It's the inventories and spreadsheets which you rely

18   on to show who owned the golden penny.

19             I'm at a loss.

20             MR. SCHIAVONI:  In the affidavit or the declaration,

21   there is a specific affirmation that the exhibit is what was

22   transferred.

23             THE COURT:  I got that.

24             MR. SCHIAVONI:  Yes.

25             THE COURT:  You don't agree with that.  I got that.

J6dnpric

1   But you are citing the letter of June 7 and Mr. Sjoblom's

2   renouncement.  That is all I am talking about.  You raised it,

3   and I'm now addressing it.

4            MR. SCHIAVONI:  Your Honor, the reason I raised that

5   letter was to explain to you temporally why we served the

6   subpoena when we did.

7            We read the letter in part as calling into question

8   the truthfulness of the declarations, and we then felt it was

9   appropriate to serve a subpoena to get the communications about

10  that affidavit, which we have obtained.

11           We don't think those communications suggest that the

12  coins on those lists are not corporate property.  What we think

13  those communications indicate is that those coins weren't

14  transferred to Mr. Kirwan, and that's what Judge Owen found.

15           That is all I have, your Honor, unless you have

16  further questions.

17           THE COURT:  Thank you.

18           MR. SCHIAVONI:  Thank you.

19           THE COURT:  Let me hear from the CFTC.  Anything you

20  want to add?

21           MR. RINGER:  Nothing, but I think it should be made

22  clear to the Court that we do support the receiver's motion

23  pending before the Court regarding the coins as well as the

24  missing property and the transfer of the receivership.

25           THE COURT:  Thank you.

J6dnpric

1              The SEC?

2              MR. FREDA:  I don't think we have anything to add.  We

3     also support the receiver's actions and the motions before the

4     Court.

5              THE COURT:  All right.

6              Let me hear from Mr. Armstrong's counsel first.

7              MR. SJOBLOM:  Thank you, your Honor.

8              I am not sure exactly where to start, so I will start

9     at the beginning.

10             I think one thing, for clarity purposes, Mr. Armstrong

11    does not dispute -- in fact, concedes that the 49 coins were

12    corporate property and they're subject to the CFTC judgment.  I

13    point specifically to the paragraph Mr.Schiavoni read from

14    paragraph 4:  Defendant Armstrong shall fully satisfy his

15    restitution obligation in this matter by transferring to the

16    receiver any and all right, title, and interest that he

17    possesses, if any, in the property and assets listed in Exhibit

18    1.

19             If you flip to Exhibit 1 and read what Mr.Schiavoni is

20    referring to, it's on page 15 of the CFTC judgment, Section B,

21    paragraph 3.

22             THE COURT:  One second.  Let me see whether I can

23    catch up with you.

24             So this is page 15.

25             MR. SJOBLOM:  Yes.

J6dnpric

1          THE COURT:  Yes, under 3.  Yes.

2          MR. SJOBLOM:  3.

3          So we go from satisfying fully his restitution

4     obligation to the property and assets of Exhibit 1.

5          If we turn to Exhibit 1, page 15, capital letter B,

6     paragraph 3:  These items are identified with particularity in

7     invoices attached to the declaration -- I wouldn't even attempt

8     that -- but Samoulis, dated December 15, 1999, docket No. 68.

9          So we have no dispute with the receiver that, whether

10    it's 48, 49, whatever, those are receivership property.  What

11    we're talking about are these other nine or ten that are open

12    for discussion.

13         Let me back up, if I may, chronologically.  I want to

14    distinguish between the coins that were purchased prior to

15    September '98 and those coins purchased after September '98.

16         With respect to the coins up to September '98,

17    Mr. Armstrong's position is he gave those to Mr. Kirwan,

18    subject to maybe two or three that he held back.

19         He held back the Henry III because that has historical

20    significance.  He testified to that fact.  He held back the

21    Syracuse decadrachm, and he had or held back this Alexander the

22    Great Macedonia, which he had acquired some -- in his 20s or

23    30s.

24         Page 23 -- which I am going to come back to and talk

25    about the need for tracing in this case.  All the coins

J6dnpric

1  subsequent to September 1998 -- let me just interpose here, as

2  you can see from our papers, the company was talking about

3  doing an initial public offering.  There were investment banks

4  and accountants that said these coins have to come off the

5  financial statements of PEI.  You can't audit, you can't value

6  it.  Remove it from the balance sheet.

7          So the coins up to September '98 were given to Kirwan,

8  and they start working on the IPO.  The discussions occur and

9  everything subsequent to September '98, Mr. Armstrong's

10  testimony both in the Philadelphia case and to Mr.Schiavoni was

11  they were transferred to him as bonus for retirement or in lieu

12  of salary and those --

13          THE COURT:  Transferred to who?

14          MR. SJOBLOM:  Mr. Armstrong.  Sorry.

15          In his declaration, he has e-mails that reference text

16  messages to Mr. Kirwan that you take these and I am going to

17  take the balance as a bonus for retirement.  That is attached

18  to Mr. Armstrong's declaration that we filed in opposition.

19          So what we are coming down to is what happens with

20  this stuff pre-September '98 and what happens post-September

21  1998.

22          Let me go back to the turnover Mr. Schiavoni

23  addressed.  According to Mr. Armstrong's deposition testimony

24  in the Philadelphia case and to Mr.Schiavoni, once the coins

25  were transferred, the post-September 1998 coins were

 1    transferred to him in connection with the IPO, and turned them

 2    over, his testimony is he thought those post-September 1998

 3    coins were in the possession of either the FBI or the receiver.

 4    They went in there, took the coins.  He then went in and

 5    produced more, which is a million one,.

 6         So for 17 years, he assumed they were in the

 7    possession of the government.  Again, there was never any

 8    inventory provided by the FBI or the receiver of what exactly

 9    was taken from his mother's basement.

10         Let me just step sideways for a moment, if I way.

11    This thing about the mother's basement, Mr. Armstrong has lived

12    there virtually all his life.  He's been a coin collector since

13    his teenage years.

14         True he has amassed a lot of coins over the years.  He

15    always kept them at his mother's house, sometimes upstairs.

16    Most of the time they were in the basement behind this wall,

17    sliding wall.  They were not in a bank, not in a vault.  He did

18    not believe in that.  His testimony is I just had them there.

19    As the coin collection grew I just left them there.

20         It is not until 17 years later that when Mr. Armstrong

21    is informed by a coin dealer in London that somebody is selling

22    some coins.  Again, he thought these were in the possession of

23    the government for all this period of time.  He gets a phone

24    call from Eric McFadden or Victor England in London saying we

25    have just seen a flyer by Heritage that they are going to sell

J6dnpric

1     some of these coins.

2             At first Mr. Armstrong says, I don't think that Henry

3     III coin is mine because, based on the Xerox copy, it looked

4     like the wrong dye lot.  But then when they mentioned something

5     about Scottish coins, he said those were part of my collection.

6     I thought those had gone to Kirwan.  So how do they show up in

7     Philadelphia?

8             Conversations ensue in December 2018 -- excuse me,

9     December 2017 to January 2018 with Heritage.  Where did you get

10    this stuff?  How did you get it?  When did you get it?  Who's

11    the consignor?  Heritage's position was we are not telling you

12    anything.  We are not going to tell you who we got it, where we

13    got it, who the consignor, none of that information.  OK.

14            Those conversations went on until about March.  March

15    of 2018, Mr. Armstrong is sued by the Antoniaks in Philadelphia

16    for declaratory relief saying these are our coins.

17            They sued anonymously -- John Doe, Richard Roe, ABC

18    company -- without disclosing who they were.  Interestingly, in

19    the complaint it says the coins were found in an abandoned

20    warehouse.

21            I pursued for several months with the Antoniaks' then

22    counsel, it was not Mr. Harvey.  It was a man by name of

23    Mr. Yanoff.  Who are your clients?  What coins were you talking

24    about?  Where did they come from?  How did you get these?

25            We were stonewalled.

J6dnpric

1        We had a meeting in chambers with Judge Bartle in July

2   2018.  At that status conference I asked Mr. Yanoff:  What

3   coins.  Where?  How many?  When?

4        He said, I'm not going to tell you anything until you

5   tell us first why you think you might want some of those.

6        At that status meeting, at that chambers meeting with

7   Judge Bartle, I raised the topic that the receiver might have

8   an interest in these coins.

9        The reason I say that is there have been some papers

10  here about somebody not notifying this Court or notifying the

11  receiver about these coins and that the receiver might have an

12  interest.  I specifically raised with Judge Bartle in July of

13  2018, even though we don't know what we are talking about,

14  who's got them, how much which coins, none of that information.

