UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

<div align="center">Plaintiff,</div>

<div style="float:right">99 Civ. 9667 (PKC)</div>

     -v-

PRINCETON ECONOMICS INTERNATIONAL, LTD,
PRINCETON GLOBAL MANAGEMENT, LTD., and
MARTIN ARMSTRING,

<div align="center">Defendants.</div>
------------------------------------------------------------------------x
COMMODITY FUTURES TRADING COMMISSION,

<div align="center">Plaintiff,</div>

<div style="float:right">99 Civ. 9669 (PKC)</div>

     -v-

PRINCETON ECONOMICS INTERNATIONAL, LTD,
PRINCETON GLOBAL MANAGEMENT, LTD., and
MARTIN ARMSTRING,

<div align="center">Defendants.</div>
------------------------------------------------------------------------x

## DECLARATION OF SAM SPIEGEL

I, **Sam Spiegel**, pursuant to the provisions of 28 U.S.C. § 1746, declare the following under the penalty of perjury.


Date: July 24, 2019


<div align="center">[The remainder of this page has been intentionally left blank]</div>

# Declaration of Sam Spiegel

### I.    Introduction

This Declaration, including all exhibits and appendices, provides a close analysis of all fifty-eight (58) coins in question. I can say that, based on my understanding of the case, I am reasonably confident, if not completely certain, that all 58 coins consigned to Heritage Numismatic Auctions, Inc. belong to the Receivership of Princeton Economics International Ltd. and its related entities.

### II.    Experience, Education and other Qualifications

I joined Heritage Numismatic Auctions, Inc. ("Heritage") in 2013 after graduating from the University of Chicago with degrees in Classics and History. I have more than ten years' experience working with world and ancient coins. My primary expertise concerns world and ancient coins.

Currently, I am Director of International Numismatics at Heritage's World and Ancient Coin Division, where my direct supervisor is Cristiano Bierrenbach. I began as an intern with Heritage in 2012, prior to graduating from college. While an intern at Heritage, I cataloged coins for the company's Signature and Internet auctions, represented the firm at trade shows, and helped on marketing projects. First as a manager, and now as the Director of International Numismatics, my responsibilities currently range from handling the intake process for new consignments to research and data analysis. I routinely counsel consignors, prospective consignors and buyers, typically dealing with high-level customer service issues. I am involved with all stages of catalog production, including the detailed research necessary to identify each coin advertised in Heritage's catalogs and presented for auction.

While I was in college, beginning in 2009, I spent two summers interning for Classical Numismatic Group ("CNG") in Lancaster, Pennsylvania. I also interned for Harlan J. Berk, Ltd., which is an old time coin dealer based in downtown Chicago. I have been researching and cataloging coins and coin descriptions since my internship with CNG. At CNG, I cataloged coins for the company's e-auctions, represented the firm at trade shows, as well as worked on larger projects such as organizing the American Numismatic

Society photo-file and the CNG counterfeit coin reference collection. In cataloging, I have experience researching the description of the obverse and reverse of a coin, as well as the location of where the coin was minted, and determining one or more reference numbers.

I have previously been published on the topic of international numismatics, and specifically world and ancient coins. I was profiled a few years ago by *CoinsWeekly* (which is available at: https://coinsweekly.com/whoswho/spiegel-sam/). I was one of five participants on the industry panel hosted by *CoinsWeekly* at the 2019 Berlin World's Fair of Money on the topic of slabbing in the coin business.

III.     **Investigation and Analysis**

It is my understanding that the court has declared, and it is not in contention, that all of the purchases made by Princeton Economics and/or Martin Armstrong as detailed in the Bulone, Stamoulis, and other Declarations, and not subsequently disbursed prior to the asset freeze, are the legal property of the Receivership. *See* Findings of Fact and Conclusions of Law, *S.E.C. v. Princeton Econ. Int'l Ltd., et al.*, 1:99–cv–09667–PKC (Dkt. No. 161) (Aug. 28, 2000), at ¶¶83, 88-89 (finding, *inter alia*, that Princeton Economics planned to use $14 million in rare and antique coins to do a "corporate-type museum," and that said coins "are the corporate property of Princeton Economics International, Ltd."). What I have endeavored to do, and believe I have objectively accomplished, is show that all 58 of these coins are represented, either explicitly or implicitly, in the various Declarations (primarily the Bulone and Stamoulis Declarations). *See* Bulone Declaration, *S.E.C. v. Princeton Econ. Int'l Ltd., et al.*, 1:99–cv–09667–PKC, Dkt. No. 66; Stamoulis Declaration, *S.E.C. v. Princeton Econ. Int'l Ltd., et al.*, 1:99–cv–09667–PKC, Dkt. No. 68.

