UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| - against – | |
| PRINCETON ECONOMICS INTERNATIONAL LTD., PRINCETON GLOBAL MANAGEMENT LTD., and MARTIN A. MR. ARMSTRONG, | 99 cv 9667 (PKC) |
| Defendants. | |
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | |
| - against – | |
| PRINCETON ECONOMICS INTERNATIONAL LTD., PRINCETON GLOBAL MANAGEMENT LTD., and MARTIN A. MR. ARMSTRONG, | 99 cv 9669 (PKC) |
| Defendants. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CASTEL, U.S.D.J.

The undersigned has presided over the above-caption actions since they were reassigned in late 2006.  The Court has adjudicated in part the Application of Alan M. Cohen, as Temporary Receiver, brought on by Order to Show Cause (May 13, 2019) (Dkt. 500) (the "Application") relating to the disposition of fifty-eight rare coins held by Heritage Numismatic Auctions, Inc. ("Heritage"). (References in the form Dkt.__ are to docket entries in 99 cv 9669 (PKC).

On June 13, 2019, the Court held a hearing on the Application and resolved the status of forty-nine of the rare coins in an Order filed July 16, 2019. (Dkt. 533.)  The Court held that

"the forty-nine rare coins that are highlighted in yellow on Exhibit B of the Declaration of Sam Spiegel (Dkt. 528) and attached to this Order as Exhibit 1 are hereby held to be among the rare coins that were the subject of this Court's turn-over and contempt rulings including Judge Kaplan's September 13, 1999 Order, Judge Owen's November 11, 1999 Order, Judge Owen's January 7, 2000 Order, Judge Owen's February 4, 2000, Order, Judge Owen's August 25, 2000 Order, Judge Owen's August 25, 2000, Findings of Fact and Conclusions of Law and the CFTC Consent Order and, as such, are and have been the property of the receivership estate." (July 16, 2019 Order (Dkt. 533) at p. 9).

At the conclusion of the June 13, 2019, hearing, the Court scheduled a hearing for July 31, 2019, to address the disposition of the nine rare coins remaining in dispute, which are held by Heritage. (June 13, 2019, Hearing Transcript, at 90: 11–12). These nine coins are as follows: Ptolemy II Octodrachm ("Coin 5"); Demetrius Poliorcetes Tetradrachm ("Coin 22"); Siculo-Punic Tetradrachm ("Coin 30"); Acanthus Tetradrachm ("Coin 31"); 1777 Pattern 2 Guineas ("Coin 39"); ND 1216-1272 Gold Penny ("Coin 49"); 1937 3 Pence ("Coin 50"); 1738 2 Guinea ("Coin 51"); and 1540 2/3 Bonnet ("Coin 52"). *See* Spiegel Declaration  (June 13, 2019) (Dkt. 528) at Ex. B (Dkt. 528–2).

Due notice of the July 31, 2019, hearing was provided to counsel for Martin Armstrong, Heritage, George and Andrew Antoniak, the SEC and CFTC, and Princeton Noteholder Yakult on the record at the June 13, 2019 hearing (June 13, 2019, Hearing Transcript, at 90: 11–12), and the Order filed July 16, 2019. (Dkt. 533.)

A hearing was held on July 31, 2019 (the "Hearing") to consider the Application as it applied to the remaining nine coins. All interested parties and persons were given an opportunity to be heard and present evidence. The Court has considered the record of the June 13 and July 31 Hearings, including the testimony of Mr. Speigel, and the written submissions of the Receiver (Dkt. 557. 579), Mr. Armstrong (Dkt. 544, 548, 553, 566, 567, 568), Andrew and George Antoniak (Dkt. 549, 550, 551), and Heritage (Dkt. 528, 547, 548, 554, 561, 562), including the second Declaration of Sam Spiegel (July 29, 2019) (Dkt. 554), Declaration of Victor England (July 30, 2019) (Dkt. 556), and Declaration of Stamatios Stamoulis (July 30, 2019) (Dkt. 555).

Citations to the record are for illustrative purposes and are not intended to imply that the cited portion is the only support for a finding. A finding of fact improperly labeled as a conclusion of law or vice versa should be considered under the correct label. The Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.      This Court has jurisdiction to hear and determine the Application, and venue in this District is proper.

2.      The notice of the Hearing described above constitutes due, sufficient, and timely notice to all persons entitled thereto. No other or further notice is or shall be required of the Application with respect to the nine coins, the Hearing on the Application.

3.      All interested persons and parties were given a due opportunity to be heard.

4.      By this Court's prior Orders, including Judge Kaplan's September 13, 1999 Order (Dkt. 2), Judge Owen's January 7, 2000 Order (Dkt. 518-2), Judge Owen's February 4, 2000 Order relief requested in connection therein has been afforded to all parties-in-interest. Dkt. 112), Judge Owen's August 25, 2000 Findings of Fact and Conclusions of Law (Dkt. 161), Judge Owen's August 25, 2000 Order (Dkt. 162), this Court held Mr. Armstrong in civil contempt after he refused to comply with this Court's turn-over orders by returning $12.9 million in rare coins, 699 gold bullion coins, a statue of Julius Caesar, and 102 gold bars that the Court found were purchased by and assets of the corporations in receivership.

