**THOMAS V. SJOBLOM**
*Attorney At Law*
tvsjoblom@tvs-law.com
**www.tvs-law.com**

| | |
|---|---|
| **Franklin Square Center** | **Americas Tower** |
| **1300 I Street, N.W.** | **1177 Avenue of the Americas** |
| **Suite 400E** | **Suite 500** |
| **Washington D.C. 20005** | **New York, NY  10036** |
| **(202) 429-7125** | **(646) 452-7060** |

November 26, 2019

**Via ECF Filing**

The Honorable P. Kevin Castel
United States District Court Judge
Southern District of New York
Courtroom 11 D
500 Pearl Street
New York, NY 10007

> Re:   *SEC v. Armstrong, 99 Civ 9667  (PKC)*
> *CFTC v.  Armstrong,  99 Civ 9669 (PKC)*
> **PRE-MOTION LETTER**

Dear Judge Castel:

Pursuant to Rule 4.A.1 of Your Honor's Rules of Individual Practices, Defendant Martin Armstrong respectfully submits this Pre-Motion Letter requesting leave to file a motion to stay Your Honor's September 5, 2019 order directing Heritage to sell certain coins and directing the Receiver to wind-up the receivership estate as directed by the SEC and CFTC. The motion to stay should be permitted to be filed and granted because Armstrong filed a petition for *writ of certiorari* with the United States Supreme Court on September 23, 2019, s*ee* Exhibit 1; and, contrary to the request of the Solicitor General to waive filing of a response, the Supreme Court on October 31, 2019 directed the Solicitor General to file a response, which is due December 2, 2019, *see* Exhibit 2 – indicating the Supreme Court's obvious interest in this matter. Accordingly, for the reasons stated below, this Court's September 5, 2019 Order should be stayed pending resolution of Armstrong's petition for certiorari. If a stay is not granted, Armstrong will suffer irreparable harm, including loss of his family property.[1]

---

[1]  There is no scheduled hearing or conference before Your Honor in this matter.

## Background

Your Honor may recall the objections that Armstrong filed in August 2017 to the closing of the receivership estate. See Dkt # 490. Those objections included the contention that Armstrong's Sixth Amendment right to counsel of choice had been violated when the government failed to trace all funds to the alleged misconduct and therefore took from Armstrong untainted funds that would otherwise have been available for counsel of choice. *Luis v. US,* 136 S. Ct. 1083 (2016). Those objections also contended that Armstrong had been denied due process when the government seized and sold property that did not trace to the alleged misconduct, some of which belonged to his father and mother, and some of which even predated the alleged misconduct in this case, including coins that Armstrong had acquired in his teenage years and in his 20s. On appeal, the Second Circuit did not opine on the *Luis* issue. On the personal property issue, the Second Circuit affirmed this Court's ruling that Armstrong had been given sufficient opportunity to obtain his personal property, that the SEC and CFTC, contrary to the language of the consent judgment, had no obligation to return any of it, and that, in any event, Armstrong merely objected to closure and had not requested any hearing. *See* Exhibit 3.

Pending appeal of Your Honor's closure order to the Second Circuit, in an independent action in the Eastern District of Pennsylvania, the Antoniaks – who owned a coin shop in Philadelphia, purchased 58 coins for $6,000, and consigned the coins for sale by Heritage Numismatics in Dallas, Texas – brought a declaratory judgment action claiming that the coins belonged to the Antoniaks. The receiver later appeared in the Eastern District of Pennsylvania and claimed that the coins should be deemed part of the receivership estate. Judge Bartle of the Eastern District of Pennsylvania agreed to stay the declaratory judgment action brought by the Antoniaks in that court while Your Honor held hearings on the Receiver's order to show cause why those coins should not be part of the receivership estate. Your Honor subsequently ruled on September 5, 2019 that all 58 coins were part of the Receivership estate.

Two weeks later, Armstrong filed his *writ of certiorari* on September 23, 2019 on Your Honor's 2017 Closing order, which the Second Circuit had affirmed. Armstrong's petition for *writ of certiorari* raises two main questions: First, whether, consistent with *Luis*, his Sixth Amendment right to counsel of choice was violated when the government seized all property without determining whether that property traced to the misconduct alleged. *See* Exhibit 1, pp. 1-2, 4, 10, 14, 17-26. Second, whether Armstrong's due process rights were violated by the Receiver's seizure and sale of property that did not trace to the alleged misconduct, some of which belonged to his father and mother, and some of which even predated the alleged misconduct in this case. *See* Exhibit 1, pp. i, 3-4, 17-18, 26-31. Resolution of those questions will impact the closing of the receivership estate, including this Court's September 2019 "so ordered" disbursement of sales proceeds.