15       THE COURT:  What was the judge supposed do with that

16  information?  The judge was supposed to call the severer?

17       MR. SJOBLOM:  No.

18       What I asked the judge to do is tell Heritage and the

19  plaintiffs that these can't be moved or sold or auctioned or

20  anything until we find out what we are talking about.

21       At that point in time we still don't know what we were

22  talking about.  Judge Bartle orally told Heritage those coins

23  are not going to be sold until we find out what it is we are

24  talking about.

25       We went through motion practice, motion to compel:

J6dnpric

1   Who's your client?  What coins are you talking about?

2              If the Court's interested, I can pass up the redacted

3   receipts, the redacted assignment agreements if your Honor is

4   interested about how we were stonewalled about how these people

5   were what we are talking about.

6              Would you like those exhibits?  They're helpful.

7              THE COURT:  The way this works is if anyone wants to

8   make any kind of an evidentiary presentation, they are free to

9   do so.

10             MR. SJOBLOM:  OK.

11             THE COURT:  I am not an inquiring magistrate.  I am

12  not conducting an investigation.  I have applications for

13  relief before me, and I'm hearing the parties and allowing them

14  to present any evidence they wish to.

15             MR. SJOBLOM:  May I approach.

16             THE COURT:  You may?

17             MR. SJOBLOM:  I ask the clerk to mark for

18  identification Exhibit No. 1, which is a redacted receipt of a

19  purchase of some coins for $6,000.  I would ask the clerk to

20  mark for identification Exhibit No. 2, which is a redacted

21  consignment agreement that --

22             THE COURT:  You premarked them?

23             MR. SJOBLOM:  Yes.

24             THE COURT:  So we don't need to mark them.

25             MR. SJOBLOM:  I haven't marked them on the record, but

J6dnpric

1    I have the numbers on them.

2              THE COURT:  The clerk is not going to do anything.

3    You premarked it as Defendant's Exhibit 1?

4              MR. SJOBLOM:  Yes, and Exhibit 2 for identification --

5    I stand corrected.  Old habits.  Marked for identification No.

6    2 an auction assignment agreement redacted as to dates, part,

7    who the consignor is.

8              I would hand it up.

9              THE COURT:  You have shown these to the other parties

10   to this case?

11             MR. SJOBLOM:  I am right now.  They have seen all

12   these before.

13             THE COURT:  All right.

14             These two documents, what are they intended to signify

15   to me?

16             MR. SJOBLOM:  That in light of some of the receiver's

17   contentions that we had a responsibility to come forward and

18   explain about coins and purchasers, the documents that we got

19   reveal nothing.  And we pressed in the Philadelphia case.

20             THE COURT:  So Defendant's Exhibit 1 and 2 are the

21   documents you received from Heritage?

22             MR. SJOBLOM:  Exhibit 1 I got from the Antoniaks I

23   believe.

24             THE COURT:  I see.

25             MR. SJOBLOM:  Exhibit 2, I don't recall if it came

J6dnpric

1   from Antoniaks or it came from Heritage.

2          THE COURT:  All right.  Does anybody have an objection

3   to these exhibits being part of the record in this hearing?

4          MR. SCHIAVONI:  No, your Honor.

5          MR. RINGER:  No, your Honor.

6          MR. HARVEY:  No your Honor.

7          THE COURT:  They are received.

8          (Defendant's Exhibits 1 and 2 received in evidence)

9          THE COURT:  Go ahead.

10         MR. SJOBLOM:  In August, again, to Mr. Schiavoni's

11  contention that somehow we were supposed to provide him with

12  information and failed to do that, in August or September I

13  spoke to Mr. Yanoff, and again told him that the receiver may

14  have an interest in this matter.

15         I would note also that Mr. Schiavoni sent a letter to

16  CNG, I think to Victor England, who had testified in August

17  2000 about he learned something about these coins.  So at that

18  point in time we virtually both knew about the same thing,

19  although there had been an earlier deposition of, I think it

20  was George Antoniak about some of this information and how it

21  came to pass.  And he was instructed by his counsel not to

22  respond to some of our questions.

23         MR. SCHIAVONI:  Your Honor, these are not in evidence,

24  Mr. Sjoblom is testifying on matters that he has offered no

25  evidence on.  In fact, it is not the case, I mean we wrote --

J6dnpric

1    we wrote Mr. England about coins that Mr. Armstrong was selling

2    on his website Athenian coins.  You have seen these coins.

3    That is what we wrote him about.  We didn't write him -- we had

4    no idea the Antoniak matter at that point.  This is not in

5    evidence, but it is also just wrong.

6             MR. SJOBLOM:  I will supply the letter.

7             THE COURT:  All right.  Thank you.

8             MR. SJOBLOM:  Through motions to compel trying to find

9    out what was going on we finally heard about this man called

10   Mr. Morales, a Raymond Morales, who testified in the

11   Philadelphia case that as a day laborer he was picked up at

12   Lowe's or home depot in Philadelphia, driven to Pennsauken or

13   Cherry Hill, New Jersey -- he couldn't recall which -- to clear

14   out a house.

15            We are not talking about an abandoned warehouse.  Now

16   we are talking about a house.  And Mr. Morales testified that

17   he was told to go in the basement of that house and clean it

18   out.  In the process he found a waterlogged box.  When he took

19   it out in the back, he opened up that box, and inside that

20   larger box was a small box of coins.

21            Mr. Morales then took them to Philadelphia, and it

22   becomes what is Exhibit 1 is the receipt for $6,000.

23            Mr. Armstrong testified in the Philadelphia case and

24   to Mr.Schiavoni it was a frequent occurrence that his mother's

25   basement flooded.  It was not unusual for her to call somebody

J6dnpric

1      to come in and do some work clean it out, whatever, and it

2      doesn't take a lot of leap of logic to say that any worker can

3      slide open that door, grab a box of coins, throw it in the

4      waterlogged box, and walk out and nobody would be the wiser.

5              THE COURT:  But that would be a theft from someone.

6              MR. SJOBLOM:  Correct.

7              THE COURT:  OK.

8              MR. SJOBLOM:  OK.  Again, because we had,

9      Mr. Armstrong had thought for 17 years these were in the

10     possession of the receiver or the FBI.  Now we are learning

11     that that this Mr. Morales had found them in this other house

12     in Pennsauken or Cherry Hill, not his mother's house, which is

13     in a different town in New Jersey.

14             Through this process, we requested subpoenas from

15     Judge Bartle, and both the receiver and the U.S. Attorney's

16     Office, can you give us an inventory of what was seized, what

17     was taken by the FBI and the receiver in the fall of '99.

18             Mr.Schiavoni objected on a number of grounds.  Judge

19     Bartle overruled those objections and authorized the subpoena.

20     The same with the Department of Justice; he overruled their

21     objection and authorized a subpoena.

22             I think I attached it to my declaration that I

23     provided to the Court that he authorized those subpoenas.  The

24     Department of Justice has not responded.  They are not going to

25     honor the subpoena they say.  There's something going on in

J6dnpric

here about people hiding coins.  We are not going to provide
anything on it.

        I would add that request for that inventory was by the
very special FBI agent who handled this in the fall of '99.
He's the one that suggested to us we should seek out the
subpoena to get the inventory from the Department of Justice.

        So, as we end up, after a year of discovery, we still
don't know what was taken by the government, how -- I will just
say what.  What is the inventory of what was -- if somebody is
saying you have hidden something or secreted something, what is
it that you had, what is the government had before accusing me
of not turning something over.

        I would just quickly add in the deposition of Mr.
Schiavoni Mr. Armstrong testified both as to the pre-September
'98 coins to Mr. Kirwan and the post-September '98 coins:

        Have you hidden anything?

        No.

        Have you secreted anything?

        No.

        Do you have it in a bank account anyplace in the
world?

        No.

        Do you have any vaults anyplace in the world?

        No.

        Have you instructed anybody in your family or anybody

J6dnpric

1     else to secrete these?

2              The answer was no.

3              From my perspective, a person who already spent 12

4     years in jail, why would he risk committing perjury and

5     possibly going back to jail to testify that way?

6              So Mr. Schiavoni and I both have, you know, a

7     different respectful difference of opinion about how --

8              THE COURT:  Let me back up for a second.

9              What do you say Mr.Schiavoni's response was to the

10    request for any inventory in the possession of the receiver?

11             MR. SJOBLOM:  His response to was to me was he doesn't

12    have anything.