I also understand that Mr. Armstrong and his counsel have brought this Court's attention to certain purported discrepancies regarding the invoices attached to the Stamoulis Declaration. *See* Appendix D, Declaration of Thomas V. Sjoblom, 1:99–cv–09667–PKC (S.D.N.Y. July 8, 2019). In conducting my investigation, I have reviewed and cited the invoices attached to the Stamoulis Declaration included

in the Appellate Appendix for one of Mr. Armstrong's appeals to the Second Circuit, *Armstrong v. Guccione*, 470 F.3d 89, 99 (2d Cir. 2006). Although Tabs 13, 14, 16 and 17 of the Stamoulis Declaration were not include in this Appellate Appendix, Mr. Sjoblom has affirmed that no relevant discrepancies exist with the invoices included under these tabs. *See* Sjoblom Declaration, 7/8/2019, at ¶12 (explaining Tab 17 contains one additional page in the copy received from the Clerk's Office)

My methodology was simple. Armstrong provided a list of the 58 coins (in Appendix A), including his recollection of the firm the coin originally came from, the price paid, the lot number (if applicable), and the date of sale. While there are a number of instances where this information was slightly or entirely incorrect, it formed the basis of the start of my investigation. I went back to those auctions Armstrong identified (which all took place between 1995 and 1999) and verified that the coins currently in the possession of Heritage Auctions are indeed the same coins that sold in those sales. I then cross-referenced those auctions with invoices in the Stamoulis Declaration (as noted above, all items represented in the invoices in the Stamoulis Declaration are the rightful property of the Receivership). By proving that a particular coin was sold to Princeton Economics (at the direction of Martin Armstrong), and exists in one form or another in the various Declarations, I can show that the coins are the rightful property of the Receivership.

For those instances where the information provided by Martin Armstrong in Appendix A is incorrect or incomplete, I have included the correct information as best I could in the summary list in Appendix B. Regardless, I have included supporting documentation from the various Declarations that show unequivocally that each of the 58 coins is the property of the Receivership.

In the few instances where either a coin did not come out of a public auction, or an invoice is missing from the Stamoulis Declaration, I have provided supporting evidence to show the paper trail for each particular coin. In most cases, this comes from the Bulone Declaration, showing that there was a payment made by Princeton Economics for the applicable coin. In other cases, and as supporting evidence,

4

the documentation comes from the images of the original dealer tickets (images of which were captured by George and Andrew Antoniak). From that, I can trace the coin to the original sale to Princeton Economics.

Many of these coins also exist in the "reference collection" noted in the Kirwan Declaration, dated January 10, 2000 (as presented as part of the Unger Declaration, Dkt. No. 96). My understanding is that this court has already declared that the coins comprising the "reference collection" are the rightful property of the Receivership. *See S.E.C. v. Princeton Econ. Int'l Ltd., et al.*, 1:99–cv–09667–PKC (Dkt. No. 161) (Aug. 28, 2000), at ¶¶83, 88-89. So while the descriptions in the inventory list attached to the Kirwan Declaration are oftentimes minimal, I have included the citation for the sake of thoroughness and removing any and all possible doubts.

My investigation and analysis of the 58 coins is divided into separate exhibits for each respective coin. The exhibits for each coin (attached to my declaration) are intended to be as concise and clear as reasonably possible, cutting out all extraneous information. The general outline of each exhibit (with just a few exceptions, such as those that were not sold at public auction) is:

      1) An image of the cover of the auction catalog that the coin was sold in;

      2) The image and description of that coin in that auction catalog;

      3) The invoice issued to Princeton Economics, to the attention of Martin Armstrong, from that auction for that coin (sometimes issued via a third-party agent);

      4) An image of the coin currently in the possession of Heritage Auctions;

      5) A comparison between the original catalog image and the coin currently in the possession of Heritage Auctions, showing that they are the same exact coin

I have structured the report into two parts. Part 1 contains my analysis of the nine coins that are in contention, and which I believe are the property of the Receivership. Part 2 contains my analysis of the forty-nine other coins in this group, over which I believe Armstrong has already conceded any

ownership claims, and to which this Court identified in its Order dated July 16, 2019 (Dkt. No. 533). Though this latter group may not be necessary to include, I chose to do so for the sake of thoroughness and to demonstrate a cohesive ownership over the entire group by the Receiver.

Three appendices are also worth mentioning. Appendix A is a copy of the most recent coin schedule produced by Armstrong; this was also a part of the Spiegel Declaration filed on June 12, 2019. Appendix B is a summary table of these 58 coins, detailing the information provided by Armstrong in Appendix A, the actual auction and sale information that I have uncovered, the reference to the applicable invoice in the Stamoulis Declaration (including the Bates Number and Appellate Appendix Number), and finally the reference to each coin in the inventory list attached to the Kirwan Declaration (as part of the Unger Declaration). *See* Declaration of Martin P. Unger, *S.E.C. v. Princeton Econ. Int'l Ltd., et al.*, 1:99–cv–09667–PKC, Dkt. No. 96. Appendix C is the bibliography of auction catalogs used throughout the rest of this report. Appendix D is the Sjoblom Declaration, which specifies there is no differences in Tabs 13, 14, or 16 in the Stamoulis Declaration (and only one difference in Tab 17 that is irrelevant to this report).

While I believe that these exhibits speak for themselves and should dispel any uncertainty as to the true and rightful owner of these coins, I make myself available for any further questions that anyone may have.

I, **Sam Spiegel**, pursuant to the provisions of 28 U.S.C. § 1746, declare under the penalty of perjury that the foregoing statements are true and correct.

Executed on July 29, 2019.

Sam Spiegel
*Director of International Numismatics*
*for Heritage Numismatic Auctions, Inc.*