5.      In holding Mr. Armstrong in civil contempt, this Court issued Findings of Fact and Conclusions of Law. *See* Findings of Fact and Conclusions of Law on the Receiver's Motion for an Order Holding Martin Armstrong in Contempt for Refusing to Produce Corporate Assets, (Aug. 25, 2000) (Dkt. 161) ("Findings of Fact and Conclusions of Law").

6.      This Court determined that a $14 million collection of rare coins, 102 gold bars, 699 gold bullion coins, and a bust of Julius Caesar were corporate assets of the Princeton companies in receivership. *See* Findings of Fact and Conclusions of Law (Aug. 25, 2000) (Dkt. 161), at ¶¶ 19–22, 25, 83–91.

7.      This Court further found that Mr. Armstrong conceded, as part of his testimony at the January 14, 2000 hearing, that the $14 million collection of rare coins was a corporate asset of the companies in receivership. *Id*. at ¶ 88.

8.      In paragraphs 83, 84 and 85 of this Court's August 25, 2000 Findings of Fact and Conclusions of Law, the Court identified the $14 million collection of rare coins, which it held to be property of the receivership, by reference to the payment records and invoices offered at the January 14, 2000 hearing and included as exhibits to the Declarations of Emanuel Bulone and Stamatios Stamoulis. *Id*. at ¶ 89.

9.      The Court further described the $14 million collection of rare coins by separating it into two distinct categories: (i) those coins purchased before September 7, 1998, and purportedly transferred to Nigel Kirwan (the "Kirwan Coins"); and (ii) those coins purchased after September 7, 1998 (the "Non-Kirwan Coins"), which were valued at approximately $2.3 million in January of 2000, according to the testimony of Victor England. *Id.* at ¶¶ 19, 23, 37–41, 43–47.

10.     Accordingly, as determined by this Court in the Findings of Fact and Conclusions of Law on August 25, 2000 (Dkt. 161) at ¶¶ 19, 23, 37-41, 43-47, 83-88, the $14 million collection of rare coins includes all coins derived from the following sources: (i) copies of original invoices attached to the Stamoulis Declaration, dated December 17, 1999 (Dkt. 68); (ii) copies of payment records made by Princeton Economics between 1995 and 1999 to various auction houses, attached to the Bulone Declaration, dated December 17, 1999 (Dkt. 66), and incorporated by reference under Tab 1 of the Stamoulis Declaration; and (iii) an inventory list of coins ("Kirwan Inventory List") delineating many of the coins comprising the corporate "reference collection," which was maintained by Princeton Economics and attached to the Declaration of Martin P. Unger, (Dkt. No. 96) (attaching Decl. Nigel Kirwan and coin inventory as Ex. D).

11.     All coins comprising the so-called "reference collection" are included in the $14 million collection of rare coins as described by this Court's Findings of Fact and Conclusions of Law dated August 25, 2000 (Dkt. 161), and subject to the Receivership Estate. *See* Findings of Fact and Conclusions of Law (Dkt. 161) at ¶88 (*citing* Armstrong's testimony from January 14, 2000); January 14, 2000, Hearing Tr., No. 99-cv-9667 (S.D.N.Y. Jan. 14, 2000) (Dkt. No. 119), at 115:23-25 – 116:1-5 (Q: What did PEI transfer from Mr. Kerwan [sic] or his entity?   A: The reference collection.  Q: Just let's stop there.  That is item number 1.  The reference collection.  What are you referring to when you use the term "reference collection"?   A: The collection of coins of ancient

5

Greece, Rome, through medieval.").

12.     The "reference collection" includes, in whole or in part, the coins delineated on the Kirwan Inventory List as attached to the Unger Declaration (Dkt. 96), and the coin inventory schedule attached to the Declaration of Nigel Kirwan proffered by Mr. Armstrong's counsel at the hearing held on April 27, 2007.

13.     The Court found that, in January of 2000, Mr. Armstrong turned over $1.1 million comprised exclusively of Non-Kirwan Coins acquired after September 7, 1998. *Id.* at ¶¶ 23, 43, 47.

14.     The Court determined that Mr. Armstrong failed to turn over $1.3 million of the Non-Kirwan Coins, and "all coins purchased prior to September 1998"—the Kirwan Coins—valued at "over $11 million," and that all such coins were corporate property. *Id.* at ¶¶ 19, 23, 46–47, 119–120, 132.

15.     In 2006, the Court of Appeals affirmed these Orders, and the findings made in connection with them, holding that: "[Mr.] Armstrong failed to produce a black Compaq computer, the missing computer hard drive, 102 gold bars, 699 gold bullion coins, a bust of Julius Caesar, and the remaining rare coins valued at $12.9 million.  All told, [Mr.] Armstrong failed to return approximately $15 million in corporate assets." Armstrong v. Guccione, 470 F.3d 89, 94 (2d Cir. 2006) (emphasis added).

16.     After an evidentiary hearing following remand on April 27, 2007, this Court terminated Mr. Armstrong's confinement for contempt, finding that it no longer had coercive effect, but reaffirmed that Judge Kaplan's September 13, 1999 Order, Judge Owen's January 7, 2000 Order, Judge Owen's February 4, 2000 Order, Judge Owen's August 25, 2000 Order, Judge Owen's August 25, 2000 Findings of Fact and Conclusions of Law, and all the findings of fact and conclusions of law made in support of the turn-over and contempt rulings by the Court remained in

effect. *See* Transcript of Apr. 27, 2007 Hearing, at 95:23–110:23 and 104:23–25 (Dkt. 502–26 and Dkt. 502–27) (Mr. Sjoblom: If I understood you, did you say that the finding of contempt is still in effect?" The Court: "Oh, absolutely.")