<u>**Legal and Factual Bases for Armstrong's Motion for Stay**</u>

This Court has inherent authority as well as authority under the All Writs Act, 28 U.S.C. § 1651(a),[2] to order a stay and preserve the status quo. A district court's power to stay proceedings was settled in *Landis v. North American Co.*, 299 U.S. 248, 254 (1936): "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its own docket with economy of time and effort for itself, for counsel, and for litigants." "It follows that the decision whether to issue a stay is firmly within a district court's discretion." *LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005) (internal citations omitted).

Armstrong intends to move for a stay of this Court's September 5, 2019 order in this concurrent related federal receivership action on the following grounds:

**A.     The Impropriety of the Asset Freeze and Turn Over Orders**

Three months before the SEC and CFTC filed their complaints in September 1999, the United States Supreme Court held in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), that an asset freeze over unsecured notes is improper. *See id.* at 329 (recognizing that in both England and the United States asset-freeze orders— "the 'nuclear weapo[n] of the law'"—were traditionally not available with respect to unsecured creditors). The asset freeze should never have been entered in this case in September 1999, since all of the PEI and PGM notes underlying the government's claims were unsecured. Exhibit 1, at 6-7. The district court nevertheless ignored – or was not informed of – the holding in *Grupo Mexicano* and permitted the asset freeze – and the Receiver's turnover order on which it was based – to go forward. The district court (Judge Owen) rejected Armstrong's objections to that "equitable" overreach, despite the lack of any historical analog for asserting such prejudgment control over foreign property, and despite *Grupo Mexicano*'s clear instruction that the equitable authority of the federal courts is limited to that which the courts of England applied in 1789. The asset freeze was improper.

The district court equally disregarded the fact that the asset freeze and turnover orders were based on entirely *foreign* note transactions and that the receiver also requested property of *foreign* entities owned and operated by *non-U.S.* citizens. The United States Supreme Court later held that §10(b) of the Securities Exchange Act, 15 U.S.C.  §78j(b), does not apply to claims of foreign investors who purchased securities of foreign issuers on foreign exchanges. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255-73 (2009). *See* Exhibit 1, at 7, note 1. Each of the notes underlying the SEC claims were issued by a Turks & Caicos company to a Japanese company. The United States federal securities laws therefore should never have applied.

---

[2] The All Writs Act provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

The United States Supreme Court has been made aware of this background in Armstrong's *writ for certiorari*. *See* Exhibit 1. The Supreme Court's decisions in *Grupo Mexicano* and in *Morrison* only serve to make more poignant and enlarge the problems underlying *Luis* and the denial of due process over personal property.

### B.    The *Kappel* Factors Warrant a Stay

Courts in the Southern District of New York consider five factors when deciding whether a stay, pursuant to a court's inherent power to regulate its docket, is appropriate: (1) the private interests of the plaintiff in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiff if delayed; (2) the private interests of and burden on the defendant; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest. *Kappel v. Comfort*, 914 F.Supp. 1056, 1058 (S.D.N.Y. 1996). "These *Kappel* factors have been applied, *inter alia*, to stay a federal action in light of a concurrently pending federal action (either because the claim arises from the same nucleus of facts or because the pending action would resolve a controlling point of law). In balancing these *Kappel* factors on a case-by-case basis, the basic goal is to avoid prejudice." *LaSala, supra,* 399 F. Supp. at 427 (internal citations omitted). *See Catskill Mountain v. EPA*, 630 F.Supp.2d 295 (S.D.N.Y.2009) (applying the Kappel factors in granting a stay in a civil matter pending the disposition of a related civil matter then on appeal to the Eleventh Circuit Court of Appeals); *Fried v. Lehman Bros. Real Estate Assocs. III*, No. 11 Civ. 4141(BSJ), 2012 WL 252139 (S.D.N.Y. Jan. 25, 2012) (granting defendant's motion to stay pending the resolution of plaintiff's appeal in a related civil action before the Second Circuit); *In re Literary Works in Elec. Databases Copyright Litig.*, No. M–21–90 GBD, MDL 1379, 00 CIV 6049, 00 CIV 7376, 00 CIV 9411, 2001 WL 204212 (S.D.N.Y. Mar. 1, 2001) (staying a civil copyright action pending the resolution of a related case before the Supreme Court of the United States because any holding would "significantly impact" the multidistrict litigation). These factors have been applied in SEC and CFTC cases. *CFTC v. A.S. Templeton Grp., Inc.*, 297 F. Supp. 2d 531, 535 (E.D.N.Y. 2003)(stay denied in parallel criminal and civil case prior to indictment); *S.E.C. v. Pignatiello*, No. 97 CIV. 9303 (SWK), 1998 WL 293988, at *4 (S.D.N.Y. June 5, 1998); *S.E.C. v. Chakrapani*, No. 09 CIV. 1043 (RJS), 2010 WL 2605819, at *10 (S.D.N.Y. June 29, 2010). [3]