13             THE COURT:  That's what I wanted to find out.  OK.

14             MR. SJOBLOM:  We asked for what came up in the

15    deposition in Philadelphia.  Mr. Armstrong couldn't recall

16    whether he might have bought something with personal funds, his

17    private checks or fees that he had earned on a hedge fund and

18    the receiver had taken all the records.

19             So we asked the receiver, Do you have the personal

20    checking accounts?  Do you have any document at all regarding

21    the transfer?  Do you have anything about corporate loans?

22             And the answer was, he responded he had nothing.  So

23    we got nothing from the receiver.  We got nothing from the

24    Department of Justice.

25             THE COURT:  All right.

J6dnpric

1          MR. SJOBLOM:  Let me go to the 58 coins, since that is

2     the topic here basically.

3          Again, whether it's 49, whatever it is, we will

4     concede that.  That's corporate property.  What we are talking

5     about is, according to the CFTC judgment, Exhibit 1, those

6     things specifically particularly identified in the invoices to

7     Stamoulis.

8          There's been this whole exercise by everyone to which

9     Stamoulis declaration, which coins match the invoice in

10    Stamoulis.  I came up to the clerk's office went and took the

11    Stamoulis deposition -- excuse me, declaration, asked the clerk

12    to make a copy, which they did, and I had it picked up and

13    brought to my office.

14         Heritage has done the same thing.

15         Mr.Schiavoni has another.

16         We have three versions of Stamoulis.  So we are not

17    sure which one is the correct one.

18         With respect to the one that Mr.Schiavoni has, if you

19    see it, it has draft declaration in it, unfinished, unsigned,

20    and pages out of order by Victor England.

21         It also has --

22         THE COURT:  And pages out of order?

23         MR. SJOBLOM:  The Victor England that is attached to

24    the Stamoulis.

25         THE COURT:  Keep your voice up.  When you look down,

J6dnpric

1   we are not catching it.

2                  MR. SJOBLOM:  Sure.

3                  THE COURT:  Go ahead.

4                  MR. SJOBLOM:  It has handwriting on some of the pages

5   that do not appear on the copy we got from the Southern

6   District.  There's missing pages of an affidavit of Michael

7   Barnett, whereas the one we have from the clerk is complete.

8   So something is wrong here about who's got --

9                  THE COURT:  So you have a copy of Stamoulis.  Have you

10  submitted that?

11                 MR. SJOBLOM:  I don't recall.  There's been so much

12  paper submitted.

13                 THE COURT:  I don't think we have that.

14                 MR. SJOBLOM:  OK.  I will submit that.

15                 THE COURT:  What I would ask you to do with your

16  submission is put in an affidavit as to its provenance, if you

17  will.

18                 MR. SJOBLOM:  OK.  Sure.

19                 THE COURT:  What are the material differences between

20  your Stamoulis -- there are three Stamoulises as I understand

21  it.

22                 MR. SJOBLOM:  Right.

23                 THE COURT:  The receiver Stamoulis, Mr. Armstrong's

24  Stamoulis, and the clerk's office version.

25                 For the record, this is all pre-ECF, which appears to

J6dnpric

1   have half of Stamoulis missing, just not there.  It indicates

2   that it was part of it, but the pages appear not to be in the

3   file.

4          MR. SJOBLOM:  Right.

5          THE COURT:  So I would appreciate that affidavit.

6          MR. SJOBLOM:  Sure.

7          THE COURT:  Yes.

8          MR. SJOBLOM:  What we are trying to do is, again, with

9   respect to --

10         THE COURT:  Have you ever shown it to the receiver's

11  counsel?

12         MR. SJOBLOM:  I don't know.  We've produced it to the

13  plaintiffs and to Heritage in the Philadelphia litigation.

14  They have it.

15         THE COURT:  So let me inquire of Mr. Schiavoni.

16         Have you ever seen the Armstrong version of Stamoulis?

17         MR. SCHIAVONI:  Your Honor, I don't think I have.

18         THE COURT:  OK.

19         MR. SCHIAVONI:  I would like at some point to proffer

20  the copy we have, which is stamped by the Southern District on

21  it.  I can explain to you I think this is a red herring.  I can

22  explain to you what's happened here.

23         THE COURT:  You have a file stamped copy of it?

24         MR. SCHIAVONI:  Yes, I do, your Honor.

25         THE COURT:  All right.  Because I was just hearing the

J6dnpric

1    copy you have is a draft, unsigned or some such thing.

2              MR. SCHIAVONI:  That is just not true.

3              MR. SJOBLOM:  Not his signature, an unsigned draft of

4    the Victor England declaration inside the Stamoulis.

5              THE COURT:  In your copy of Stamoulis it is signed.

6              MR. SJOBLOM:  Unsigned.  The Victor England piece of

7    it is an unsigned draft.

8              THE COURT:  All right.

9              I am just trying to figure out what is Stamoulis.

10             Yours, Mr. Sjoblom, is unsigned England; and Mr.

11   Schiavoni's is unsigned England, which in a strange and

12   peculiar way is good news to me because it suggests that you

13   both are working off the same copy.

14             MR. SCHIAVONI:  No, your Honor.  There's no England.

15   It is right here.  I can hand it up.  There's no drafts.  This

16   is the final -- this is a signed copy by Mr. Stamoulis.

17             THE COURT:  No, no.  Who is England?

18             MR. SJOBLOM:  Victor England owned CNG, the Classical

19   Numismatic.

20             THE COURT:  You contend that in your version of

21   Stamoulis his declaration is unsigned.  Is that right?

22             Do I have that right?

23             MR. SJOBLOM:  Correct.  Unfinished, unsigned, and out

24   of order.

25             THE COURT:  And in your copy of Stamoulis, it's

J6dnpric

 1    signed?

 2              MR. SCHIAVONI:  It's signed by Mr. Stamoulis.

 3    Mr. England is not in it because it is a Stamoulis declaration.

 4              THE COURT:  I am hearing that an exhibit to the

 5    Stamoulis declaration is the England declaration, and that the

 6    version that Mr. Sjoblom has has an unsigned England

 7    declaration.

 8              That's right, Mr. Sjoblom?

 9              MR. SJOBLOM:  Right.

10              THE COURT:  I am asking you, this is just trying to

11    figure out whether we are talking about apples and apples.

12              MR. SCHIAVONI:  He didn't put into evidence whatever

13    he is talking about or submit it to the court.

14              THE COURT:  I am asking you, do you have an England

15    declaration?

16              MR. SCHIAVONI:  No.

17              THE COURT:  There's no England declaration?

18              MR. SCHIAVONI:  No.

19              THE COURT:  We know yours is different because his has

20    an England declaration as an exhibit to Stamoulis and yours

21    doesn't.

22              Is that what you are representing?

23              MR. SCHIAVONI:  Yes.  It does not have an England

24    declaration in it.

25              THE COURT:  Do you have it with you?

J6dnpric

1          MR. SJOBLOM:  No, I do not.

2          THE COURT:  All right.

3          MR. SJOBLOM:  So, again, this is what was provided by

4    the clerk's office to us.

5          When I went to the clerk's office and I went through

6    the files, they asked me to postmark it -- I mean, to post it

7    and asked for Xeroxing.  So they sent this to me.  This is how

8    we obtained it from the clerk's office.

9          THE COURT:  All right.

10         MR. SJOBLOM:  The point is, what's right on the money

11   is which Stamoulis are we talking about?  If we are trying to

12   compare these nine --

13         THE COURT:  It would be real helpful if yours was in

14   this courtroom today, but that is a different story.

15         MR. SJOBLOM:  I am going to give you some exhibits to

16   try to pare this down simpler.  OK.

17         THE COURT:  Well, I have asked for what I have asked

18   for, but you are welcome to give me the exhibits you want to

19   show me.  But there are three Stamoulises now.

20         MR. SCHIAVONI:  Your Honor, there is only one

21   Stamoulis declaration.

22         THE COURT:  I figured that out.

23         But there are three contenders to the throne.

24         MR. SCHIAVONI:  Your Honor, may I have just five

25   minutes to tell you what I think happened here or would you --

J6dnpric

1          THE COURT:  Well, I am puzzled by this England

2   declaration, so maybe if you want to address that.

3          MR. SCHIAVONI:  There is an England declaration.  It

4   was submitted at the same time.  It is a separate declaration.

5   19 years later I cannot attest for -- after multiple people

6   have apparently gone to the courts and made copies of these

7   very thick documents -- whether somebody broke the binding and

8   mixed the pages up in them.  I can't rule out that that's

9   possible.  But there was a separate, signed, England

10  declaration.  It's mentioned in the Second Circuit decision,

11  etc., it's part of the appellate record.