17.    In June and July of 2008, Mr. Armstrong entered into consent orders with the CFTC and SEC that this Court then so ordered. *See* Final Consent Judgment as to Defendant Martin A. Armstrong (July 22, 2008) (Dkt. 435) (hereinafter "SEC Consent Order"); Judgment and Consent Order of Permanent Injunction and Other Equitable Relief Against Defendant Martin A. Armstrong, No. 99-cv-9669, (June 24, 2008) (Dkt. 110) (hereinafter "CFTC Consent Order").

18.    In addition to Mr. Armstrong, his counsel, Thomas V. Sjoblom, signed both the SEC Consent Order and the CFTC Consent Order.

19.    Section III.3 of the CFTC Consent Order, dated June 12, 2008, holds that the Order was entered into "without disturbing the findings of fact and conclusions of law in the civil contempt order entered by the Court." *See* CFTC Consent Order (June 24, 2008) (Dkt. 110), at 10, § III.3.

20.    The findings of fact and conclusions of law referred to in Section III.3 of the CFTC Consent Order include the Findings of Fact and Conclusions of Law made by this Court in its Order dated August 25, 2000. The Findings of Fact and Conclusions of Law made in support of the Court's civil contempt order include the finding that the $12.9 million in rare coins, statue of Julius Caesar, 699 gold bullion coins and 104 bars of gold bullion are the property of the receivership estate. *See* Findings of Fact and Conclusions of Law (Aug. 25, 2000) (Dkt. 161), at ¶¶ 25, 83–91.

21.    As part of the CFTC Consent Order, Mr. Armstrong also separately agreed to transfer to the Receiver as civil restitution "any and all right, title and interest that he possesses" in the property and assets listed in Exhibit 1 to the CFTC Consent Order and to "forever waive any

claim against such property and assets." *See* CFTC Consent Order (June 24, 2008) (Dkt. 110), at 8,

§ II.4.

Declaration and Testimony of Sam Spiegel

22.     Sam Spiegel is a rare coin specialist with the World and Ancient Coin division of Heritage.  In his second Declaration that was admitted into evidence by the Court at the Hearing (July 29, 2019) (Dkt. 554), Mr. Spiegel affirmed that the nine coins remaining in dispute were purchased and paid for by Princeton Economics International, Ltd. (or another Princeton entity subject to the receivership estate).

23.     Mr. Spiegel is a highly qualified and experienced expert in rare coins.  He completed his investigation, analysis, and testimony in a credible manner and exhibited a thorough knowledge of rare coins and the collection of rare coins owned by the Princeton Companies in Receivership. The Court credits his testimony.

24.     Mr. Spiegel traced each of the nine coins to coins purchased by Princeton Economics, through one or more of the following sources: (i) copies of original invoices attached to the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68) (hereinafter "Stamoulis Declaration"); (ii) copies of payment records made by Princeton Economics to various auction houses, attached to the Bulone Declaration (Dec. 17, 1999) (Dkt. 66) (hereinafter "Bulone Declaration") (and incorporated by reference into the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68) at Exhibit 1); and (iii) an inventory list of coins ("Kirwan Inventory List") delineating many of the coins comprising the corporate "reference collection," which was maintained by Princeton Economics and attached to the Declaration of Martin P. Unger (Jan. 12, 2000) (Dkt. 96) (hereinafter "Unger Declaration"), (attaching the Declaration Nigel Kirwan as Ex. C and Kirwan Inventory List as Ex. D).

25.     Each of the nine coins, and the sources upon which Mr. Spiegel's investigation and analysis rely, are identified by Mr. Spiegel in Exhibits 5, 22, 30, 31, 39, 49, 50, 51, and 52 of his

second Declaration (July 29, 2019) (Dkt. 554).

26.    Mr. Spiegel further concluded that each of the nine coins were included in the $14 million collection of rare coins, as described in the August 2000 Findings of Fact and Conclusions of Law (Dkt. 161) and the Court adopts this finding.

27.    Mr. Spiegel began his investigation of each coin by examining a high-resolution image of the coin in the possession of Heritage; he then searched prior auction catalogs for the same coin (guided by the auction dates that Armstrong provided during Discovery), and examined images of the coin included in the catalogs.

28.    Mr. Spiegel, then, compared and analyzed the image of the coin in Heritage's possession with the image of the coin from a prior auction catalog, and determined whether the two coins were, in fact, the same.

29.    Because many of these ancient coins were "hammered" or hand-struck while being made, Mr. Spiegel was able to use distinct features visible on the face of the coins to conclusively match them to the coins listed in the auction catalogs.  (July 31, 2019, Hearing Transcript at 45:23 to 46:7.)

30.    Once Mr. Spiegel confirmed the specific auctions in which the nine coins were offered (and typically sold), he reviewed (i) the invoices attached to the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68), and (ii) the payment records attached to the Bulone Declaration (Dec. 17, 1999) (Dkt. 66) to locate invoices, checks, and wire transactions corresponding with the pertinent lot numbers, auction dates, and estimated purchase amounts for the remaining coins.