---

[3] A similar set of factors are used where there is no concurrent related case pending but a party is seeking review by *writ of certiorari*:

> "To obtain a stay pending the filing and disposition of a petition for a writ of certiorari, an applicant must show (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay."

*Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010).

The *writ of certiorari* before the Supreme Court concerns a matter directly related to this Court's September 2019 order to wind-up the receivership estate and to disburse all proceeds. The *Kappel* factors warrant the stay.

*First,* Plaintiffs SEC, CFTC and the Receiver will not be prejudiced if execution of this Court's order is stayed pending grant (or denial) of the petition for certiorari. This receivership has been pending for more than 20 years, *i.e.,* since late September 1999. The Receiver has even been content to hold unto proceeds of sales that occurred more than 7 years ago – in 2012 – without disbursement. The Receiver has not been in any rush to close the estate, and there is no reason to do so now.[4] Moreover, some of the proceeds from the 2012 sales were for coins that were the private collection of Armstrong that he acquired as far back as his teenage years and in his 20s, s*ee* Exhibit 4 - Armstrong Declaration, November 24, 2019, ¶ 4 ("Armstrong Nov. 2019 Declar."), Exhibit A, for which there can be no justifiable reason for inclusion in the receivership estate. These sales proceeds cannot be traced to property that was bought with funds of the entity defendants, and these purchases pre-date any alleged misconduct in this case. There can be no prejudice to the government in selling property and disbursing proceeds to which it was never entitled in the first place.[5]

Of course, the actual grant of Armstrong's *writ of certiorari* by the United States Supreme Court will operate to stay the judgment of the Court of Appeals, *Glick v. Ballentine Produce, Inc.*, 397 F.2d 590  (8th Cir. 1968), which means the Receivership will be halted at that time. The Receiver should not be permitted to out-run the Supreme Court.

*Second,* Armstrong will be significantly burdened if the Receiver executes this Court's order. If the Receiver sells or abandons Armstrong's personal property, there is real uncertainty about whether Armstrong will be able to recoup this property should he prevail in the Supreme Court. Armstrong would be unable to claw back funds disbursed by the government to the entities listed in the Receiver's closing report. In such circumstances, a stay is necessary. *See, e.g.*, *Ledbetter v. Baldwin*, 479 U.S. 1309, 1310

---

[4]  The Receiver has warned Armstrong that he must claim his property from the Langhorne storage locker by December 1st - the day before the Solicitor General's brief is due in the Supreme Court - or it will be too late to claim it. Armstrong resisted the threat. Last evening, the Receiver offered other dates up to December 15 at which point he intends to resolve disposition of all the storage lockers. The Receiver's new position makes the need for a stay more pressing. He intends to dispose of the contents before the Supreme Court rules on the grant or denial of the petition for certiorari.

[5] Armstrong had respectfully also requested that his other personal property be returned to him, including the money in his personal checking account and the money in his 401K account, for which he never received proper notice. Although the Receiver previously claimed he could not comply with a subpoena issued from the Eastern District of Pennsylvania requiring him to turn over  the personal checking account because he did not have any such account information, he then presented Armstrong with that checking account information at Armstrong's deposition in this proceedings on May 30, 2019.  The bankruptcy courts routinely treat  401(k) plan as personal property. "His assets consist entirely of personal property, consisting primarily of a 401(k) plan in the amount of $24,200." *In re Tuck*er, 389 B.R. 535, 537, 2008 Bankr. LEXIS 1589, *14 (Bankr. N.D. Ohio May 20, 2008) ("He owns no real property and no personal property of significant value other than funds in his 401(k) plan.").