12          The Stamoulis declaration when it was -- as submitted,

13  your Honor, is a very, like, the way this thing is set up, the

14  declaration explains what the exhibits are and in front of each

15  tabbed exhibit is -- these tabbed exhibits show the invoices

16  that were obtained from each of the auction houses, and in the

17  front of each one is a list of or at least the key ones, 10 and

18  11, which are at issue, are a list of the invoices that are

19  attached.  What I posit, what apparently happened is, in making

20  their copy, they either in breaking the binding some pages fell

21  out --

22          THE COURT:  "They" being whom?

23          MR. SCHIAVONI:  Either Mr. Sjoblom when he made the

24  copy or the clerk's office 18 years after the fact broke --

25  Mr. Sjoblom told me that the copy that he got from the clerk's

1   office apparently had a rubber band around it or something,

2   that after all those years it had broken apart.

3           THE COURT:  What are you going to give me?

4           MR. SCHIAVONI:  I have what we at the time filed -- in

5   the old days when you would file, you would present one to the

6   court and the court would -- the clerk's office, and they would

7   stamp it and give you one back.

8           I have that stamped copy from the time.  What I would

9   say is whatever other version Mr. Sjoblom has, what is going to

10  be the case is that --

11          THE COURT:  Have you submitted your version to the

12  Court?

13          MR. SCHIAVONI:  Our view is ours is in the record, but

14  I have only one copy of the one stamped, and I have marked

15  that --

16          THE COURT:  I don't need your original.  But have you

17  given me that full document with the SDNY stamp?

18          MR. SCHIAVONI:  No.  We haven't resubmitted it.  We

19  just cited what was on the docket.

20          THE COURT:  Wait a minute, Mr.Schiavoni.

21          MR. SCHIAVONI:  Yes.

22          THE COURT:  What you mean is you cited the one on the

23  record?

24          MR. SCHIAVONI:  Yes.

25          THE COURT:  So I am supposed to go to the clerk's

1    office, and get the one with the rubber band and all broken

2    apart and having nothing in it?

3              Is that what you mean?

4              MR. SCHIAVONI:  Well --

5              THE COURT:  Am I missing something?

6              MR. SCHIAVONI:  No.

7              THE COURT:  When you cite to the one in the record,

8    you mean I should have my staff go to the clerk's office and

9    get the document which you're telling me the papers are all

10   befuddled on?

11             Is that what you mean?

12             MR. SCHIAVONI:  Your Honor, the only explanation I can

13   offer --

14             THE COURT:  It is not an explanation.  It is a

15   question.

16             MR. SCHIAVONI:  All right.  That's why I would like to

17   offer this into evidence.

18             THE COURT:  Yes.

19             That's what I am asking you to do.

20             MR. SCHIAVONI:  Yes, your Honor.

21             THE COURT:  I don't mean to be difficult about this.

22   You really should have an out-of-body experience and try

23   looking at this from the perspective of a judicial officer.  I

24   am just trying to get to the bottom of this, and telling me,

25   "Well, it's in the record," when you know standing in front of

J6dnpric

 1    me that that which is in the record in the clerk's office,

 2    pre-ECF, has the binding broken and the pages out of order --

 3    you tell me that they're broken and out of order.

 4            MR. SCHIAVONI:  To be clear, I don't know exactly what

 5    is in the clerk's office.  I don't know what's there.  I have

 6    only heard what Mr. Sjoblom has said.

 7            THE COURT:  So it's my problem?

 8            MR. SCHIAVONI:  No, no, your Honor.  I am not putting

 9    it on you in any way at all.  That's why I just tried to

10    clarify.  I would like to offer -- that's why we brought this

11    and I would like to offer it.

12            THE COURT:  Is that a copy or your original?

13            MR. SCHIAVONI:  That is exactly the original.

14            THE COURT:  Show me the original, and I'm handing it

15    back to you on the record.  I want to look at the original with

16    the stamp on it.  Madam deputy?

17            All right.  Show it to the other parties.  And I would

18    like an affidavit --

19            Because I am doing the same thing with Mr. Sjoblom,

20    OK?

21            MR. SCHIAVONI:  Yes.

22            THE COURT:  -- as to its provenance.

23            Show it to any other party who wants to look at it.

24            MR. GOLDSTEIN:  Your Honor, we have seen this exhibit

25    and the expert report that we have put into testimony, that

 1   contained the report of our expert Sam Spiegel, who's with us

 2   today, where we indicated the 49 coins came out of this

 3   document, out of this copy of it.  We obtained from it from the

 4   receiver.

 5              THE COURT:  Thank you.

 6              MR. GOLDSTEIN:  To the extent Mr. Sjoblom is

 7   acknowledging in the courtroom today that these are, the coins

 8   are the receivers, they came from this.

 9              THE COURT:  Thank you.

10              MR. SJOBLOM:  I have no objection.  I would like to

11   have a copy to match it against what we have.

12              THE COURT:  Unfortunately -- I say unfortunately

13   because we are going to kill a lot of trees, but it is a

14   reasonable request.  It is a reasonable request.

15              MR. SJOBLOM:  Right.

16              I except Mr. Schiavoni's word that this is the stamped

17   copy.

18              THE COURT:  Yes.  Just hand it back up to me for one

19   second.  Just so any reviewing Court has the benefit of this,

20   as I understand it, this is what we used to call a conformed

21   copy, in that the clerk put the stamp, it looks like an

22   original stamp with the date of December 17, the year being not

23   fully legible to the eye, but it's 19, and it is a Southern

24   District square stamp with the date in red letters on it in the

25   original red.  It appears to be the original ink stamp on it.

J6dnpric

1          This was the declaration of Mr. Stamoulis, which he

2     declared under penalty of perjury on December 14, 1999.  I

3     advise you in taking this apart and making the copies that you

4     undertake some measure to ensure that the integrity of the

5     document is maintained.

6          All right?

7          MR. SCHIAVONI:  Yes.

8          THE COURT:  Also, if it becomes an issue, I wonder

9     whether it's ever been in an appendix volume in the Second

10    Circuit.  I don't know whether it has or it hasn't.  There have

11    been a number of appeals up there.

12         MR. SCHIAVONI:  I will ascertain and double check,

13    your Honor.

14         THE COURT:  Yes.  OK.

15         Go ahead, Mr. Sjoblom.

16         MR. SJOBLOM:  OK.

17         So the question becomes which of these coins, the 58

18    that the Antoniaks have match invoices in Stamoulis.

19         If I may approach, your Honor, I would like to hand

20    the Court two more exhibits.

21         THE COURT:  Yes.

22         MR. SJOBLOM:  For the record, what I have premarked as

23    Exhibit No. 3 is a listing of the 58 coins which was prepared

24    by Mr. Armstrong, and it's dated March 21, 2019, coins 1

25    through 58, listing the date it was purchased and the auction

J6dnpric

1   house it was purchased from.

2           That's Exhibit No. 3.

3           I have premarked as Exhibit No. 4 what was taken from

4   Mr. Bierrenbach's declaration filed in the Philadelphia case,

5   where he attempted to match the 58 on that list against the

6   Stamoulis invoices, and I think in this one he has eight or

7   nine that don't match.

8           That is Exhibit No. 4.

9           THE COURT:  All right.  Thank you.

10          MR. SJOBLOM:  I will just point out for the record --

11          THE COURT:  Any objection to Defendant's Exhibit 3 and

12  4.

13          MR. SCHIAVONI:  No, your Honor.

14          THE COURT:  All right.  Received.

15          (Defendant's Exhibit 3 and 4 received in evidence)

16          MR. SJOBLOM:  If you look at Exhibit No. 4, there are

17  eight white spaces.  Those are the ones that could not be

18  matched against Stamoulis.  I just point out quickly, since

19  this was filed at 1:30 this morning by Mr. Spiegel, paragraph

20  25, he says he's located 49 of the 58 coins on the invoices

21  attached to Stamoulis.  I don't know if we are talking about

22  nine or ten coins that don't quite match up.  So we're trying

23  to sort that out.

24          THE COURT:  I understand.

25          I'm going to change topics for a second, and maybe we

1   will jump back to where you are, but here's a question.

2            Is there any dispute in your mind that, as to what

3   Judge Kaplan and Judge Owen ordered in their original orders,

4   which were the subject of the contempt ruling, and the

5   continued efficacy of those orders, do you contend that those

6   orders have been vacated or are no longer binding on your

7   client?