31.    Mr. Spiegel also reviewed other contemporaneous documentation pertinent to tracing the provenance of the coins, including communications and letters. *See* second Declaration of Sam Spiegel (July 19, 2019) (Dkt. 554) at Ex. 49 (attaching various correspondence concerning

Armstrong's acquisition of export license necessary to transport the Henry III Gold Penny in August 1996, as well as various correspondence directing wire payment from Princeton Economics to Spink and Son also in August 1996.

32.     Separately, Mr. Spiegel reviewed the Kirwan Inventory List attached to the Unger Declaration (Jan. 12, 2000) (Dkt. 96) for each of the nine coins; in doing so, Mr. Spiegel also conducted similar image comparison for any coin images included on the inventory list.

33.     After carefully conducting his investigation, Mr. Spiegel determined that five (5) of the nine coins are included on invoices attached to the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68) and the Court adopts this finding.

34.     Coin 5, Ptolemy II Octodrachm, was purchased from the Bank Leu auction in October, 1997; and that the invoice was included within Tab 11 of the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68).  *See* second Declaration of Sam Spiegel (July 19, 2019) (Dkt. 554) at Ex. 5 (finding the coin on the invoice at Appellate Appendix No. A-407; Bates Number CNG00372).

35.     Coin 22, Demetrius Poliorcetes Tetradrachm, was purchased from Superior Stamp & Coin on January 3, 1996; and that the invoice was included within Tab 16 of the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68).  *See* Spiegel Declaration (July 19, 2019) (Dkt. 554) at Ex. 22 (finding the coin on the invoice at Bates SSC0015 under Tab 16).

36.     Coin 30, Siculo-Punic Tetradrachm, was purchased from Classical Numismatic Group during an auction held on May 6, 1995; and that the invoice was included within Tab 10 of the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68).  *See* second Declaration of Sam Spiegel (July 19, 2019) (Dkt. 554) at Ex. 30 (finding the coin on the invoice at Appellate Appendix No. A-313; Bates Number CNG00806).

37.     Coin 31, Acanthus Tetradrachm, was purchased from an auction conducted by

Numismatik Lanz on November 20, 1995; and that the invoice was included within Tab 17 of the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68). *See* second Declaration of Sam Spiegel (July 19, 2019) (Dkt. 554) at Ex. 31 (finding the coin on the invoice at Bates Number EJW00041, EJW00042, EJW00045 under Tab 17).

38.     Coin 52, 1540 2/3 Bonnet, was purchased from Spink Auction #119 held on March 4, 1997; and that the invoice was included within Tab 11 of the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68). *See* second Declaration of Sam Spiegel Declaration (July 19, 2019) (Dkt. 554) at Ex. 52 (finding the coin on the invoice at Appellate Appendix No. A-458; Bates CNG00480).

39.     Of the four remaining coins, Mr. Spiegel traced Coin 39, 1777 Pattern 2 Guineas, and Coin 49, Henry III ND 1216-1272 Gold Penny, to payment records included in the Bulone Declaration (Dec. 17, 1999) (Dkt. 66),and incorporated under Tab 1 of the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68) and the Court agrees with this analysis.

40.     Princeton Economics purchased Coin 49, Henry III ND 1216-1272 Gold Penny, as lot 203 from Spink Auction #114 held on July 9, 1996; a wire payment to Spink from Princeton Economics account #45062 (the corporate account Mr. Armstrong used for many of his coin purchases) for 257,676.37 GBP, or $399,243.77, on August 14, 1996, corresponds with this purchase; and this wire payment is included in Tabs 22–24 of the Bulone Declaration (Dec. 17, 1999) (Dkt. 66) and Tab 1 of the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68).

41.     On August 25, 2000, the Court held that "Defendant Armstrong paid for the rare and antique coins with funds that were transferred by wire out of accounts maintained by Princeton Economics International Ltd." (Findings of Fact and Conclusions of Law (Dkt. 161) at ¶85 (citing Bulone Decl. ¶ 5 and Ex. 1).)

42.     Further, Coin 49, Henry III ND 1216-1272 Gold Penny is included on the Kirwan

Inventory List, as attached to the Unger Declaration (Jan. 12, 2000) (Dkt. 96), and Coin 49 in

Heritage's possession is an exact match to the image of the Henry III Gold Penny appearing on the

Kirwan Inventory List.

43.    On February 4, 2000, the Court issued an Order directing Nigel Kirwan to turn over

all of the coins on the Kirwan Inventory List to the Court (Dkt 112), and the Kirwan Inventory List

was specifically incorporated into the Court's finding of contempt Order on August 25, 2000.

(Findings of Fact and Conclusions of Law (Aug. 25, 2000) (Dkt. 161) at p. 30.)

44.    Mr. Spiegel further reviewed contemporaneous correspondence that confirms (i)

Princeton Economics purchased Coin 49, Henry III ND 1216-1272 Gold Penny, from the Spink

Auction #114 held on July 9, 1996; and (ii) the corresponding payment for this purchase is the wire

payment to Spink from Princeton Economics account #45062 for 257,676.37 GBP, or $399,243.77,

on August 14, 1996, (Bulone Declaration (Dec. 17, 1999) (Dkt. 66), Tabs 22–24; Stamoulis

Declaration (Dec. 17, 1999) (Dkt 68), at Ex. 1, p. 1).