(1986) (finding irreparable harm where, among other things, "it is unlikely that disputed payments made pursuant to the District Court's judgment could be recovered"); *Heckler v. Turner*, 468 U.S. 1305, 1307-08 (1984) (finding irreparable harm where, if a party were to prevail on appeal, it would be "extremely unlikely . . . to recover funds improperly paid out"); *Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) (granting injunction to stay enforcement of state tax statute where there was "no remedy" to recoup money paid if the law was found invalid); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss . . . does qualify as irreparable harm."); *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir. 1985) ("The absence of an available remedy by which the movant can later recover monetary damages . . . may also be sufficient to show irreparable injury.").

*Third,* while this Court may have an interest in clearing its docket of this protracted 20-year proceeding, that interest cannot outweigh the possible constitutional violations that may have occurred by the Receiver's and government's conduct. And, the short delay while the parties await the Supreme Court's decision on the grant (or denial) of petition for certiorari – which will occur at the conference on January 10, 2020 if the Solicitor General files his brief on the due date – is *de minimis* compared to the length of time these proceedings have already endured and the irreparable harm to Armstrong if the Receiver distributes all sales proceeds now, including proceeds to which the Receiver has no valid claim. *See* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶4, Exhibit A.

Your Honor may recall that at the June 13, 2019 hearing you expressed concern about disbursements being made by the Receiver should a certiorari petition be filed. Your Honor stated: "[t]he only question I have is, if there is a pending cert. petition from the Second Circuit's decision, you may have to wait until the mandate has issued. I have no view on that other than to urge caution on your part to get to the bottom of that issue." *See* June 13, 2019, Hearing Transcript at 92:19-93:1. Even though a mandate has been issued, the pending petition for certiorari counsels the same caution.

The Supreme Court's grant of certiorari to the Second Circuit affirming closure of the receivership estate will affect the disposition of the current matter before this Court. The Receiver seeks to disburse proceeds that came from personal property of Armstrong, and this Court stated that the Receiver can abandon – or even sell – his other personal property, as well as property belonging to his father and mother. A stay is proper, in the interest of judicial economy, when the resolution of issues in the independent but related case – now before the Supreme Court – may dispose of the case that is to be stayed. *See, e.g.*, *Wash. Mut. Bank v. Law Office of Robert Jay Gumenick*, 561 F. Supp. 2d 410, 412 (S.D.N.Y. 2008) (stay was in the interest of judicial economy where plaintiff's damages in the later-filed federal case might have been eliminated by the outcome of its claims in pending state court proceeding); *Wing Shing Prods. (BVI) Ltd. v. Simatelex Manufactory Co., Ltd.*, No. 01 Civ. 1044, 2005 U.S. Dist. LEXIS 6780, at *5-8 (S.D.N.Y. Apr. 18, 2005) (stay was in the interest of judicial economy where issues before appeal court in different case were "potentially outcome determinative"); *In re Literary Works in Elec. Databases Copyright Litig.*, 2001 U.S. Dist. LEXIS 2047, at *5-9 (S.D.N.Y. Mar. 1,

2001) (stay was in the interest of judicial economy where Supreme Court decision could dispose of all claims).

*Fourth,* there are few remaining non-parties with an interest in this civil litigation, such as Price WaterHouse Coopers ( "PwC"), Yakult Honsha Co., Ltd. ("Yakult") and O'Melveny & Myers ("OMM"), the Receiver's law firm. PwC performed forensic accounting work, for which it has presumably been paid under two prior distributions, but is to be paid another $568,030 under the proposed closing order. [6]

Beyond what OMM has already been paid, OMM intends to pay itself another $882,8782 (legal fees), plus $7,048 in third party vendor costs.

Yakult, a Japanese beverage maker, was the first company to seek an unsecured note from Cresvale-Tokyo, PEI's Tokyo franchise operation.[7] The Receiver proposes to distribute to Yakult $5.033 million. Dkt# 526-3, Exh. 2-A, at 2. However, all the notes issued to Yakult were redeemed. *See* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶ 15. Yakult on its own had lost over $1 billion trading at various brokerage firms, which had nothing to do with Armstrong, PEI or PGM.[8] Because of mounting losses but need to

---

[6] Besides being the forensic investigator for the Receiver, PwC was also the auditor for Yakult, and therefore had a conflict of interest. Did the Receiver discontinue the investigation of Yakult because of PwC's conflict of interest with Yakult? Moreover, PwC was the auditor of HSBC, which was not only given the Princeton notes to redeem by which HSBC made $400 million windfall profit, but also HSBC was assigned all remaining assets of PEI and PGM. *See* Exhibit 5 - Order of Supreme Court of Turks & Caicos, dated April 9, 2009, ¶3. Further, PwC was the trustee for the JPLs. It is unclear whether all these conflicts of interest were ever disclosed and there implications scrutinized.