8            MR. SJOBLOM:  No, I think not.  I think you made that

9   clear in April 2007 when I asked you are the findings still in

10  effect, and you said yes.

11           THE COURT:  Yes.

12           That is also true with regard to the judgment and

13  consent order of the CFTC?  That remains in place?

14           MR. SJOBLOM:  Correct.

15           We are talking about what is Exhibit 1 with

16  particularity, the invoice in Stamoulis, how do we match them

17  against these coins?

18           THE COURT:  So, for example, if your client had

19  somewhere else on earth a coin falling within the scope of

20  these existing orders, your client understands that it would be

21  his obligation to turn it over to the receiver?

22           MR. SJOBLOM:  He does understand that.

23           THE COURT:  All right.

24           Go ahead.

25           MR. SJOBLOM:  That was exactly why those questions

J6dnpric

1    were asked in the depositions.

2            So to try to unpack, unravel these 58 coins on Exhibit

3    3 against Stamoulis, and we have had four or five people try

4    this now, and we get different numbers.

5            So, just for sake of discussion, let's just say nine

6    or ten, 48, 49, whatever the number is, so what are the ones

7    that are not there?  Why do we say that they are not there?

8            In particular, again, if I may approach and provide

9    some exhibits.

10            OK.  So for identification purposes I have premarked

11    as Exhibit 5-A, a one-page exhibit called Coins Not in

12    Stamoulis Declaration.

13            This has 11 coins, and I think after what Mr. Spiegel

14    provided last night, we will eliminate No. 23 so we are down to

15    ten coins.  But this is as we prepared yesterday.  It would be

16    Exhibit 5-A.

17            THE COURT:  When you say Exhibit 5-A, I am going to

18    take this as, if you will, a demonstrative.  It is not evidence

19    in chief.

20            MR. SJOBLOM:  Correct.

21            THE COURT:  It is not being offered as evidence in

22    chief, correct?

23            MR. SJOBLOM:  It is for purposes of conducting the

24    analysis of where we are on the nine or ten.  This is our

25    attempt to take the exhibits we have, pull it together, and say

J6dnpric

1   these are the nine or ten we are talking about.

2          THE COURT:  Any objection to 5-A as a demonstrative

3   only?

4          MR. SCHIAVONI:  No, your Honor, as a demonstrative.

5          THE COURT:  All right.  Received.

6          (Defendant's Exhibit 5-A received in evidence)

7          MR. SJOBLOM:  For identification purposes Exhibit 5-B

8   is an invoice from Sotheby's, a one-page document.

9          THE COURT:  Any objection to 5-B?

10          MR. SJOBLOM:  That is an invoice from Stamoulis, so

11   that would be evidence.

12          THE COURT:  All right.

13          MR. SJOBLOM:  Not demonstrative.

14          THE COURT:  Any objection?

15          MR. SCHIAVONI:  I'm sorry.  This is the Sotheby's

16   invoice?

17          THE COURT:  Yes.

18          MR. SCHIAVONI:  No, your Honor.

19          THE COURT:  All right.  Received.

20          (Defendant's Exhibit 5-B received in evidence)

21          MR. SJOBLOM:  Exhibit 5-C is two pages.  It's from the

22   Lon auction in May 1997.  The front page is the front of the

23   catalog that has page 25, which is the Vernaki 2 coin, which is

24   among the 58, Exhibit 5-C.

25          THE COURT:  Where is this found?

 1          MR. SJOBLOM:  These are the catalogs that we were able

 2     to obtain to try to match against the invoices.

 3          The problem with the Stamoulis --

 4          THE COURT:  Have you shown this to counsel?

 5          MR. SJOBLOM:  Yes.

 6          THE COURT:  Any objection to this document?

 7          MR. GOLDSTEIN:  No, your Honor.

 8          THE COURT:  All right.

 9          MR. SJOBLOM:  Here's how it arises --

10          THE COURT:  Received.

11          (Defendant's Exhibit 5-C received in evidence)

12          MR. SJOBLOM:  Once you see the Stamoulis declaration,

13     all you have is lot numbers and a dollar amount.  There are no

14     descriptions of the coins, there is no way to figure out what

15     is in that invoice to match it up against something.

16          The only way to do it is to go back and dig up the

17     catalogs, when it was purchased, where it was purchased, to

18     match it to see if it matches up that invoice.  So this is what

19     this is an attempt to do.

20          THE COURT:  All right.

21          MR. SJOBLOM:  5-D is from the Spinks catalog, 9 July

22     1996.

23          Maybe Mr. Schiavoni misspoke when he said the Henry

24     III was bought in 1997.  It was actually 1996.  I am sure this

25     was just a mistake on his part.  This is the Spinks catalog.

J6dnpric

1    We were able to find of the Henry III, the price when it was

2    bought, etc.

3           This is a three-page exhibit, and what is attached as

4    the third page is from the Stamoulis declaration, where the

5    wire transfer is referred to that Mr. Schiavoni referred to, a

6    three-page exhibit, Exhibit 5-D.

7           THE COURT:  Any objection?

8           MR. GOLDSTEIN:  None, your Honor.

9           THE COURT:  Received.

10          (Defendant's Exhibit 5-D received in evidence)

11          MR. SJOBLOM:  If you start with Exhibit 5-A, we will

12   scratch No. 23, but Mr. Spiegel last night said he found that

13   one.  These are the nine or ten that we are saying don't match.

14          Let me just back up a little bit again to the CFTC

15   judgment, because the CFTC judgment said, as does the SEC

16   judgment, that the asset freeze with respect to the personal

17   property of Mr. Armstrong is dissolved.

18          So if the coins were transferred to him in January

19   1999 in lieu of salary or bonus or retirement, it becomes his

20   personal property.  Then they are outside the CFTC judgment and

21   outside the freeze order because the asset freeze of the

22   personal property is dissolves.

23          THE COURT:  Why don't you have a seat for a second,

24   because I want to hear from the Antoniak parties and from

25   Heritage, who are really nonparties to the proceeding, but they

J6dnpric

 1    have a right to be heard, and I plan to hear them.

 2            But let me tell you what I propose to do here so that

 3    we are all on the same page.

 4            Subject to hearing further argument from anyone, I

 5    propose to have the receiver prepare an order which will

 6    provide as follows:

 7            For a transfer of all 58 coins from the Dallas office

 8    of Heritage to the New York office of Heritage, subject to

 9    further order of this Court.

10            As to the 49 coins, and the receiver will submit a

11    proposed finding on this, but with regard to the 49 coins, I am

12    prepared, based on what I have seen and heard, to rule that

13    they were the subject of Judge Kaplan's order, Judge Owen's

14    January 7, 2000 order, Judge Owen's August 25, 2000, findings

15    of fact and conclusions of law, and the CFTC judgment and

16    consent order of June 24, 2008, and they are and have been

17    property owned by the receiver.

18            They are the receiver's property, though they too will

19    remain at the Heritage New York facility pending further order.

20    But, based on the prior rulings in this case, that's already

21    been adjudicated that they are the property of the receiver.

22    In terms of the parties to this litigation, that fact is not

23    disputed by the receiver, the two enforcement agencies, or

24    Mr. Armstrong.

25            With regard to the receiver's request for a further

J6dnpric

1    injunction or direction to Mr. Armstrong to turn over any and

2    all other coins, it would appear to me that what would be

3    appropriate is in an order a restatement that the existing

4    orders that would require him to turn them over to the receiver

5    remain in full force and effect.  That may be unnecessary to

6    put that in an order that they remain in full force and effect,

7    but it's appropriate to restate that for the avoidance of doubt

8    more than anything else.

9                MR. SJOBLOM:  May I comment on the last order?

10               THE COURT:  Yes.

11               MR. SJOBLOM:  I have no problem with the preliminary

12    injunction other than that it just be for things up to, you

13    know, January 2000.  Obviously, he's gotten out of jail, he's

14    purchased other coins --

15               THE COURT:  Well, what I am saying is somewhat --

16               MR. SJOBLOM:  You are speaking only to the ones that

17    are back in the orders of --

18               THE COURT:  The orders that have existed.  In other

19    words, the orders that have existed, I declare they still

20    remain orders of this Court.  That is what I am saying.  I am

21    not changing their scope at this point.  I'm declaring them to

22    be viable, extant orders of the Court.

23               Mr. Sjoblom, just to tidy things up, I guess before I

24    get to you, I'll quickly take the CFTC.