45.    Specifically, Mr. Spiegel reviewed a fax from Mr. Armstrong's secretary, sent on

Princeton Economics letterhead, to Spink on August 8, 1996, requesting an invoice for the

purchases Armstrong made on behalf of Princeton Economics in the July 9 auction (second

Declaration of Sam Spiegel (July 29, 2019) (Dkt. 554), at Ex. 49.3); from this, Mr. Spiegel

concluded that Princeton Economics bought multiple coins offered by Spink at the July 9, 1996

auction.

46.    Mr. Spiegel also considered a fax from Mr. Armstrong, sent on Princeton Economics

International Ltd. letterhead, to H.M. Customs and Excise from July 25, 1996, which noted that Mr.

Armstrong left the United Kingdom on July 11, 1996, carrying several coins purchased at the Spink

auction on July 9, 1996 (second Declaration of Sam Spiegel (July 29, 2019) (Dkt. 554), at Ex.

49.4); according to Mr. Spiegel, this correspondence further establishes that Mr. Armstrong purchased multiple coins on behalf of Princeton Economics from the Spink auction in July 1996.

47.     Finally, Mr. Spiegel included in his analysis a fax from Irene Tilmont to Mr. Armstrong dated August 22, 1996, explaining that the export license for Coin 49, Henry III ND 1216-1272 Gold Penny, and one other coin, was shipped to Armstrong the following day (second Declaration of Sam Spiegel (July 29, 2019) (Dkt. 554), at Ex. 49.5).

48.     Mr. Spiegel observed that the United Kingdom required an export license for coins over a certain value threshold or for coins of major historical or cultural significance and that his experience informs him that an export license takes a month or more to receive, which corresponds with the date of Tilmont's letter being slightly more than one month following the Spink Auction 114 held on July 9, 1996.

49.     During his testimony at the Hearing on July 31, 2019, Mr. Spiegel was questioned about Victor England's identification of specific coins purchased by Princeton Economics at the Spink Auction 114 held on July 9, 1996, in conjunction with Coin 49, Henry III ND 1216-1272 Gold Penny. (July 31, 2019 Hearing Tr. at pp. 27–28.)

50.     Although he did not have the CNG records referenced by Mr. England when he prepared his second Declaration (July 29, 2019) (Dkt. 554), Mr. Spiegel affirmed that those records strengthened his conclusion that Princeton Economics purchased Coin 49, Henry III ND 1216-1272 Gold Penny, and that it was included in the $14 million collection of rare coins. (July 31, 2019 Hearing Tr. 27:17–27:18.)

51.     Coin 39, 1777 Pattern 2 Guineas, was offered as lot 219 at the Spink Auction #111 held on November 21, 1995; Princeton Economics purchased Coin 39; and a wire payment to Spink from Princeton Economics account #45062 for 44,490 GBP on December 18, 1995, corresponds

with this purchase (as attached to the Bulone Declaration (Dec. 17, 1999) (Dkt. 66), and is
incorporated under Tab 1 of the Stamoulis Declation (Dec. 17, 1999) (Dkt. 68)).

52.     During his testimony, Mr. Spiegel was questioned about Mr. England's analysis of
Coin 39, 1777 Pattern 2 Guineas, and whether it alters any of his conclusions.  (July 31, 2019
Hearing Tr. 25:15–26:9, 27:6–23.)

53.     Mr. Spiegel explained that his conclusion remained the same—that "[Coin 39, 1777
Pattern 2 Guineas] was offered as part of the Spink auction in November 1995, and [he] believe[d]
that Martin Armstrong, on behalf of Princeton Economics, purchased it after the sale from Spink."
(July 31, 2019 Hearing Tr. 25:12–14 and 17–20 (Mr. Spiegel further noting that his findings and
conclusion were consistent with those of Victor England for Coin 39, 1777 Pattern 2 Guineas).)

54.     Mr. Spiegel—like Mr. England—concluded that Princeton Economics purchased
Coin 39, 1777 Pattern 2 Guineas, from Spink and paid for the coin by transferring a wire payment to
Spink from Princeton Economics account #45062, a record of which was attached to the Bulone
Declaration (Dec. 17, 1999) (Dkt. 66) and incorporated under Tab 1 of the Stamoulis Declaration
(Dec. 17, 1999) (Dkt. 68).

55.     Although Mr. Spiegel did not find an invoice or payment record in either the
Stamoulis Declaration or the Bulone Declaration that corresponded to either Coin 50, 1937 3 Pence,
or Coin 51, 1738 2 Guinea, he concluded that both coins (i) were purchased by Princeton
Economics during the relevant time period, and (ii) were included within the $14 million coin
collection identified and described in this Court's prior Findings of Fact and Conclusions of Law
from August 2000 (Dkt. 161).

56.     Both Coin 50, 1937 3 Pence, and Coin 51, 1738 2 Guinea, appear on the Kirwan
Inventory List as belonging to the "reference collection" and as two of the coins purportedly

transferred to Mr. Kirwan in September 1998; thus, both coins are "Kirwan Coins" included within the $14 million coin collection as identified in this Court's Findings of Fact and Conclusions of Law from August 2000, and were directed by the Court to be turned over to the Receiver (Dkt. 161).