[7] The note transactions at issue in this case began in or about 1992 in Tokyo exclusively, when the PEI's Japan franchise operations was approached by Mr. Setogawa, chairman of Cresvale-Tokyo. Yakult, a Japanese company that had previously obtained a note from Credit Suisse, requested Cresvale-Tokyo to provide a similar type of note. Mr. Setogawa requested PEI to act as intermediary in issuing a similar note to Yakult. *See* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶s 13-15.

[8] See Exhibit 4 - Armstrong Nov. 2019 Declar. ¶16. One commentator has described it this way:

> The scheme worked something like this: Japanese Corporate 'Y' perhaps lost $100,000,000 speculating through a subsidiary, selling Nikkei Put Options or buying boatloads of overvalued shares after consulting with Madame Inoue's Buddhist toad. They were able to hide this for a while by playing "pass the parcel", perhaps between offshore subsidiaries with different year-ends. Thus their consolidated accounts still showed these losses as assets at their full value on their balance sheets. So, Armstrong/Cresvale proposed they swap $50,000,000 of new money for a "repair bond" with a maturity value equal to the full $150,000,000 ($100mm of losses + $50mm of new money) and then let [Armstrong] do his thing. If things went right, they would make their money back and everyone wins. If something goes wrong, well they can blame the investment losses on Armstrong, call it fraud, and take write-offs, without having to take responsibility in the first instance. (Note: this is sketch of the essence, not the actual details).
>
> ***
> And since we are writing it, we all now know that things didn't go according to planned. When the Armstrong fraud broke, many of the guilty Japanese Corporates had to come clean. Sort of. They said they were victims of fraud (and some truly were unsuspecting purchasers of Cresvale Bonds), but the "repair bond" concept and angle was often lost on most observers. **Yakult Honsha**

continue to speculate to recover those losses, Yakult instructed Cresvale-Tokyo to place a hedge of $50 million in the Nikkei index over other positions Yakult maintained at other Japanese brokerage firms. *See* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶ 17. At the time the SEC and CFTC commenced these proceedings in September 1999, Yakult still owed PEI that $50 million.  In or about April 2000, at a reverse proffer session with AUSA Richard Owens, attended by counsel for the SEC and CFTC, Armstrong informed AUSA Owens that Yakult owed PEI about $50 million for the hedge. But no one investigated or pressed that claim on behalf of PEI. *See* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶s 27-28. This $50 million is still due and owing to PEI, despite any so-called out-of-pocket losses on which Yakult bases its "stub claim" of $34 million. *See* Dkt #s 450 (exhibit 3) & 451.[9] Yakult had lost its money from Kumagai's speculative trading, for which he was charged with criminal conduct. *See* Exhibit 4 – Armstrong Nov. 2019 Declar. ¶s 16 & 26. It would be imminently improper and inequitable for the Receiver to distribute to Yakult proceeds derived from the sale of Armstrong's personal property, especially when Yakult had engaged in criminal conduct[10] and Yakult had earlier been denied distributions

---

**(TSE#2267) was said to have $1bn of losses**, as well as engineering firm Chudenko (#1941); specialty chemical maker Gun-Ei Co. (#4229), pharma co's. Kissei (#4547), and Towa Pharm (#4553), machine-tool giant Amada Corp (#6113), pneumatic specialist SMC (#6273), electronic parts mfgr Alps Electric (#6770), advertising agency Asatsu (#9747), office furniture maker Itoki Crebio (#7972) and more than 50 other firms were deemed to be "stung". **Yakult's losses were so big that they couldn't blame Armstrong,** but many other companies  did, and were "absolved" of culpability for their original sins.

<u>Cassandra Does Tokyo</u>  "The Enigma of Martin Armstrong" (August 21, 2006).

[9]  "The basis for Yakult's claim is specious. The actual facts are unknown to Armstrong, but Armstrong believes that Yakult managed to lose several hundreds of millions of dollars either trading in derivative contracts or buying millions of dollars worth of overvalued shares. Yakult needed to "bury" the losses, and may have done so by shifting the loses between and among various subsidiaries with different year-end reporting obligations. Unbeknownst to Armstrong, Yakult managed to have Armstrong's signature forged on a Princeton note out of the Tokyo office. Armstrong believes that the so-called loss that Yakult is claiming stems from a hedge Yakult asked Armstrong to put in place against a long position Yakult maintained at another financial institution. This loss was reported in the Wall Street Journal in 2000. Thus, the Receiver appears to have improvidently granted Yakult a "stub claim" (settling the specious $50 million dispute for $35 million), which, after payment of the $1.2 million under the 2008 plan [see Exhibit 3 to 2008 Final Plan of Distribution], has a remaining balance of $34 million. Armstrong objects to this "stub claim," because he was never a participant in any proceedings at which he was permitted to bring forward the real underlying facts and prove Yakult's fraudulent activity." Armstrong's  Objections to Closing Receivership, August 31, 2017, Dkt # 490, at 25-26, note 13. *See* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶s 13-27.