25               Any objection to my allowing the temporary receiver to

J6dnpric

1    withdraw and to appoint substitute receiver Mr. Schiavoni?

2              From the CFTC, any objection.

3              MR. RINGER:  No objection, your Honor.

4              THE COURT:  From the SEC?

5              MR. FREDA:  No objection, your Honor.

6              THE COURT:  And Mr. Sjoblom, as I understand it, you

7    do not have an objection to the withdrawal of Mr. Cohen, but

8    let me hear you if you object otherwise to the appointment of

9    Mr. Schiavoni.

10             MR. SJOBLOM:  My only objection is the that I think

11   that, given what the Supreme Court has defined a receiver to

12   be, someone who is indifferent and impartial and not seeking to

13   advocate for either side and can have somewhat of a judicial

14   temperament, I respect Mr. Schiavoni.  You know, he is a nice

15   person, I actually like him.  But for purposes of what we're

16   asking, I think there should be a fresh set of eyes.

17             Mr. Schiavoni can still be counsel.  He's got all the

18   back knowledge.  He still has all the records.  He knows what's

19   going on.  But, from Mr. Armstrong's standpoint, it would be

20   nice to have someone come in who has not been so prosecutorial

21   minded towards him and we could have a fair shot.

22             That's my request.

23             THE COURT:  All right.  Thank you.

24             What I would say in that regard is, as in the case of

25   Mr. Cohen, who has been the client heretofore, to whom Mr.

J6dnpric

Schiavoni answers as an advocate, all views taken by Mr. Cohen
have been taken and have developed as a result of being
receiver, just like a judge's view on a case can evolve based
on what occurs.  While figuratively speaking the judge is
wearing the black robe, considering the evidence, hearing the
witnesses, reading the papers, their view of the case evolves.
There's nothing at all slightly inappropriate with that.

          So, Mr. Cohen, who heretofore, even as I speak now, is
the receiver and the person to whom Mr. Schiavoni answers,
Mr. Cohen is entitled to form views even recognizing that a
receiver is a quasi-judicial position.  So I find nothing
inappropriate about Mr. Cohen forming views on issues based on
what he's learned in his role as receiver, and derivatively,
Mr. Schiavoni as Mr. Cohen's lawyer.

          So the order that I am asking be prepared will, with
the thanks of the Court, relieve Mr. Cohen of his temporary
assignment of how many years now?  17?

          MR. COHEN:  1999 to --

          THE COURT:  We are in the 20th anniversary.

          MR. COHEN:  I think that's two decades, your Honor.

          Thank you.

          THE COURT:  On the 20th anniversary or so, give or
take, of your temporary receivership, the order will reflect
that you are released of that responsibility and that Mr.
Schiavoni, who the Court has had the opportunity to observe for

J6dnpric

1    I guess 12 years, I guess 12 of the 20 years, is appointed as

2    the substitute receiver.  As with any receivership appointment,

3    it's always subject to modification as may be appropriate in

4    light of new circumstances.

5          With that business out of the way, let me hear from

6    Mr. Harvey.

7          MR. HARVEY:  Thank you, your Honor.  I will be brief.

8          I came into this case, in the case in Philadelphia in

9    or around Thanksgiving of last year, when my clients changed

10   counsel because they were dissatisfied with the representation.

11   Mr. Yanoff was a nice man, but he's a personal injury lawyer

12   from Jenkintown, PA, and this was a commercial litigation

13   matter.

14         I came into it, and I -- it took me a long time to

15   figure this case out.  And the culmination of my figuring this

16   case out is a summary judgment motion a copy of which I

17   provided to the Court, although I didn't provide all the

18   exhibits and the papers.  We can do that if necessary.

19         I had help in that.  I had help.  I had advice from

20   Heritage.  I also had spoken to Mr. Schiavoni during that

21   process.  I spoke to Mr. Schiavoni prior to Mr. Armstrong's

22   deposition.  I met him.  And I finally pieced together and

23   figured out how this all fit together, and then we said these,

24   all 58 coins were part of this receivership.

25         Now, you might think that would leave us out of the

J6dnpric

1   money, but at this point the receiver wasn't saying those coins

2   belonged to me, so -- and that's where the evidence led us.

3   The evidence clearly led us that all 58 coins were part  of

4   this receivership.

5          And your Honor made reference to your turnover orders,

6   and your prior orders, which I studied carefully.  Just in a

7   humorous aside, we had conversation with Judge Bartle on the

8   record about the Stamoulis declaration, similar to what was had

9   here today a few weeks ago.  And it was not -- I wasn't very

10  illuminating.  Let's put it that way.

11         THE COURT:  Let's put it this way.  On behalf of the

12  Southern District of New York, I'm inclined to be red faced and

13  embarrassed about it, but when documents sit in a public

14  document room for 20 years, and there are of this size -- and I

15  wasn't a judge at the time -- I certainly can understand how

16  this can happen.

17         MR. HARVEY:  Well, but because of the complexity and

18  because of that confusion, I wanted to -- my client's feel very

19  strongly, and I believe the evidence is very strong that

20  Mr. Armstrong has no ownership rights here, that this is

21  fraudulent, this claim to his to ownership is completely bogus.

22         And I have tried to find a way to express that.  And

23  the key thing from the court's order triggering language is

24  corporate ownership of the assets.  So if they were purchased,

25  if they were assets of Princeton Economics International Ltd.

1   or any of its affiliates, then they were subject to the Court's

2   orders.  It's that simple.

3          And I went to Mr. Armstrong's deposition mystified as

4   to how he was going to claim that these 58 coins, which are on

5   the list that has been provided, were all his.

6          And that's when he disclosed -- and we have covered

7   this in our summary judgment papers -- that he said that there

8   was a transfer in January of 1999.  He didn't have a document,

9   any document on it, and I asked him was that ever disclosed?

10  That transfer was never disclosed.  His entire ownership rests

11  an undocumented -- or at least can't find the documents, no

12  other witnesses, transaction that took place in January of 1999

13  that magically took the seven, eight million dollars of coins

14  and transferred them from personal assets into corporate

15  assets.  And I believe -- and then critically --

16          THE COURT:  Corporate assets to personal assets.

17          MR. HARVEY:  Excuse me.

18          They were transferred supposedly from corporate assets

19  to personal assets of --

20          THE COURT:  Of his.

21          MR. HARVEY:  Of his.

22          THE COURT:  Right.

23          MR. HARVEY:  That's his story.

24          And I asked him, and I have -- that is at the

25  deposition.  I asked him which of these coins -- I said, Which

1    of these coins were purchased with corporate assets?

2            He said the majority were purchased by corporate

3    assets because they were used for research.

4            And this idea of a corporate reference collection, we

5    covered this in the deposition.  He admitted that he had

6    created this collection of coins which he was going to use for

7    his economic forecasting, and these coins were all part of the

8    corporate reference collection.

9            There was no reason to have this particular set of

10   coins for any reason other than the corporate reference

11   collection.  He said that most of these, the majority of these

12   were purchased by corporate funds, because they were used for

13   research.

14            THE COURT:  I would be hesitant to ask you how he

15   thought the physical coins were going to help him forecast.  I

16   suspect that would be a lengthy discussion, and one that you

17   would be repeating somebody else's testimony.

18            MR. HARVEY:  Yes.  Yes, your Honor.

19            frankly, I didn't -- I wasn't interested, and I didn't

20   go into that.  The point is I pressed him for any proof that

21   these coins were purchased with his money, money that came out

22   of his pocket.

23            He said, well, maybe -- he said, possibly the Edward

24   III or the Edward I groat, which was coin 56 on this.  But he

25   has no -- he has no proof that any of these coins were

J6dnpric

 1   purchased by him personally.  So they have to be the corporate

 2   coins.  Otherwise he has no possible claim to them.

 3          And that -- and the whole basis for our summary

 4   judgment, and I think these grounds can be relied upon by this

 5   Court, and I think this entire argument is valid and would suit

 6   your Honor's purposes extremely well, because under the

 7   doctrine of collateral estoppel he had a duty -- if there was

 8   adjudication of corporate assets and the ownership of corporate

 9   assets, he had the duty stand up and say, wait, some of those

10   are mine.  I actually -- those are mine.  I own them.  He never

11   did that.  He ever disclosed that.  It is far too late to

12   claim, for him to claim now any corporate asset -- any personal

13   asset ownership of any of those coins.

14          So, your Honor, that's really the main point I wanted

15   to make here.  I also wanted to point out that --

16          THE COURT:  Help me out here.

17          Here, in my courtroom, you support the receiver's

18   position that the 58 coins should be turned over to the

19   receiver.