57.     In both 2000 and 2007, Mr. Armstrong and his counsel proffered to this Court that Princeton Economics transferred the coins reflected on the Kirwan Inventory List to Mr. Kirwan in September 1998; the Court previously found this narrative lacking in credibility. Findings of Fact and Conclusions of Law (Aug. 25, 2000) (Dkt. 161) at ¶¶119–132).

58.     In a letter to this Court dated June 7, 2019, Mr. Armstrong and his counsel acknowledged that some or all the coins appearing on the Kirwan Inventory List were not transferred to Mr. Kirwan in September 1998, but instead were retained by either Mr. Armstrong or Princeton Economics. *See* Sjoblom Letter (June 10, 2019) (Dkt. 523) at 2 ("Mr. Armstrong has testified in his recent depositions that the inventory attached to Mr. Kirwan's January 2000 declaration may reflect the entire [reference] collection, which shows more than what Mr. Kirwan actually received in September 1998.").

59.     During Mr. Armstrong's Deposition on March 22, 2019, in connection with *Antoniak, et al., v. Armstrong*, No. 2:18-cv-01263-HB (E.D. Pa.), Mr. Armstrong testified that the Kirwan Inventory List attached to the Unger Declaration was "for everything that was ever bought[.]" Armstrong Dep. I (Mar. 22, 2019) (Dkt. 502–28) at 302: 9–10. When questioned about the nature of the Kirwan Inventory List, Mr. Armstrong answered as follows:

> [Armstrong]. This does not appear to be what Kirwan received. This appears to be the spreadsheet for everything that was ever bought, I believe, because this would add up to definitely more than the $10 million.

> So I think [Unger] probably attached the wrong one. And he probably put
> the one [spreadsheet] that was for everything, rather than the one that was
> for Kirwan.

*Id.* at 302: 7–17.

60.     Mr. Armstrong further described the Kirwan Inventory List as "more

comprehensive" and comprised of "Greek, Judean English, Roman Republican [coins]." *Id.* at 304:

9–11.

61.     During his testimony before this Court on January 14, 2000, Armstrong explicitly

described the "Kirwan Coins"—as identified in this Court's Findings of Fact and Conclusions of

Law from August 2000 (Dkt. 161)—as the "reference collection of Greek, Roman and medieval

coins[.]" (January 14, 2000, Hearing Tr. (Jan. 14, 2000) (Dkt. 119), at 115:23 – 116:11) (Mr.

Armstrong further acknowledging the existence of a list of coins in the "reference collection").

62.     This Court's Findings of Fact and Conclusions of Law from August 2000

ascertained that Princeton Economics used the "Kirwan Coins"—the coins in the "reference

collection" purchased before September 7, 1998—as part of the "corporate-type museum" that Mr.

Armstrong had assembled. *See* Findings of Fact and Conclusions of Law (Aug. 25, 2000) (Dkt.

161), at ¶ 88 (*quoting* January 14, 2000 Hearing Tr. (Dkt. 119) at 119:18–25).

63.     Mr. Spiegel not only located Coin 50, 1937 3 Pence, as delineated on the Kirwan

Inventory List, but he also matched a coin image appearing on the same list with the image of Coin

50 in Heritage's possession; Mr. Spiegel concluded that the two images are of the same coin. *See*

second Declaration of Sam Spiegel (July 19, 2019) (Dkt. 554), at Ex. 50.3.

64.     Mr. Spiegel determined that Princeton Economics purchased Coin 51, 1738 2

Guinea, as lot 3339 from Stack's Coin Galleries auction held on July 18, 1995; he discovered an

invoice from Stack's Coin Galleries auction directed to Mr. Armstrong at the corporate address of

Princeton Economics (214 Carnegie Center, 3rd Floor, Princeton, NJ 08540), and marked as Bates

number STACKS/SEC-00002.  *See* second Declaration of Sam Spiegel (S.D.N.Y. July 29, 2019) (Dkt. 554) at Ex. 51.3.

65.    Mr. Spiegel further found that an image of lot 3339 from the Stack's Coin Galleries auction held on July 18, 1999, corresponds to the image of Coin 51, 1738 2 Guinea, in Heritage's possession. *Id*. at Ex. 51.5

66.    Mr. Spiegel based his conclusion that Princeton Economics purchased Coin 51, 1738 2 Guinea, upon (1) the Stack's Coin Galleries invoice for lot 3339 and the corresponding image match; and (2) the appearance of Coin 51, 1738 2 Guinea, on the Kirwan Inventory List of coins comprising Princeton Economics' "reference collection."

67.    Mr. Spiegel traced eight of the nine coins remaining in dispute to the Kirwan Inventory List: (i) Coin 5, Ptolemy II Octodrachm; (ii) Coin 22, Demetrius Poliorcetes Tetradrachm; (iii) Coin 31, Acanthus Tetradrachm; (iv) Coin 52, 1540 2/3 Bonnet; (v) Coin 39, 1777 Pattern 2 Guineas; (vi) Coin 49, Henry III ND 1216-1272 Gold Penny; (vii) Coin 50, 1937 3 Pence; and (viii) Coin 51, 1738 2 Guinea.