[10] Exhibit 4 - Armstrong  Nov. 2019 Declar. ¶s 18 & 26. Akira Setogawa (chairman of Cresvale Tokyo, who later forged Armstrong's signature to the Yakult note Armstrong refused to issue, *see* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶ 22), and Naoki Kumagai (a former official from Japan's Finance Ministry's tax agency and a senior executive at Yakult in charge of investing Yakult's surplus funds) were both charged by the Japanese authorities  not only for making or receiving improper payments (*e.g.,* Setogawa paid Kumagai more than $5 million to buy Cresvale's "rescue products" to cover up Kumagai's $1 billion losses from trading), but also for deceiving regulators with false financial statements. *Wall Street Journal*, "How U.S. Finance Guru's Venture in Japan Went Terribly Wrong," (August 9, 2000). *See* Exhibit 4 - Armstrong Nov. 2019 Declar. ¶ 16 & Exhibit A.

because of its criminal conduct.[11] At a minimum, that $50 million should have operated as a set off against the $34 million stub claim and wiped it out. If the Receiver decided not to pursue the $50 million to which PEI was entitled, the Receiver cannot now use Armstrong's personal proceeds to cover the settlement the Receiver negotiated with Yakult when the Receiver neglected to pursue its claims against Yakult. Any such distribution to Yakult would also be problematic since that money also could have been available to retain counsel of choice under *Luis*.

*Fifth,* the public interest will not be adversely affected, given the shortness of the stay. *See SEC v. Pignatiello*, *supra*, at 4. The public also is served far better when the Supreme Court answers important constitutional questions affecting the rights of Americans than when the government is permitted to rush pell-mell and roughshod over private rights. Obviously, the government would wish this case to be closed and quickly, so that its mistakes do not see the light of day. But that hardly serves the public interest.

### C.    Conclusion

The stay of this Court's September 5, 2019 Order is warranted until the United Sates Supreme Court decides on January 8, 2020 whether to grant Armstrong's petition for certiorari. Therefore, Armstrong should be permitted to file a formal motion requesting that stay.

Your Honor, thank you for your attention to this important matter.

Respectfully Submitted,

*/s/ TV Sjoblom*
Thomas V. Sjoblom (TS 2601)

---

[11] During the guilty plea hearing of Republic, AUSA Richard Owens emphasized that Yakult was not entitled to any restitution because it was a co-schemer in the fraudulent cover up:

> There is a third note holder who the government believes is not entitled to restitution for an entirely different reason.  That note holder is Yakult Honsha Limited, a Japanese beverage maker which had been indicted in Japan and is presently  standing trial for charges related to conduct arising out of the way that Yakult accounted for and reported these Princeton notes that it purchased.  In essence, what Yakult Honsha did was mislead its own regulators by using the Princeton Notes in a sort accounting fraud to hide other losses. Because Yakult was culpably involved in the scheme in that fashion, the government does not believe it's appropriate for this court's criminal powers to be brought to bear to obtain restitution for Yakult.

> Yakult has filed a civil lawsuit against Republic and others that is presently pending before Judge Owen and the government believes that Yakult's claims can be fairly and fully adjudicated in that setting and it would be inappropriate to use the criminal restitutions processes to obtain restitution for an entity that is in fact a co-schemer with the defendant.

*See* Armstrong's Objections to Closing of Receivership, August 31, 2017, Dkt #490, Exhibit  G, Transcript, at 13-14.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, November 26, 2019, I caused a true and correct copy of the foregoing Pre-Motion Letter to be electronically filed using the Court's Electronic Case Filing System, where it is available for viewing and downloading by all counsel of record.

<u>*/s/ TV Sjoblom*</u>

Thomas V. Sjoblom (TS 2601)
Americas Tower
1177 Avenue of the Americas
Suite 500
New York, NY  10036
(646) 452-7060
Counsel to Defendant Martin
Armstrong