20          Is that correct?

21          MR. HARVEY:  Yes, with a caveat.

22          THE COURT:  How does that affect your clients' rights?

23          MR. HARVEY:  It's a funny thing as a lawyer, sometimes

24   you have to just to lead where the evidence goes or else with

25   you get yourself in a lot of trouble.

J6dnpric

 1          THE COURT:  I understand that.

 2          MR. HARVEY:  But became blindingly -- it was not

 3  obvious for a long time, but it became quite obvious as it went

 4  on that there was no way these coins were anything but, you

 5  know, subject to this receivership.

 6          We still believe we have rights however.  We have

 7  rights against the receiver.  Mr. Armstrong is out of the money

 8  he.  Has no rights here.  But my clients have rights as against

 9  the receiver, because the receiver didn't put its hand up until

10  very, very late and say that these coins were its.

11          And the receiver knew about the action involving the

12  Armstrongs at least in November of last year at the same time I

13  came on the case.  And the receiver could and should have put

14  its hand up a lot earlier.  Certainly, the receiver benefited

15  from all the hard work that I did from preparing this

16  transcript, from taking the deposition, from fighting

17  respectfully with Mr. Sjoblom, having multiple hearings with

18  Judge Bartle.

19          There was a lot of work that went into this to get to

20  this point, this aha moment.  It's quite unfair that the

21  Antoniaks spent money on the first lawyer.  They've -- and we

22  have an arrangement.  They have spent -- they paid for

23  deposition costs.  There's been a lot -- and they are truly

24  victims here.  They wouldn't have a right necessarily to the

25  coins if the coins didn't belong to them, but the fact is, is

J6dnpric

1    that because of mis -- because of whatever happened here, that

2    these coins -- however they came into the possession of

3    Mr. Morales, and we believe this is an absolutely truthful,

4    good-faith story.  However Mr. Morales found these coins in a

5    house in Pennsauken, New Jersey, and then brought them into my

6    client, who did look at the -- who did conduct some research to

7    see if they were stolen and didn't find that they were stolen,

8    and they did work with a reputable auction house, that they

9    acted in good faith at all times and they are out quite a bit

10   of money and quite a bit of trouble, as am I, for litigating

11   this case all because of some hiding of some coins over the

12   years.  Something that's gone on here that we can't -- you

13   know, I don't think we are ever going to be able to say exactly

14   how things happened and how these coins got with from one place

15   to another, but here we are now.

16           We believe that we have rights as against the receiver

17   with respect to these coins.  It may be an abandonment

18   argument, so that we would have the right to the entire coins.

19   It may be an argument that we just have the right to be -- some

20   reasonable compensation, sort of a quantum meruit theory.

21           And, in addition, we believe we have a claim against

22   Mr. Armstrong and possibly his counsel.  And all of this we

23   would like to assert here.  So we think the Court should --

24           THE COURT:  Well, let's pause.  That's the magic

25   question.  You have a lawsuit to which Mr. Armstrong is a

J6dnpric

1    party.

2          MR. HARVEY:  Correct.

3          THE COURT:  It would seem to me any right or claim you

4    have against Armstrong, which is to me afield of the CFTC and

5    the SEC enforcement actions, a claim your client -- maybe a

6    legitimate claim -- your client has that Armstrong did you

7    wrong by reason of his conduct in the litigation in the Eastern

8    District of Pennsylvania or otherwise is not something to be

9    litigated before me.

10         What I am more interested in is how you propose to

11   litigate a claim with regard to the receiver.

12         MR. HARVEY:  I would like to assert a pleading.  This

13   doesn't quite fall into statutory receivership, but it's close

14   or certainly the Court had the authority to adjudicate claims

15   to ownership of the property, so I think one way or another

16   this Court has the authority to hear claims that my clients

17   would bring.

18         There's diversity jurisdiction here.  They are not

19   citizens.  I believe there's diversity jurisdiction here.  And

20   so we would like to assert those claims against the receiver.

21   If we can't settle them or if we can't resolve them between us,

22   then I would like to assert them here in writing with a formal

23   pleading, take discovery, have them resolved expeditiously.

24         THE COURT:  So, in other words, what you are talking

25   about is commencing a separate action against the receiver?

J6dnpric

1        MR. HARVEY:  Yes.

2        THE COURT:  All right.

3        MR. HARVEY:  I have not quite given up on commencing

4    an action against Mr. Armstrong here either.  I respect what

5    your Honor said of course.

6        THE COURT:  I am agnostic as to whether you commence a

7    separate action in New York or the Eastern District of

8    Pennsylvania or amend your pleading in the existing case.  My

9    main point is not in the proceeding that we are convened on

10   today.

11       MR. HARVEY:  I think might it be appropriate -- most

12   appropriate there because part of the conduct of Mr. Armstrong

13   that gave rise to the current situation is conduct that related

14   directly to this and your Honor is in the best -- and is it

15   really part of this action.

16       THE COURT:  It is not a question of who's in the best.

17   This is an action by the United States Commodities Futures

18   Trading Commission and the SEC.  That is what this case is

19   here.

20       You having a claim over against Mr. Armstrong is

21   unrelated to that.  Maybe you bring it in in the existing

22   action, maybe you bring a new action in the Eastern District of

23   Pennsylvania, or maybe you bring a new action somewhere in New

24   York.  Maybe you argue it's related to this case in some way.

25   But it does not appear to me that, absent your citing precedent

J6dnpric

1    to me, that it would be properly asserted in a CFTC action.

2             MR. HARVEY:  Well, I seriously doubt I am going to

3    find any precedent that -- you know, on this extremely unusual

4    set of facts.  But the basis or a basis for that claim would be

5    the inherent authority of the Court.  It doesn't really fit --

6    Rule 11 is fairly circumscribed mechanism, and so I really do

7    think it would fit -- fall under the inherent authority of the

8    Court, and the fact that it appears that misrepresentations,

9    serious misrepresentations and hiding and lies to this Court

10   were told, and that that ricocheted over a period of many years

11   later and caused harm to my clients.

12            THE COURT:  Inherent power of the Court is not a great

13   way to go when you're trying to sort through subject matter

14   jurisdiction.

15            Listen, I haven't barred you from doing something.

16   You act on your own in that regard, sir.  I am just suggesting

17   that you should consider your options, and I don't think you

18   want to engage in motion practice or even -- I can tell you

19   right now I could sua sponte would raise subject matter

20   jurisdiction over this claim, and you would have a chance to

21   brief it and argue it, but it's doubtful to me that you would

22   have the ability to assert a claim in this proceeding relating

23   to actions that happened with regard to Mr. Morales and

24   litigation misconduct in the action in the Eastern District of

25   Pennsylvania against Mr. Armstrong here.

1

2             MR. HARVEY:  Point well taken.

3             I am going to complete my research on that, and I

4    won't do anything ill advised.

5             THE COURT:  Good idea.

6             MR. HARVEY:  That is all I have, your Honor.

7             THE COURT:  All right.

8             Well, thank you very much.  That was very clear and

9    helpful.

10            MR. SJOBLOM:  Your Honor, may I make one point to

11   address Mr. Harvey?

12            THE COURT:  Yes, sure.

13            MR. SJOBLOM:  The SEC is sitting right in front of me,

14   but, at least when I was there, Section 21(g) of the 1934

15   Exchange Act prohibits consolidation of private claims in

16   government law enforcement actions.  I don't think the inherent

17   power of the Court overrides 21(g) of the '34 Act.

18            THE COURT:  There you have it OK.

19            Heritage?

20            MR. GOLDSTEIN:  Good afternoon, your Honor.  We're

21   very grateful for the opportunity to be with you here today.

22   We are in the dangerous position of batting cleanup after much

23   has been said, so we are going to try to keep it pretty narrow.

24            We sell coins.  That is what we do.  We sell coins.

25   My client sells coins.  We tried to sell some coins, and

J6dnpric

1    Mr. Armstrong and his counsel sued us.

2         They said very specifically that they had documents

3    proving that Martin Armstrong owned these coins.  Discovery

4    revealed they had no such documents.

5         Then they said, well, we own the coins anyway, and

6    there was a private transfer, undocumented by anyone, that we

7    moved these coins to us.  By the way, when that private

8    transfer occurred, Mr. Armstrong said he took those coins as

9    compensation, never filed an income tax return on it.  So, to

10   the extent these coins are his personal property, he's created

11   a pretty vexing tax problem for himself.