68.    Of further note, the Kirwan Inventory List also included an image of the Henry III ND 1216-1272 Gold Penny.

69.    Using the same methods described previously, Mr. Spiegel matched the image appearing on the Kirwan Inventory List with the high resolution image of Coin 49, Henry III ND 1216-1272 Gold Penny, which is currently in Heritage's possession; accordingly, Mr. Spiegel included this as further support for his conclusion that Coin 49, Henry III ND 1216-1272 Gold Penny, is included in the $14 million coin collection described in this Court's Findings of Fact and Conclusions of Law from August 2000 (Dkt. 161).

Declaration of Victor England

70.    Mr. England is an expert in rare coins and the former principal of an auction house,Classical Numismatic Group, Ltd. ("CNG"), specializing in ancient and medieval coins, . Mr. England was personally familiar with the rare coin collection owned by the Princeton Companies in Receivership, in part, because his firm served as agent in helping Mr. Armstrong purchase many of the rare coins that are missing. (Declaration of Victor England (July 30, 2019) (Dkt. 556), at ¶¶ 4–10.) From 1995 through 1999, Mr. Armstrong placed purchase orders for millions of dollars of rare coins with Mr. England and his firm. (*Id.* at ¶ 5.)

71.    Mr. England reviewed high-definition images of the nine coins and compared those images to the images of coins in auction catalogues for the period and the descriptions associated with the invoices and payment records generated by sales to the Princeton Companies in Receivership that were incorporated in the Stamoulis Declaration. (*Id.* at ¶ 11.)

72.    Based on his personal knowledge, Mr. England testified that his former firm, CNG, served as agent for the purchase of Coin Nos. 5 and 30, and auctioneer for Coin No. 52, and that the CNG invoices in the Stamoulis Declaration correspond to these sales to the Princeton companies. (*Id.* at ¶ 11.)

73.    Mr. England traced Coin Nos. 22 and 31 to invoices in the Stamoulis Declaration attributable to two other auction houses with whom he dealt, Superior Stamp & Coin and Numismatik Lanz, Coin Nos. 39, 49, and 50 to payment records in the Stamoulis Declaration for sales to the Princeton companies and Coin No. 51 to a purchase made by the Princeton companies. (*Id.* at ¶¶ 18–20, 21–35.)

74.    Mr. England's business partner attended the July 6, 1996 auction at which the Henry III, Gold Penny (Coin No. 49) was sold and recorded the sales made at that auction. (*Id.* at ¶ 22.)

CNG maintained these notes as a business record in its files. (*Id.*) Mr. England's testimony about this auction and the exhibits that support it further corroborate that the payment records incorporated in the Bulone Declaration (Dec. 17, 1999) (Dkt. 66) and incorporated by the Stamoulis Declaration (Dec. 17, 1999) (Dkt. 68) correspond with Princeton Economics' purchase of the Henry III, Gold Penny and, as detailed above, that it falls within the scope of the prior orders of this Court.

75.     Mr. Armstrong's admission concerning the Henry III, Gold Penny further confirms that it is the property of the Receivership.  At his deposition on May 30, 2019, Mr. Armstrong admitted that the Henry III, Gold Penny was part of Princeton's "Corporate Reference Collection" of coins (which was the subject of this Court's August 25, 2000, Findings of Fact and Conclusions of Law (Dkt. 161)):

> Q. So, the corporate reference collection included a medieval collection of coins, right?
>
> A. Only really English.
>
> Q. And that medieval collection of coins in the corporate reference collection included the English golden Penny, right?
>
> A. Up to that point, yes.

Armstrong Deposition Tr. (May 30, 2019) (Dkt. 556–25), at 49: 8–15, attached as Exhibit 25 to the Declaration of Victor England (July 30, 2019) (Dkt. 556).

76.     As the nine coins that are identified under Section 1 of the second Declaration of Sam Spiegel (July 29, 2019) (Dkt. 554), on Exhibit B of the original Spiegel Declaration (June 13, 2019) (Dkt. 528), and in the Declaration of Victor England (July 30, 2019) (Dkt. 556) are among the rare coins that are the subject of this Court's September 13, 1999 Order, January 7, 2000 Order, August 25, 2000 Findings of Fact and Conclusions of Law (Dec. 17, 1999) (Dkt. 161), and the CFTC Consent Order, No. 99-cv-9669, (June 24, 2008) (Dkt. 110) they are and have been the property of the Receivership estate.

The Stamoulis Declaration

77.     Mr. Stamoulis is a former associate of O'Melveny & Myers LLP and the author of the Stamoulis Declaration dated December 14, 1999.

78.     Mr. Stamoulis affirmed that the Conformed Copy of the Stamoulis Declaration bearing Bates number AB0000001-574 is, to the best of his knowledge, the declaration that was filed and served on December 14, 2000.

79.     In addition to preparing the Stamoulis Declaration, Mr. Stamoulis also prepared the appendix that was submitted to the United States Court of Appeals for the Second Circuit (Case No. 01-6159) as part of the appeal of the contempt order.  Mr. Stamoulis affirms that he incorporated relevant sections of the Stamoulis declaration into the Appellate Appendix and that his comparison of the appellate appendix to the Conformed Copy of the declaration confirms that the pages of the declaration that are cited in support of the Receiver's motion were in the original declaration.

80.     Based on the testimony and evidence presented to the Court, the Court holds that the Conformed Copy of the Stamoulis Declaration in the possession of the Receiver is an authentic copy of the Stamoulis Declaration that was filed as Docket Number 168, and Mr. Armstrong— through his counsel—accepted that conclusion in open court.  (July 31, 2019 Hearing Tr. at 6:4–6:6, 6:10, 6:19–6:22.)