12        Nevertheless, we have nine coins left.  49 have been

13   handled and nine coins left.  The August 2000 findings of fact

14   and conclusions of law we all know are still in effect, still

15   good.

16        In our brief, on page 12 of our brief in support of

17   our motion for summary judgment, page 12 of our brief in

18   support of our motion for summary judgment we talk about the

19   Kirwan and non-Kirwan coins.  I will resist every effort to get

20   me to talk about them here today.  I will simply refer to our

21   pleading, that we may be able to shed some light on those last

22   nine coins through the arguments we have made there.

23        To the extent that doesn't decide the issue of the

24   remaining nine coins, we have an expert with us today.  Sam

25   Spiegel is in the courtroom.  Were the hour earlier, we would

J6dnpric

 1    ask to put him on.  I won't ask for that today unless the court

 2    is zealous in its desire to stay past sunset.

 3              THE COURT:  It is not that.  It's my loyal and trusty

 4    court reporter should not be subjected to that.

 5              MR. GOLDSTEIN:  I understand totally.

 6              We would not ask to put it on today.  To the extent it

 7    seems as though everyone lends a lot of credibility to our

 8    expert, his work is not yet done.  Particularly with regard to

 9    the gold penny that was the subject of much discussion earlier

10    and the other coins, he has more research that he can

11    undertake.  To the extent he is able to demonstrate

12    conclusively, as he has with the first 49 coins, that the other

13    coins are also the property of the receiver, and to the extent

14    the Court doesn't rule on the basis of the Kirwan/non-Kirwan

15    distinction we argued in page 12 of our brief support of motion

16    for summary judgment, we believe that those last coins could be

17    disposed of, or their ownership could be disposed of or decided

18    based on further expert testimony.

19              So we ask today, does the Court intend to dispose of

20    the remaining nine on the basis of the pleadings?  Would the

21    court appreciate further expert testimony?  Because I will tell

22    you our ultimate destination to go back to the Eastern District

23    of Pennsylvania and ask for a Rule 54 fees and penalties

24    against the people that initiated a baseless lawsuit against

25    us.

J6dnpric

THE COURT:  All right.

I think what I need to do and I think -- I hope you can all understand this -- is I want to get the submissions from Mr. Sjoblom, his version of the declaration as well as there was one other letter that he said he wanted to submit to me after the fact.

The receiver is going to get me his submission.

What I would propose to do is set a date for us to come back to address the balance of the coins.  It would be my hope and expectation that I would have the benefit of your expert's assistance and input and testimony, subject to cross-examination, of course.

So that would be most helpful I think.  It may be that if he did a report of some sort it might not be necessary for him to testify before me because it would be resolvable on paper.

What I think I should do is set a date in about a month out or so for us to reconvene on the balance of the coins.

MR. GOLDSTEIN:  Your Honor, would you like -- none of us I think have our calendars.  We are all without our phones.

THE COURT:  Right.

MR. GOLDSTEIN:  Should we confer among us and come back to the Court with some dates that work, or will you assign a date to us?

J6dnpric

| | |
|---|---|
| 1 | THE COURT:  What I am going do is I will issue an |
| 2 | order with the date.  Then if it turns out that that date does |
| 3 | not happen to work, you will let me know.  I may even be able |
| 4 | to do it right now. |
| 5 | MR. GOLDSTEIN:  With the Court's permission, what we |
| 6 | will also do is, to the extent Mr. Spiegel prepares another |
| 7 | report and its accuracy is accepted by all the other parties, |
| 8 | we may be able to settle the last nine by stipulation or |
| 9 | agreement. |
| 10 | THE COURT:  That's wonderful.  That may be the case. |
| 11 | So I propose that we all reconvene on July 31 at 11 |
| 12 | a.m., if that would be convenient.  It is a Wednesday. |
| 13 | MR. GOLDSTEIN:  Your Honor, we'll confer among us, I |
| 14 | assume, and make sure that date works. |
| 15 | THE COURT:  Yes. |
| 16 | MR. GOLDSTEIN:  We're very grateful for the court's |
| 17 | attention today.  Thank you for hearing me out on these various |
| 18 | points.  I'm hopeful that our expert will be able to produce a |
| 19 | report that will be so definitive as to allow us to agree to it |
| 20 | and not require us to come back on the 31st. |
| 21 | Thank you, your Honor. |
| 22 | THE COURT:  That would be just wonderful.  Thank you. |
| 23 | MR. GOLDSTEIN:  Thank you, your Honor. |
| 24 | MR. HARVEY:  Your Honor, I can't make it on the 31st. |
| 25 | I'm on vacation.  It may not be necessary for me to be here. |

J6dnpric

 1    In fact, I don't think it will be.  I can play it by ear,

 2    but --

 3              THE COURT:  OK.  I have your position in writing,

 4    including the summary judgment papers that you submitted in the

 5    other case, and that is wonderful.  If you want me to give you

 6    another date, I can give you another date, or if that works

 7    with you, then we will just proceed.

 8              MR. HARVEY:  I think you should proceed.

 9              THE COURT:  OK.  Thank you.

10              MR. GOLDSTEIN:  Your Honor, if there's nothing further

11    before the Court today, I ask that I be excused at this time.

12              THE COURT:  All right.  Let me just take one moment.

13              Is there anything further from the receiver?

14              MR. SCHIAVONI:  Your Honor, just as basically a

15    housekeeping matter, you had ordered certain distributions

16    could be made in August 2017 when we were last before you.

17              We held up making those because of the appeal.  The

18    appeal is now over, although I suppose we have a cert.

19    petition, but we served a notice indicating our intent to go

20    forward with that.

21              We provided full disclosure.  It is on the docket.  We

22    are not asking your Honor to order anything.  Your Honor has

23    already ordered that.  We just wanted to advise the Court we

24    intend to do that.

25              THE COURT:  You have to figure out whether there is

1    any significance to a mandate not having issued yet, because

2    there is a cert. application pending.  I am not going to think

3    that through for you.

4              MR. SCHIAVONI:  That's fine.

5              THE COURT:  That is your shoulders.

6              MR. SCHIAVONI:  Yes, your Honor.

7              MR. SJOBLOM:  Your Honor, if I just might,

8    Mr. Armstrong would object to any distribution because of the

9    lack of tracing that's occurred here.

10             We know from sales made by Mr. Schiavoni in January

11   2012, he sold some of the coins he had in his age when he was

12   in his 20s and his 30s.  His position would be until there is

13   some tracing to the Princeton notes that there shouldn't than

14   be any further distribution to anybody until this is sorted

15   out.

16             MR. SCHIAVONI:  I think this issue was dispensed with

17   by the motions panel and is the subject of a pending sanctions

18   application.

19             THE COURT:  That's something that has already been, it

20   seems to me, already litigated.  It's the law of the case.

21             The only question I have is, if there is a pending

22   cert. petition from the Second Circuit's decision, you may have

23   to wait until the mandate has issued.  I have no view on that

24   other than to urge caution on your part to get to the bottom of

25   that issue.  If I don't have jurisdiction because the mandate

J6dnpric

| | |
|---|---|
| 1 | has not issued, you may not have jurisdiction either. |
| 2 |         MR. SCHIAVONI:  Understood, your Honor. |
| 3 |         THE COURT:  OK. |

1   has not issued, you may not have jurisdiction either.

2          MR. SCHIAVONI:  Understood, your Honor.

3          THE COURT:  OK.

4          MR. SCHIAVONI:  We will look into that.

5          THE COURT:  I want to thank everybody for their help

6   in trying to make this as clear as possible.  I especially want

7   to thank the temporary receiver for his loyal service over the

8   years.

9          MR. COHEN:  Thank you, your Honor.

10          THE COURT:  And he was a magnificent television star.

11   If you missed it I was featured in a documentary on PBS

12   regarding a famous watering hole known as Neary's.  One night I

13   happened to see Mr. Cohen smiling back from the PBS broadcast.

14          MR. COHEN:  You are a connoisseur of fine watering

15   holes, your Honor.

16          THE COURT:  There you go.  All right.

17          Thank you.

18          (Adjourned)

19

20

21

22

23

24

25

J6dnpric

DEFENDANT EXHIBITS

Exhibit No.                                              Received

1 and 2  . . . . . . . . . . . . . . . . . .49

3 and 4  . . . . . . . . . . . . . . . . . .66

5-A  . . . . . . . . . . . . . . . . . . . .69

5-B  . . . . . . . . . . . . . . . . . . . .69

5-C  . . . . . . . . . . . . . . . . . . . .70

5-D  . . . . . . . . . . . . . . . . . . . .71