Mr. Armstrong's Response

81.     Mr. Armstrong, who was represented by counsel, did not call any witnesses to contest that the nine coins are and have been the property of the Receivership estate. Mr. Armstrong was free to testify at the July 31 Hearing but did not appear in person. (July 31, 2019 Hearing Transcript at 57: 1–7). The Court afforded Mr. Armstrong a further opportunity to appear and testify on August 9, 2019 but his counsel advised the Court in a letter

that Mr. Armstrong was not available on the date and did not wish to have the Court schedule a hearing for some other date. (Letter from T. Sjoblom, Aug. 2, 2019 (Dkt. 563)).

82.    Against this evidence offered by the Receiver, Mr. Armstrong offered nothing to show that he purchased any of the nine coins with his personal funds. *See* (Armstrong II Tr., April 17, 2019 (Dkt. 502-28) at 697:1-21 (testifying that "[he] did not buy [coins for] $15 million or $20 million of [his] personal checking account" and, perhaps, during the 1990s "[he] may have" spent $250,000 on coins total)).

83.    Mr. Armstrong offered the declaration he filed prior to the hearing and excerpts from his depositions wherein he asserts that certain coins were transferred from the Princeton companies to himself as compensation. However, Mr. Armstrong admitted that his tax returns for the period do not corroborate his testimony.

84.    Mr. Armstrong did not offer any document authorizing a transfer of rare coins to himself in January 1999 (or at any other time), nor did Mr. Armstrong offer the testimony or statement of any person with knowledge of this purported transfer.

85.    Mr. Armstrong, in fact, testified during his deposition on March 22, 2019, that he intentionally chose not to disclose to this Court this alleged transfer of rare coins from Princeton Economics to himself in January 1999. (Armstrong I Tr., Mar. 22, 2019 (Dkt. 502-28) at 286:18-24 – 287:1-22).

86.    Mr. Armstrong has failed to offer any credible documentation or explanation identifying a right to or interest in the fifty-eight coins held by Heritage—and particularly the nine coins that remained in dispute as of the hearing on July 31, 2019.

87.     Mr. Armstrong concedes that Coin 52 was purchased by PEI using corporate funds, is listed in the Stamoulis Declaration, and is property of the receivership.  (Dkt. 565 at 4.)

88.     There is no credible testimony or documentary evidence that Mr. Armstrong holds title, interest or ownership of any coin in the $14 million coin collection, including the nine coins in dispute at the July 31 Hearing.

CONCLUSIONS OF LAW

89.     The nine rare coins are the property of the receivership.  The Court's prior orders direct the Receiver to take such steps as are reasonable and necessary to recover these assets and distribute the proceeds in accordance with the terms of the Plan of Final Distribution.  It is well established that federal courts have the authority to grant these types of powers upon receivers. S.E.C. v. Koenig, 469 F.2d 198 (2d Cir. 1972) (granting receiver investigatory and managerial powers for defendant corporation); see Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141, 143 (2d Cir. 1964).

90. The entry of the Closure Order did not change this as the Court expressly retained jurisdiction to enforce the Plan of Final Distribution even if the case was closed.  Order Approving Final Plan of Distribution (Sep. 30, 2008) (Dkt. 451), at 9.  ("This Court shall retain jurisdiction over these cases to enforce this Approval Order and for all other purposes including, but not limited to, those described in Section 7 of the Plan of Final Distribution.  Such jurisdiction shall be retained even if a Plan of Final Distribution is approved and/or the case is closed, and the case may be reopened for such purpose.")  See Closure Order of Oct. 6, 2017 (Dkt. 494 at 3.)

CONCLUSION

The nine rare coins that were the subject of the July 31, 2019 hearing, i.e. Ptolemy II

Octodrachm ("Coin 5"); Demetrius Poliorcetes Tetradrachm ("Coin 22"); Siculo-Punic Tetradrachm

("Coin 30"); Acanthus Tetradrachm ("Coin 31"); 1777 Pattern 2 Guineas ("Coin 39"); ND

1216-1272 Gold Penny ("Coin 49"); 1937 3 Pence ("Coin 50"); 1738 2 Guinea ("Coin 51"); and

1540 2/3 Bonnet ("Coin 52"), are the property of the Receivership.  By the preponderance of the

evidence, the Receiver has proven that each of the nine coins at issue were purchased with the

corporate funds of Princeton Economics International, Ltd.; (2) the nine coins are not the personal

property of Mr. Armstrong; (3) the nine coins were the subject of prior orders issued by this Court

on February 4, 2000 and August 25, 2000; and (4) the nine coins are subject to the Restitution

provision of the CFTC Consent Decree voluntarily entered into by Mr. Armstrong and/or are

corporate property subject to the Receivership Estate.

Heritage is directed to sell the nine coins in its possession at auction and transmit the

proceeds from this sale to the Receivership Estate.  The Receivership is further directed to dispose of

any storage lockers it maintains – either by sale if practicable or abandonment if not, and to wind-up

its operation by disbursing any proceeds from the Heritage and locker sales as directed by the SEC

and CFTC.

SO ORDERED:

Dated: New York, NY
          September 5, 2019

_____
                                           U.S.D.J.

24